Supreme Court of the State of New York
Appellate Division : Second Judicial Department

M56235
P/nl

EDWARD D. CARNI, J.

2007-05188

The People, etc., respondent,
v Gerald Garson, appellant.

DECISION & ORDER ON MOTION

(Ind. No. 5332/03)

Motion by the appellant pursuant to CPL 460.50 for a stay of execution of a judgment of the Supreme Court, Kings County, rendered June 5, 2007, and to release the appellant on his own recognizance, or in the alternative, to fix reasonable bail.

Upon the papers filed in support of the motion, the papers filed in opposition thereto, and upon hearing the attorneys for the respective parties, it is

ORDERED that the motion is denied; and it is further,

ORDERED that the temporary restraining order contained in the order to show cause dated June 5, 2007, is vacated and the defendant-appellant is directed to surrender himself to the Supreme Court, Kings County, so that execution of the judgment may commence or resume.

SUPREME COURT, STATE OF NEW YORK
APPELLATE DIVISION SECOND DEPT.
I, JAMES EDWARD PELZER, Clerk of the Appellate Division of the Supreme Court, Second Judicial Department, do hereby certify that I have compared this copy with the original filed in my office on 6/20/07 and that this copy is a correct transcription of said original.
IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of this Court on 6/20/07
James Edward Pelzer

EDWARD D. CARNI
Associate Justice

June 20, 2007

PEOPLE v GARSON, GERALD

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
--------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

                                      Kings County
                                        Indictment No.
       - against -                        5332/03

GERALD GARSON,
                                    ORDER TO
           Defendant                  SHOW CAUSE

                                      2007-5188
--------------------------------------------------------------X

Upon the annexed affirmation of Jeremy Gutman, Esq., dated June 5, 2007, and

the papers annexed thereto, let respondent, the People of the State of New York

(represented by the District Attorney, Kings County) show cause before this Court, at the

courthouse thereof, located at 45 Monroe Place, Brooklyn, New York, 11201, on the 5th *12th*

day of June, 2007, at 9:30 o'clock in the ~~afternoon~~ *fore* of that date or as soon thereafter as

counsel may be heard, why an order should not be made and entered, pursuant to CPL

§460.50, staying the execution of a judgment of conviction and sentence entered by the

Supreme Court of the State of New York, Kings County (Berry, J.), on June 5, 2007,

releasing the defendant on bail pending determination of his appeal, and granting such

other and further relief as the Court may deem just and proper.

      SUFFICIENT CAUSE THEREFOR APPEARING, it is

      ORDERED that, pending the hearing and determination of this motion, the

judgment of the Supreme Court of the State of New York, Kings County (Berry, J.),

entered on June 5, 2007, is stayed, and it is further,

*and bail previously posted under Indictment*
*No. 5332/03 is continued*

ORDERED that service of a copy of this order to show cause and the papers upon

which it was made upon Michael Vecchione, Esq., Joseph Alexis, Esq., Bryan Wallace,

Esq., or Seth Lieberman, Esq., of the Kings County District Attorney's Office, by

personal delivery pursuant to CPLR 2103(b)(1) on or before June 5, 2007, shall be

deemed sufficient service thereof.

Dated: Brooklyn, New York
        June 5, 2007

_____

Associate Justice
Appellate Division: 2nd Department
Hon. Edward A. Carni

SUPREME COURT, STATE OF NEW YORK
APPELLATE DIVISION SECOND DEPT
I, JAMES EDWARD PELZER, Clerk of the Appellate Division of the Supreme
Court. Second Judicial Department, do hereby certify that I have compared
this copy with the original filed in my office on   6/5/2007   and that
this copy is a correct transcription of said original.
    IN WITNESS WHEREOF I have hereunto set my hand and affixed
the seal of this Court on  6/5/2007

James Edward Pelzer

2

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-----------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

                                                   **Kings County**
                                                 **Indictment No.**
            - against -                       **5332/03**

**GERALD GARSON,**

                      **Defendant**                      **ORDER TO**
                                                    **SHOW CAUSE**

-----------------------------------------------------------------------X

Upon the annexed affirmation of Jeremy Gutman, Esq., dated June 5, 2007, and

the papers annexed thereto, let respondent, the People of the State of New York

(represented by the District Attorney, Kings County) show cause before this Court, at the

courthouse thereof, located at 45 Monroe Place, Brooklyn, New York, 11201, on the 5th

day of June, 2007, at ___ o'clock in the afternoon of that date or as soon thereafter as

counsel may be heard, why an order should not be made and entered, pursuant to CPL

§460.50, staying the execution of a judgment of conviction and sentence entered by the

Supreme Court of the State of New York, Kings County (Berry, J.), on June 5, 2007,

releasing the defendant on bail pending determination of his appeal, and granting such

other and further relief as the Court may deem just and proper.

**SUFFICIENT CAUSE THEREFOR APPEARING**, it is

**ORDERED** that, pending the hearing and determination of this motion, the

judgment of the Supreme Court of the State of New York, Kings County (Berry, J.),

entered on June 5, 2007, is stayed; and it is further,

**ORDERED** that service of a copy of this order to show cause and the papers upon which it was made upon Michael Vecchione, Esq., Joseph Alexis, Esq., Bryan Wallace, Esq., or Seth Lieberman, Esq., of the Kings County District Attorney's Office, by personal delivery pursuant to CPLR 2103(b)(1) on or before June 5, 2007, shall be deemed sufficient service thereof.

Dated: Brooklyn, New York
     June 5, 2007

_____
Associate Justice
Appellate Division: 2nd Department

2

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-----------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

                                                        Kings County
                                                         Indictment No.
         - against -                                5332/03

GERALD GARSON,                                 AFFIRMATION
                     Defendant

-----------------------------------------------------------------------X

        JEREMY GUTMAN, an attorney duly admitted to practice before the

Courts of the State of New York, affirms under the penalty of perjury that the following

statements are true:

        1.      Together with Michael S. Washor, Esq., I represent defendant-appellant

Gerald Garson in the present case, and I am familiar with the facts stated herein.

        2.      This affirmation is submitted in support of the application of appellant

Gerald Garson for an order, pursuant to CPL §460.50, staying the execution of a

judgment of the Supreme Court of the State of New York, Kings County (Berry, J.), and

releasing him on bail pending determination of his appeal. That judgment, entered on

June 5, 2007, convicted him, following a jury trial, of bribe receiving in the third degree

[Penal Law § 200.10](one count), a D felony, and receiving reward for official

misconduct in the second degree [Penal Law § 200.25](two counts), an E felony, and

sentenced him to a term of

3.      Notwithstanding widespread media coverage that has reported, erroneously, that the "bribe receiving" charge against Mr. Garson entailed receiving money in exchange for adjudicating cases before him in a particular manner, that charge was not based on any such allegation; rather it was based on the allegation that, in exchange for being taken out for meals and drinks by an attorney who appeared before him, and who had become a close friend, Mr. Garson had *ex parte* conversations with the attorney concerning pending cases, increased the number of cases in which he appointed the attorney to serve as a law guardian, and extended greater "courtesy" to that attorney than to others who appeared before him.  One count of receiving reward for official misconduct was based on the allegation that Mr. Garson received a box of cigars, supplied by the District Attorney's Office to the attorney – who had agreed to cooperate against Mr. Garson as part of a plea bargain that allowed him to escape prosecution for crimes he had committed with other individuals and to receive a recommendation of no jail time for the single misdemeanor to which he was required to plead guilty – as a thank-you for giving *ex parte* advice.  The other count of receiving reward for official misconduct was based on the allegation that Mr Garson accepted one thousand dollars in cash – also supplied to the cooperating witness by the District Attorney's Office – as compensation for referring two clients to the attorney four and five months earlier.

4.      There has been no prior application for the relief sought by the present motion.

2

5.     As shown below, the appeal in the present case will raise substantial issues that are likely to result in reversal of the judgment below. We will also show that Mr. Garson, a 74-year-old first offender who has extensive roots in the community and who requires complex diagnostic services and medical treatment for a plethora of severe illnesses and conditions, including cancer of the bladder, poses no risk whatsoever of flight.

### History and Nature of the Case

6.     Gerald Garson, who practiced law in New York City since his admission to the New York bar in 1961, was elected as a Justice of the Supreme Court, Kings County, in 1998, and was assigned to a matrimonial part. In December, 2002, he was certificated to continue serving on the bench past retirement age, but stopped serving following his arrest in the present case in March of 2003

7.     In October of 2002, a divorce litigant, Frieda Hanimov, informed the Kings County District Attorney that a Brooklyn electronics dealer, Nissim Elmann, had solicited money from her by claiming it would be used to influence the outcome of cases before Garson. Relying on that allegation, the District Attorney's Office enlisted Hanimov as an undercover operative and recorded conversations in which Elmann claimed to have a corrupt relationship with Garson. After Hanimov's payment of cash to Elmann, investigators observed Elmann delivering the money to Paul Siminovsky, a Brooklyn attorney who practiced in the matrimonial parts and had been co-chair of the Brooklyn

3

Bar Association Committee that reviewed the qualifications of applicants to the Second
Department's list of approved law guardians. The investigation revealed that Elmann
referred a number of clients to Siminovsky and that Siminovsky aided in Elmann's efforts
to obtain money from matrimonial litigants by claiming that it would be used to bribe
Garson.

8.    By the time the investigation commenced, Siminovsky and Garson, who
had known one another for several years, had become close friends and the two were
frequently seen dining together in restaurants near the courthouse that were frequented by
judges, lawyers, and litigants.

9.    In November, 2002, relying on evidence developed through its
investigation, the District Attorney submitted an application asserting that there was
probable cause to believe that further surveillance would uncover evidence that Garson
was receiving bribes to "fix" matrimonial cases and, based on that representation,
obtained judicial permission to install wiretaps on the telephones of Elmann and
Siminovsky. Even though the investigation, including the telephone eavesdropping,
failed to disclose any evidence that Garson was aware that Elmann was soliciting money
for the ostensible purpose of bribing him, that Garson ever received anything of value
from Elmann, or that he had any contact or relationship with Elmann whatsoever, the
District Attorney, on December 9, 2002, obtained court authorization to conduct
clandestine surveillance of Garson by means of a camera and microphone hidden in the

4

ceiling of his robing room. Based on approval of renewal applications, the video and audio surveillance of the robing room, as well as the telephone wiretaps, continued until March of 2003.

10.     As the prosecution acknowledged at Garson's trial, after an intensive, six-month-long investigation, it was ultimately determined that Elmann's claims that he was paying bribes to Garson were false. In fact, the trial jury was advised by the court (after recorded conversations between Elmann and Hanimov were received as "background" evidence over Garson's hearsay objection) of the People's acknowledgment that Elmann had no relationship of any kind – business, personal, or otherwise – with Garson.

11.     As of February 25, 2003, the District Attorney's investigation (as conceded by detective investigators who appeared as prosecution witnesses at trial) had failed to uncover any evidence that Garson had engaged in criminal conduct. Intercepted telephone calls and recorded conversations showed that Garson and Siminovsky had a close, personal relationship, and that, during Siminovsky's frequent visits to the robing room, Garson and Siminovsky (in violation of ethical and disciplinary rules applicable to judges and lawyers) had *ex parte* conversations about a pending case, *Levi v. Levi*, in which Siminovsky represented the husband, Avraham Levi. During the period in January and early February when a trial in that case was being conducted in Garson's part, Garson and Siminovsky had private discussions concerning such matters as the nature of Avraham Levi's testimony, the use of a subpoena to secure the attendance of a witness,

5

and the issues that should be addressed in Siminovsky's post-trial memorandum of law. No recorded conversation referred to money or anything of value that had been or was to be given to Garson, nor did any recorded conversation refer to any intention by Garson to adjudicate the *Levi* case – or any other case – other than on the merits.

12.    On February 25, 2003, Siminovsky was taken into custody by the District Attorney's detective investigators. Rather than formally arresting and charging him, the District Attorney's agents took him to the Fort Hamilton army base, where Assistant District Attorneys and detective investigators confronted him with evidence of numerous crimes he had committed with Elmann and with court personnel other than Garson. In exchange for a promise that would permit him to avoid prosecution for felonies that could result in an estimated sentence of from three to twenty years, and instead to plead guilty to a single misdemeanor as to which the prosecution would recommend that he receive no jail time, Siminovsky agreed to cooperate against Garson. That very day, Siminovsky was outfitted with a body wire and engaged in the first of a series of secretly-recorded conversations with Garson.

13.    Pursuant to his cooperation agreement, Siminovsky testified before the grand jury that, virtually every time he and Garson went out for lunch, dinner, or drinks, Siminovsky would pay the bill. Although he did not assert that there was any agreement or discussion with Garson concerning the purpose for his doing so, and no recorded conversation referred to any such agreement, Siminovsky claimed that he paid these

6

restaurant bills in the hope that he would receive a greater number of appointments to serve as a law guardian, *ex parte* advice, and greater courtesy when appearing before Garson.

14.    Siminovsky also claimed that Garson had referred four clients to him and that, within days of being retained, Siminovsky paid a referral fee to Garson by folding cash (or, on one occasion, a check) in his hand and delivering it to Garson by means of a handshake in Garson's robing room.

15.    In an effort to establish evidentiary support for Siminovsky's claims that Garson received benefits in exchange for official acts or misconduct, detective investigators from the District Attorney's Office supplied Siminovsky with a box of cigars (purchased for approximately $250 dollars) and $1000 in cash, and instructed him to deliver them to Garson in the robing room (where the acts would be recorded by the hidden video camera and microphone, as well as by a body wire worn by Siminovsky).

16.    After joining Garson and a number of other individuals for lunch on the afternoon of March 4, 2003, Siminovsky, following the instructions of the District Attorney's detective investigators, accompanied Garson to his robing room, handed Garson an individual cigar, and then, after showing Garson the box of cigars provided to him by the District Attorney's Office and saying they were given to him by a client, placed the box in a drawer of Garson's desk. Several minutes later, in the hallway outside the robing room (as recorded on Siminovsky's body wire), Siminovsky thanked Garson

7

for giving him "advice" and Garson responded: "What advice?" Approximately ten minutes later, back in the robing room, Siminovsky thanked Garson for "keeping my head together" and then made a reference to "pointers." Siminovsky then initiated a discussion with Garson concerning the subjects that should be addressed in his post-trial memorandum in the *Levi* case.

17.    On the afternoon of March 10, 2003, as shown on a secretly-recorded videotape, Siminovsky openly handed the cash provided to him by the District Attorney's office to Garson. Although the investigative plan was for Siminovsky to present the cash as a "referral fee" in connection with clients referred to him by Garson in November and December of the previous year, the video and audio tapes disclose no mention of the word "referral"; although Siminovsky's mention of the name of one of the clients is arguably discernable from close listening to the tape, the remainder of the sentence in which that name appears to be mentioned is largely unintelligible.

18.    Within a half hour of this meeting with Siminovsky, Garson called him and asked him to return to the robing room. Immediately upon Siminovsky's return, Garson says (according to the prosecution's own transcript of the recorded conversation) that the thousand dollars was a lot of money for the "election." Garson then hands the cash back to Garson and suggests that Siminovsky instead write a check to the campaign fund of his wife, Robin Garson, who had been elected as a Judge of the Civil Court of the City of New York the previous November, and whose campaign fund had not yet overcome a

8

shortfall. Siminovsky, however, told Garson that he would write such a check in addition to providing the cash, and he returned the envelope containing the cash to Garson, who then placed the envelope in his pocket. The ten 100-dollar bills, which had been photocopied by the District Attorney's office prior to their delivery, were still in Garson's wallet when he was arrested two days later.

19.    On May 21, 2003, Garson was charged in Kings County Indictment No. 3515/2003 with six counts of receiving reward for official misconduct in the second degree, one count of official misconduct and one count of receiving unlawful gratuities. On August 5, 2003, Garson was charged in Indictment No. 5332/2003 with bribe receiving in the third degree and three counts of official misconduct (one of which superseded the official misconduct count of the earlier indictment). Those indictments were subsequently consolidated under the latter indictment number.

20.    In pretrial motions, Garson sought dismissal of the indictment on the ground that the evidence presented to the grand jury was legally insufficient, and suppression of the evidence derived from the video and audio taping of his robing room on the ground that the applications for judicial approval of that surveillance did not satisfy statutory and constitutional standards. The trial court (Justice Steven W. Fisher) denied the motion to suppress, but granted the motion to dismiss the six counts charging receiving reward for official misconduct in the second degree and one of the counts charging official misconduct. *People v. Garson*, 4 Misc.3d 258 (Kings Co. 2004). The

9

People exercised their option to appeal to this Court, which unanimously affirmed that decision, *People v. Garson*, 17 A.D.3d 695 (2d Dept. 2005). The People were granted leave to appeal by a Judge of the Court of Appeals and, in an opinion issued on March 30, 2006, the Court of Appeals reinstated the six counts of receiving reward for official misconduct. *People v. Garson*, 6 N.Y.3d 604 (2006).

21.    Because Justice Fisher had been elevated to this Court, the *Garson* case was re-assigned to Hon. Jeffrey G. Berry. The trial could not proceed immediately after the Court of Appeals' decision, however, because, in January of 2006, Mr. Garson had been diagnosed with bladder cancer, which required that he undergo transuretrhral resection surgery and follow-up monitoring and treatment. An examination in August 2006 revealed that the cancer had recurred, requiring a second surgery, followed by an intensive course of chemotherapy, as well as treatment for a number of other medical conditions (which are discussed more fully in paragraphs ⟨58-65⟩, *infra*.). After the conclusion of Mr. Garson's chemotherapy, the case preceded to trial on March 13, 2007.

22.    Before the case was submitted to the jury, two misdemeanor counts were dismissed. On April 19, 2007, the jury returned a verdict of guilty as to the three counts described above, and not guilty on the remaining four counts.

23.    Sentence was imposed on June 5, 2007, and the defense served and filed a notice of appeal (a copy of which is attached to this affirmation as Exhibit 1).

10

### Garson's Appeal Will Raise Meritorious Issues that are Likely to Result in Reversal of the Judgment Below

24.    Although we expect additional issues to be identified after a full review of the transcripts and other papers concerning pretrial and trial proceedings, and further research, we anticipate that the following grounds for reversal will be among those presented to this Court:

*a.    The Verdict Is Against the Weight of the Evidence*

25.    We will urge this Court to exercise its authority, under CPL § 470.15(5), to determine whether the "verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." As the Court of Appeals has explained:

> If based on all the credible evidence a different finding would not have been unreasonable, then the appellate court *must*, like the trier of fact below,"weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony."

*People v. Bleakley*, 69 N.Y.2d 490, 494 (1987)(emphasis added), quoting *People ex rel. MacCracken v. Miller*, 291 N.Y. 55, 62 (1943). The required review goes beyond simply determining whether the evidence meets the test of "legal sufficiency" under which a verdict must be upheld if there is "any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial." *Bleakley*, 69 N.Y.2d at 495. Rather, the appellate court "must engage in its own de novo review of the evidence, sitting as a 'thirteenth juror.'" *People v. Rayam*, 39 N.Y.2d 557, 560(2000), quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982).

11

We will urge the Court to conclude, pursuant to such a review, that each of the counts of conviction should be reversed.

### Bribe Receiving (Count One)

26.     The theory of the prosecution, as specified in the indictment and bill of particulars, was that Siminovsky bribed Garson by paying restaurant bills pursuant to an "agreement or understanding" that, in exchange, Garson, in his capacity as a public servant, would give Siminovsky law guardianship appointments, *ex parte* advice, and greater "courtesy" than other attorneys. In his trial testimony, however, Siminovsky acknowledged that there was no agreement – or even a discussion – between himself and Garson concerning any action that Garson would take in exchange for being treated to meals and drinks; rather, he testified that he picked up restaurant bills based on nothing more than his "hope" that he would receive law guardianship appointments. (T. 2382-83). As the Court of Appeals has explained, the essence of the crime of bribe receiving is not the public official's receipt of a benefit or his performing of an official act, but "the doing of one in exchange for the other." *People v. Alvino*, 71 N.Y.2d 233, 244 (1987). Lacking direct evidence of an "agreement or understanding" regarding such a *quid pro quo*, the prosecution relied entirely on circumstantial evidence, arguing that the jury could infer an "understanding" that the law guardianship appointments were given in exchange for meals and drinks because, as the number of lunches and dinners increased, the number of law guardianship appointments increased. The prosecution relied on similar

12

circumstantial evidence to support the inference that *ex parte* discussions and "courtesy"
were a *quid pro quo* for payment of restaurant checks.

27.    The evidence, however, made clear that Siminovsky, who had co-chaired
the law guardian screening committee for the Second Department and by all accounts
(including his own) was an excellent law guardian, was eminently qualified for such
appointments. He had begun receiving such appointments from Garson before the
alleged bribery commenced, and over the course of the three-year period charged in the
indictment, he received only slightly more appointments than three other attorneys whom
Garson regularly relied on to serve as law guardians.[1]  According to Garson's former law
secretary, who testified for the prosecution, Garson would appoint law guardians whom
he could trust to effectively advocate on behalf of children.  We would urge this Court to
conclude from all of this evidence that the most reasonable inference was that Siminovsky
was appointed to serve as a law guardian because his experience and expertise made him
one of the better choices for such appointments. Rather than reflecting an unspoken *quid
pro quo* for meals and drinks, the marginal increase in the number of appointments to
Siminovsky can most reasonably be viewed as a reflection of Garson's increased
recognition, given the opportunity for more and more observation of Siminovsky's

_____

[1]A court employee's review of court records, the completeness and accuracy of which
could not be assured, indicated that Siminovsky received 24 such appointment during the period
in question, while another attorney, Ellen Ferber, had received 16. Ferber's own grand jury
testimony, which was received at trial pursuant to stipulation, was that, during roughly the same
period, she had received 18 law guardianship appointments from Garson.

13

performance in the cases before him, of Siminovsky's ability to serve as an effective law guardian. It would also be reasonable to infer that the increase in appointments reflected the deepening of the personal relationship between Garson and Siminovsky. That same factor also provides an alternative, reasonable explanation for Garson's *ex parte* discussions with Siminovsky and his "courtesy" toward him.

28.   Moreover, even assuming that Siminovsky's largely uncorroborated testimony about the number of times he paid restaurant bills were deemed credible, the evidence made clear that regularly joining Garson for meals at public restaurants near the courthouse provided substantial benefits for Siminovsky that were unrelated to any actions Garson took in his official capacity. Being with Garson enabled Siminovsky to make the acquaintance of numerous judges and lawyers, who either joined them for meals or stopped by their table, and the exposure gained by being introduced to these people by Garson helped Siminovsky expand his practice. Because taking Garson out inured to Siminovsky's benefit in a manner unrelated to any actions taken by Garson in his official capacity, the evidence fell far short of pointing to an "understanding" regarding the exercise of Garson's official duties as the most likely – much less the only – reasonable hypothesis about why Siminovsky would find it worthwhile to pay restaurant bills.

29.   Thus, on a *de novo* review of the evidence, this Court should conclude that it fell far short of supporting, beyond a reasonable doubt, the inference that there was an "understanding" between Siminovsky and Garson that payment of restaurant checks

14

would be rewarded with increased law guardianship appointments, or any other official act by Garson. As this Court has recognized, the standard at trial for a finding of guilt based exclusively on circumstantial evidence "is that ' the ... facts from which [the] inference of [the] defendant's guilt is drawn must be established with certainty, must be inconsistent with his innocence, and must exclude to a moral certainty every other reasonable hypothesis.'" *People v. Hepp*, 2007 N.Y. Slip Op. 04317, available at 2007 WL 1440989 (2d Dept. May 15, 2007), quoting *People v. Williams*, 35 N.Y.2d 783 1974).[2] In its role as the "thirteenth juror" [*Rayam*, 39 N.Y.2d at 560] in the context of an "against the weight of the evidence" challenge, this Court should readily conclude that the evidence, even if fully credited, clearly failed to exclude several reasonable hypotheses consistent with innocence.

30.    Moreover, Siminovsky's claim about the number of times he paid for Garson's meals was highly dubious. Siminovsky's general credibility as a witness was strongly impeached by a showing that he had committed numerous felonies (with individuals other than Garson), that he repeatedly perjured himself by giving trial testimony that contradicted the sworn testimony he had given before the grand jury and at a previous trial of other defendants, as well as testimony given during this very trial.

---

[2] As the *Hepp* Court noted, an appellate challenge to the legal sufficiency of the evidence is not reviewed pursuant to that standard, but would require a determination that, viewed most favorably to the People, the evidence was insufficient to permit a jury to conclude that the elements of the offense had been proven beyond a reasonable doubt. It is likely that, in addition to arguing that the bribe receiving conviction was against the weight of the evidence, our appeal will also challenge this conviction pursuant to that higher standard.

15

Further doubt was cast on the reliability of Siminovsky's testimony because his hope of

receiving a promised recommendation that he serve no jail time depended on the

prosecutor's determination that he had fulfilled the obligations of his cooperation

agreement.[3]  With regard to his specific testimony concerning the number of times that he

paid the entirety of restaurant bills, Siminovsky did not have any actual recollection of the

circumstances of each of his meals with Garson, but claimed, implausibly, that virtually

*every* time he ate at certain restaurants – even though they were in close proximity to the

Brooklyn courthouses and to his office at Pearl and Fulton Streets – he was dining with

Garson.  Based on that preposterous claim – uncorroborated by any receipts, tax records,

or any other documentation – he testified that every entry on his American Express card

statements for those particular restaurants reflected an occasion when, without receiving

any payment in return, he picked up the check for Garson.  We will also urge the Court to

conclude that this testimony was too unreliable to support a determination of guilty

beyond a reasonable doubt.

### Receiving Reward for Official Misconduct (Count Three)

31.    Count Three was based on the allegation that, on March 4, 2003, Garson

accepted a box of cigars as a reward for engaging in *ex parte* communications with

Siminovsky concerning the *Levi* case.  While there was evidence, in the form of video and

---

[3]Notably, the jury found Garson not guilty of four counts concerning alleged "referral
fees" that depended largely on Siminovsky's testimony, and as to which the People introduced no
videotaped surveillance evidence.

audio tapes, that such communications had occurred prior to March 4th, and the March 4th videotape shows Siminovsky placing a box of cigars in Garson's desk drawer[4], we will argue that the conclusion that Garson understood the cigars to be a "reward" for violating the Rules of Judicial Conduct by engaging in *ex parte* communications is against the weight of the evidence.

32.    There was no evidence that Garson had ever requested or suggested that Siminovsky compensate him in any way for *ex parte* communications or that Siminovsky had previously given Garson cigars or any other gift as a reward for engaging in such communications. Notwithstanding that the delivery of the package of cigars was staged by the District Attorney's office for the express purpose of creating evidence of Garson accepting a reward for engaging in *ex parte* communications in violation of his official duty, the prosecution's agent, Siminovsky, never declared that the cigars were intended to be a reward for that conduct. Instead, as shown on the videotape, upon displaying the box and placing it in the desk drawer, Siminovsky said only that they were given to him by a client. A few moments later, in the hallway outside the robing room, a body wire captured Garson responding to Siminovsky's reference to "advice" by asking "What advice?"

---

[4]There was, however, no evidence that Garson himself did anything at all with the box of cigars; when the robing room was searched long after March 4, 2003, the box was still in the desk drawer and the plastic wrapping around the box was unbroken.

17

33.    Approximately ten minutes after the cigars were placed in the drawer,
Siminovsky (back in the robing room) thanked Garson for "keeping my head together."
He said nothing to make clear what that remark related to, or to connect it to the cigars.
A few minutes later, as Garson glanced at the cigars in the drawer, Siminovsky referred to
"pointers" received from Garson, but made no reference to the *Levi* case or otherwise
specified what "pointers" he was referring to. Given that Garson, whom Siminovsky
acknowledged viewing as a "mentor," had innumerable conversations with Siminovsky
during the weeks and months preceding March 4th, there is no basis for assuming that
Garson would understand the mention of "pointers" as a reference to *ex parte* advice
about the *Levi* case – much less for finding that such an understanding had been proven
beyond a reasonable doubt.[5]

34.    Thus, viewing the entirety of the evidence fairly and impartially, this Court
should conclude that the evidence about the circumstances surrounding the staged
delivery of the box of cigars was far too vague and equivocal to support a finding, beyond
a reasonable doubt, that Garson understood that the cigars were a "reward" for violating
his official duty by engaging in *ex parte* discussions about the *Levi* case. Because, as the

---

[5]Subsequent to thanking Garson for giving him "pointers," Siminovsky asked Garson to
tell him what he should address in the post-trial memorandum in the *Levi* case. Because
"receiving a reward for official misconduct," by definition, applies only to rewards for "*past*
official misconduct," *People v. Alvino*, 71 N.Y.2d 233, 244 (1987)(emphasis added), however, a
conviction for this offense could not in any event be based on *ex parte* advice given after
receiving the alleged "reward."

18

jury was instructed, such a *mens rea* was essential to a determination of guilt, the verdict on this count was against the weight of the evidence, and should not stand.

### Receiving Reward for Official Misconduct (Count Eight)

35.      Count Eight, also charging Receiving Reward for Official Misconduct, was based on the theory that, on March 10, 2003, Garson received $1000 in cash as a reward for violating the Code of Judicial Conduct by "lending the prestige of his office" in referring clients to Siminovsky. While there is a videotape showing Siminovsky handing money supplied to him by the District Attorney's Office to Garson on that date, a review of the evidence will show this Court that the videotape – on which there is no mention of a "referral" – fails to establish, beyond a reasonable doubt, that Garson understood the money given to him by Siminovsky to be a "referral fee." Although this staged event was meant to corroborate Siminovsky's claims that he had paid referral fees to Garson on four previous occasions, the circumstances of this payment in fact were *inconsistent* with the manner in which Siminovsky claimed to have given Garson such payments in the past.[6]

36.      According to his testimony, Siminovsky had previously given "referral fees" within a few days of being retained by clients recommended to him by Garson. He also claimed that, on each of those occasions, he had folded cash (or, in one case, a check) in his palm, and clandestinely passed it to Garson in a handshake. By contrast, the clients Garson was purportedly being rewarded for referring on March 10, 2003 –

_____

[6]As previously noted, the jury found Garson not guilty of the four counts of receiving reward for official misconduct based on those claims.

Dominick Aiello and Salvatore Caputo -- had retained Siminovsky in November and

December, respectively, of 2002. Despite the extensive monitoring of thousands of hours

of telephone calls, robing room conversations, and conversations during which

Siminovsky was wearing a body wire, there is no evidence that Garson ever asked

Siminovsky why he had not received a fee in connection with those referrals during the

four- and five-month interval between the dates on which Siminovsky was retained and

the date the alleged "referral fee" was paid; indeed, there is no recorded conversation in

which the subject of "referral fees" is mentioned at all. Moreover, on March 10, 2003,

rather than folding the money in his hand and delivering it in a handshake, as he claimed

was his custom, Siminovsky (who claimed not to know that the robing room was being

videotaped) handed an envelope containing the thousand dollars to Garson openly,

making it clearly visible on the video.

37.    According to Siminovsky's testimony, Garson had accepted each of the

earlier referral fees without hesitation. On March 10, 2003, however, Garson called

Siminovsky shortly after being handed the money and, upon Siminovsky's return, handed

the cash back to him. If, as Siminovsky claimed, he had a two-year history of making

cash referral payments to Garson, in amounts greater than one thousand dollars, it would

make no sense for Garson suddenly to be disturbed by being given a thousand dollars in

cash in March of 2003.

20

38.    Since Siminovsky knew that the March 10, 2003, event was being
orchestrated in an effort to corroborate that he had paid Garson "referral fees" in the past,
it would be reasonable to expect that he would attempt to establish unequivocally that the
payment was being given to Garson for that purpose. Certainly, nothing prevented
Siminovsky from saying loudly and clearly words to the effect of "Here's the fee for
referring Aiello and Caputo to me; sorry it took so long." On the video and audio tapes
introduced into evidence, however, Siminovsky is not heard saying anything about a
referral or a referral fee.[7]  On close listening, one can arguably discern him referring to
"Caputo" but the surrounding words are too inaudible to make the context of that mention
comprehensible, and certainly fail to establish that he was identifying the payment as a
"referral fee." In view of all of the circumstances discussed above, the possible mention
of a client's name in an unclear context is surely too thin a reed upon which to support a
finding, beyond a reasonable doubt, that Garson understood the money to be a "referral
fee."

39.    That is particularly true because the videotape demonstrates that Garson in
fact understood the payment to have a different purpose altogether. Upon Siminovsky's
return to the robing room in response to Garson's phone call, Garson can be heard saying,
while returning the money to Siminovsky, that it was a lot of money "for the election."

---

[7] The most plausible explanation for his failure to do so is that he knew his claims about a history of making referral payments to be false, and was crafty enough to avoid making a statement that would prompt Garson to make that clear by asking him what he was talking about.

21

(Indeed, the prosecution's own transcript recognized that that is what Garson said.) Immediately after saying that, Garson suggested that, instead of cash, Siminovsky should write a check to the campaign fund of Robin Garson. The fact that they were discussing Robin Garson's campaign fund, which Garson indicated on the videotape was experiencing a shortfall, is consistent with other evidence establishing that Garson had previously asked Siminovsky to assist in efforts to raise funds for Robin Garson's campaign to be elected as a Civil Court judge in November 2002. Thus, the evidence not only fails to prove beyond a reasonable doubt that Garson understood the money given to him to be a "referral fee" – a finding that was essential to a determination that he was guilty of the charged offense -- but instead reveals (in the one portion of the tape that reflects his understanding of the purpose for the money) that he understood it to be a contribution to his wife's campaign fund.[8]

40.    Notably, rather than addressing these facts on summation, the prosecutor simply ignored them and implied to the jury that it was a given that the payment seen on the videotape was a referral fee and that the only issue before them was whether or not Garson intended to keep the money. It is at least somewhat understandable that the jurors, in the face of the unquestionably disturbing sight of a judge accepting a payment of cash from an attorney, were swayed by the prosecutor's summation to overlook the

---

[8]A further flaw in the proof is that the People, by failing to present any evidence from the clients in question or anyone who observed the referrals being made, failed to provide any basis upon which the jurors could conclude that Mr. Garson "lent the prestige of his office" to the making of these referrals.

flaws in the People's proof and return a verdict of guilty that was not supported by the

evidence. It is precisely because of the danger that a jury may lose sight of the critical

issues in a case such as the present one that the right to appellate review of the weight of

the evidence provides such a vital safeguard. For the reasons discussed above, we submit

that, upon such a review, this Court will conclude that the verdict in the present case

should be reversed.

      *b.*      *Because the Prosecution Relied Solely on Circumstantial*
               *Evidence to Establish the Crime of Bribe Receiving, the Court*
               *Below Erred by Refusing a Request to Instruct the Jury on the*
               *Applicable Standard*

41.    As discussed above, in order to establish the essence of the crime of bribe

receiving – an agreement or understanding that the official action of a public servant

would be performed in exchange for a benefit provided to him – the People depended

exclusively on circumstantial evidence. They argued that a *quid pro quo* could be

inferred from the pattern of payments for meals and drinks, on the one hand, and law

guardianship appointments and other alleged benefits on the other. Because the very

existence of the charged crime depended on drawing an inference from circumstantial

evidence, Garson was entitled to an instruction concerning the unique standard that

applies when proof of an offense depends entirely on circumstantial evidence. *See People*

*v. Sanchez,* 61 N.Y.2d 1022, 1024 (1984)("when the evidence is circumstantial the jury

should be instructed in substance that it must appear that the inference of guilt is the only

one that can fairly and reasonably be drawn from the facts, and that the evidence excludes

23

beyond a reasonable doubt every reasonable hypothesis of innocence"). Accordingly, we will demonstrate on appeal that the trial court committed reversible error by declining Garson's request for such a charge as to Count One.

       *c.*     *The Trial Court Erroneously Permitted the Prosecution to*
             *Insinuate that Garson Based Legal Determinations on*
             *"Bribes" Even though No Such Misconduct Was Alleged in*
             *the Indictment or Bill of Particulars*

42.    Notwithstanding that Garson was not placed on notice, in either the indictment or the bill of particulars, of any allegation that he decided the outcome of any case or any legal ruling in exchange for a bribe, the prosecution was permitted to make statements to the jury and present evidence insinuating that this was the case. That effort began during the People's opening statement, when the prosecutor commented that, because of the relationship between Garson and Siminovsky, the wife in the *Levi* case "never had a shot." The trial court declined to grant a mistrial motion based on the prejudicial impact of that comment, nor did it take any action to offset the ensuing prejudice. Later in the trial, the People were permitted to introduce testimony by Siminovsky suggesting that Garson acceded to his request to limit the length of Avraham Levi's testimony and a tape recording of an out-of-court conference in which an attorney relayed Sigal Levi's complaint about the perceived unfairness of rulings that resulted in her husband testifying for a shorter period of time than she had.[9]  Overruling Garson's

_____

    [9]No evidence was presented concerning the factual or legal context of any such rulings, so there was no way for the jury to assess whether or not they in fact related to the nature of the issues addressed in the respective testimony of the two witnesses.

24

objection that this evidence was beyond the scope of the indictment and the bill of particulars, the court ruled that it was covered by the allegation in the bill of particulars that one of the benefits received by Siminovsky in return for his alleged bribes was greater "courtesy" in Garson's courtroom.

43. On appeal, we will show that the bill of particulars' reference to extending "courtesy" to an attorney did not put Garson on notice that he would have to defend against an allegation that he made a legal ruling in that attorney's favor because of a bribe, rather than on the merits underlying the ruling. Although the People did not assume any burden of proof with regard to that allegation, permitting them to introduce evidence and make insinuations suggesting that the outcome of cases or legal determinations were based on bribes undoubtedly tainted Garson in the eyes of the jury. Our appeal will demonstrate that, in permitting the People to inject these uncharged insinuations into the trial, the court caused substantial prejudice to the defense and deprived Garson of his right to a fair trial.

*d. The Trial Court Erroneously Refused to Permit the Defense to Offer Evidence That Siminovsky Was Unwilling to Ask Garson to Steer a Case to his Part Because He Knew That Garson Would Be Outraged by Such a Request.*

44. Seeking to counter the prejudice discussed in the preceding paragraphs, Garson sought to introduce evidence regarding Siminovsky's unwillingness to ask Garson to assist him in efforts to bypass the Supreme Court's random case assignment process in order to have a matter assigned to Garson. Pursuant to instructions by the District

Attorney's Office, Siminovsky had purchased an index number for a fictitious case entitled *Monroe v. Monroe* and was told to make efforts to determine whether certain court employees would agree to have the case assigned to Garson in exchange for a bribe. Through materials received in discovery, Garson's attorneys had learned that, in response to the suggestion that he approach Garson with such a request, Siminovsky had refused, stating words to the effect that Garson would "kill" him if he proposed such an impropriety.

45.    When the defense sought to elicit testimony concerning this issue, the prosecution's objection was sustained. We will argue on appeal that, particularly in light of the prejudicial rulings referred to above, Garson should have been permitted to present evidence that would serve to counter the suggestion that he was willing to take action that would substantively affect the administration of justice at Siminovsky's behest. Because the trial court's rulings resulted in an unbalanced suggestion about Garson's willingness to subvert justice, they were highly prejudicial and deprived Garson of a fair trial.

   e.    *The Court Erroneously Admitted Extensive Hearsay Evidence Concerning Nissim Elmann's Acceptance of Payments for the Purported Purpose of Bribing Garson*

46.    In response to a defense objection to evidence concerning hearsay evidence involving divorce litigant Frieda Hanimov's allegations that a Brooklyn electronics dealer, Nissim Elmann, had solicited bribes from her by claiming that they would be used to bribe Garson, the trial court ruled that the evidence would be received, not for its truth,

26

but solely as evidence of the "background" of the investigation. This "background" evidence, however, was received not only in the form of testimony by detective investigators employed by the District Attorney's office, but through recordings of conversations between Hanimov and Elmann, and evidence of surveillance involving Hanimov, Elmann, and Siminovsky. Notwithstanding its designation as mere "background" to the present case, this evidence occupied the first several days of trial.

47.    On appeal, we will show that the extensive amount of evidence received with regard to this matter inevitably suggested to the jury, notwithstanding limiting instructions by the court, that this evidence bore a greater significance to the present charges than merely serving as "background." Presentation of such extensive evidence regarding Elmann's claim to be able to "fix" cases before Garson played such a prominent role at the outset of the trial that, notwithstanding the acknowledgment that his claims were false, it is likely to have prompted the jury to speculate about the possibility that the claims had some element of truth. While case law contemplates receipt of limited hearsay testimony in order to establish the background of an investigation, we will argue on appeal that the extraordinary amount of "background" evidence received in this case, and presented through multiple forms of media and the testimony of several witnesses, went far beyond what was necessary and engendered unfair prejudice to the defendant.

27

f.    *The Videotapes of Garson's Robing Room Should Have Been*
      *Suppressed Because the Warrants Pursuant to Which Those*
      *Videotapes Were Obtained Did Not Satisfy the Statutory and*
      *Constitutional Standards for Authorization of Video and*
      *Audio Surveillance.*

48.    In lengthy and substantial pretrial motions, Garson sought suppression of

the evidence derived from electronic surveillance of his robing room. On appeal, we will

demonstrate that the initial warrant, as well as the two subsequent renewal warrants,

authorizing both video and audio surveillance of his robing room should have been

invalidated because the People failed to make a sufficient showing, as required by Article

700 of the Criminal Procedure Law and the constitutional rights that article was designed

to safeguard, that there was probable cause to believe a designated offense would occur

and that normal investigative procedures would not suffice. We will show, additionally,

that the surveillance was permitted to continue longer than necessary to fulfill its

investigative objectives.

49.    We expect to demonstrate that, although the warrant applications asserted

that there was probable cause to believe that the requested surveillance would disclose

evidence of Garson receiving bribes, at the time those applications were made

investigators had already obtained information showing that Eimann's claim that he had a

corrupt relationship with Garson was false, and that he was exploiting that false

suggestion to perpetrate a fraud on the divorce litigants from whom he solicited money.

Accordingly, the totality of the evidence did not support a finding of probable cause to

believe that Garson was in fact receiving bribes or that evidence of such conduct would be obtained by means of the videotaping of Garson's robing room.

50.    Additionally, we will show that the court-authorized surveillance continued beyond the point at which the declared objectives of the investigation had been achieved.

51.    Based on the issues discussed above, we submit that the present appeal will raise meritorious issues giving rise to a substantial likelihood of reversal on appeal.

**In View of, His Deep Roots in the Community, His Extensive Medical Problems, and His Consistent History of Attending Court Proceedings Over a Four-Year Period, Mr. Garson Does Not Pose Any Risk of Flight and Will Unquestionably Remain Amenable to Any Order of this Court.**

52.    Mr. Garson is a United States citizen who was born in Brooklyn in 1932. Apart from his attendance at the Peekskill Military Academy and the University of Pennsylvania (both as an undergraduate and as a law student), and his military service in the United States Air Force, he has continuously and exclusively resided in New York City. Since 1986, he has been married to Robin Garson, a Judge of the Civil Court of the City of New York, with whom he resides. He has four grown children from an earlier marriage, and numerous grandchildren, all of whom live in or near New York City.

53.    Mr. Garson's youngest son, Robert ("Bobby"), who is 38 years old, has Down Syndrome, and, after being raised and cared for in Mr. Garson's home, currently resides in a supportive living residence in Brooklyn. Bobby, whose mental development

29

is that of a nine-year-old, is extremely close to his father, whose regular visits are a central part of the lives of both father and son.

54.    In January of this year, Mr. Garson's granddaughter, Stella, died after a two-year battle with leukemia, three months short of her seventh birthday. In her continuing state of bereavement, Stella's mother -- Mr. Garson's 42-year-old daughter Mary -- is also extremely dependent on her father for moral and emotional support.

55.    Two years after being admitted to the bar of the State of New York in 1960, Mr. Garson and a partner formed a law firm, which remains in existence, and at which Mr. Garson practiced until his election as a Justice of the Supreme Court in 1998. In December of 2002, Mr. Garson was certificated to continue serving as a judge past retirement age; he resigned from the judiciary, however, following the initiation of the present case.

56.    Upon his arraignment on the present charges, Mr. Garson surrendered his passport and was released on a $15,000 bond. Throughout the proceedings related to the present indictment – which occurred over an unusually protracted period, and included a five-week trial – Mr. Garson has faithfully appeared at all proceedings at which his attendance has been required.

57.    In addition to all of the factors discussed above, flight is unthinkable in view of Mr. Garson's age and medical condition and the extensive regimen of medical intervention that is necessary to monitor and maintain his fragile health.

30

58.    Mr. Garson is currently under the care of four physicians and is taking eleven prescribed medications daily. His current diagnoses are: Atrial Fibulation; Recurring Urolthelian Cancer; Hypertension; Aortic Valve Disease; Bullous Pemphigoid (an auto-immune disease); Cataracts with progressive loss of vision; Glaucoma; Prostatism (enlarged prostate); Gastroesophageal Reflux Disease; Osteoarthritis; and, Alcoholic Dependent Syndrome.

59.    His scheduled requirements include weekly blood testing to monitor his anti-coagulant levels; CBC to monitor other blood chemistries; urinalysis; and cystescopes of the bladder every 12 weeks. The full regimen of diagnostic and medical procedures administered to Mr. Garson is so complex that, rather than recite it here, we respectfully refer the Court to the letter of Dr. Philip Weintraub, and the annexed list of medical requirements, which is attached as Exhibit 2.

60.    Mr. Garson was first diagnosed with bladder cancer in January 2006, after which he underwent a transurethral resection surgery. His second three-month follow up examination, in August 2006, revealed that the cancer had recurred. Following a second surgery for the removal of cancerous tumors, Mr. Garson was treated with BCG, an attenuated tuberculosis bacillus used to augment the bladder's immune system. Unfortunately, during the later course of treatment with BCG, Mr. Garson developed high fever and chills. Consequently, upon a recurrence, his cancer cannot be treated with BCG again.

31

61.    Mr. Garson was also treated for nine years with Imuran, an immuno-suppressant, for his autoimmune disease. That treatment had to be discontinued, however, because it decreased the efficacy of his cancer treatment;  nonetheless, Imuran will continue to suppress his immune system for quite some time after discontinuance. As a result, Mr. Garson is now particularly susceptible to another recurrence of the cancer. *See* Letter of Robert W. Dillon, M.D, Mr. Garson's urologist, attached as Exhibit 3.

62.    Mr. Garson's bullous perphigoid, a potentially fatal autoimmune disease that can manifest itself in painful internal and skin lesions, was diagnosed in 1996 by oncologist Lynn H. Ratner, M.D., and is being treated by Dr. Albert Lefkowitz, a specialist in the disease. *See* letter of Dr. Ratner, attached as Exhibit 4.

63.    Further exacerbating the fragile status of Mr. Garson's health, and complicating his treatment for the conditions discussed above, he is under cardiac treatment for atrial fibrillation, which is managed with Coumadin, an anticoagulant drug used to prevent embolic strokes. Coumadin levels must be monitored weekly so that adjustments can be made to keep the drug at a safe level in the blood. Dr. Weintraub, Mr. Garson's cardiologist, also advises that Mr. Garson is under treatment for aortic valve disease and hypertension, which require medication and frequent monitoring.

64.    In his physical examination of Mr. Garson on May 8, 2007, Dr. Nicholas A. Pace, who specializes in addiction medicine and is an associate professor at NYU

32

Medical Center, noted the following apparent signs of Mr. Garson's failing health:

> Pulse: 100 irregular, Skin: erythematous with poor turgor.
> Positive tongue tremor and hand tremor. Atrial fibrillation,
> Enlarged liver, (3 finger breaths enlargement right upper
> quadrant) Neurological examination: increased Deep Tendon
> Reflexes and severely impaired balance (Positive Skater
> Test).

65.     Dr. Pace explains that Mr. Garson has a severe alcohol problem, making it

essential that Mr. Garson undergo a monitored alcohol detoxification prior to any period

of incarceration. As Dr. Pace explains, Mr. Garson's detoxification is "especially

complicated because of his heart disease, anti-coagulation therapy, gastrointestinal

complications, neurological symptoms, and recurrent bladder cancer." Consequently, if

Mr. Garson is incarcerated before he is medically detoxified in a hospital, "he probably

won't survive." *See* Letter of Nicholas Pace, M.D., attached as Exhibit 5.

66.     The complexity of Mr. Garson's medical treatment and almost continuous

monitoring requires precise planning, conferencing between treating physicians and

sophisticated technology. In view of these extraordinary medical needs, it would be

virtually suicidal for Mr. Garson to flee the jurisdiction in which his treating physicians

and their hospitals are located, and there is virtually no location in the world in which he

could maintain anonymity.

67.     The fact that Mr. Garson poses no risk of flight is confirmed by Justice

Berry's determination, immediately following the jury verdict finding him guilty of a D

felony and two E felonies, to reject the prosecutor's application for a remand and to

33

permit him to remain at liberty pending sentencing without raising his bail. As Justice

Berry observed:

> . . . but for the times he may have been ill in the hospital [Mr.
> Garson] has been in court every day, and your request for a
> remand – if this had been some other type of cases, sometimes
> it would have to be granted, i.e., a B felony and items of that
> nature, and A felonies.
>
> In this case, because of the illness, because of the fact
> that he has been in court each and every date and never not
> been here, and also because of the fact that throughout the
> course of this trial he has shown up every single day, I don't
> see the necessity to remand him. (T. 3644).

## Conclusion

68.    For all of the foregoing reasons, the criteria for granting a stay and

permitting release on appeal are more than amply satisfied in the present case. As a

Justice of this Court recognized in *People v. Kern*, 137 A.D.2d 862, 862-63 (2d Dept.

1988), on an application pursuant to CPL § 460.50, the court should apply the criteria set

34

forth in CPL § 510.30(a) and (b)[10], and the court's essential concern is to ensure that the defendant will remain amenable to the order of the court determining the appeal.

69.    A defendant is not required to show a likelihood that he will succeed on appeal. Rather, the Criminal Procedure Law itself provides that, while "a determination that an appeal is palpably without merit" may "justify" a denial of an application for bail, even such a determination "does not *require*" that the application be denied. CPL § 510.30(2)(b)(emphasis added). As Justice Brown of this Court observed in *Kern*:

> Even though the statute recognizes that a convicted defendant
> is in a different position than one awaiting trial, the issue --
> regardless of whether recognizance or bail is sought in an
> ongoing criminal action or pending appeal from a judgment of

---

[10]The criteria listed in CPL § 510.30(a) are:

> (i) The principal's character, reputation, habits and mental condition;
> (ii) His employment and financial resources; and
> (iii) His family ties and the length of his residence if any in the community; and
> (iv) His criminal record if any; and
> (v) His record of previous adjudication as a juvenile delinquent, as
> retained pursuant to section 354.2 [FN1] of the family court act, or, of
> pending cases where fingerprints are retained pursuant to section 306.1 of
> such act, or a youthful offender, if any; and
> (vi) His previous record if any in responding to court appearances when required
> or with respect to flight to avoid criminal prosecution; and
> (vii) If he is a defendant, the weight of the evidence against him in the pending
> criminal action and any other factor indicating probability or improbability of
> conviction; or, in the case of an application for bail or recognizance pending
> appeal, the merit or lack of merit of the appeal; and
> (viii) If he is a defendant, the sentence which may be or has been imposed upon
> conviction.

> conviction thereon – is that of securing the defendant's future
> attendance when required.

137 A.D.2d at 863 (citing case law). After finding that the appellate issues suggested in

Kern's application were not "frivolous or palpably without merit," Justice Brown went on

to analyze, and be guided by, the issue of risk of flight. *Id.* at 863-64. Indeed, he noted

that it was not the role of the court determining such an application to "pass[] upon the

points raised by the defendant or suggest[] the outcome of his appeal . . ." *Id.* After

concluding that the 510.30(2)(a) factors weighed heavily in favor of release, Justice

Brown concluded:

> Whether the points of error raised by the defendant will
> warrant a vacatur of his conviction is a matter that will be
> determined by this court only after a thorough review of the
> trial record, the briefs to be submitted, and the arguments to
> be made by both the [prosecution] and defense counsel. If it
> is then concluded that the defendant was fairly convicted and
> that the sentence imposed was just, his hour of punishment
> will come.

*Id.* at 864.

_ 70.    Here, we submit that it cannot reasonably be said that the issues to be raised

on Mr. Garson's appeal are "palpably without merit." Moreover, consideration of the

applicable criteria demonstrates overwhelmingly that Mr. Garson poses no risk of making

himself unavailable for future attendance as required by the Court. Accordingly, this

Court should readily conclude that justice will be served by ensuring that he remain at

36

liberty pending this Court's determination of whether the judgment of the court below

should stand.

WHEREFORE, we respectfully request that the present application be granted, and

that the Court grant such other and further relief as it may deem just and proper.

Affirmed:    New York, New York
             June 5, 2007

JEREMY GUTMAN
*Attorney for Appellant*
*Gerald Garson*

37

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS: CRIMINAL TERM: PART 6
-----------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

                                                **Indictment No.**

         - against -                          **5332/03**

**GERALD GARSON,**                              **NOTICE OF**

             **Defendant**                 **APPEAL**

-----------------------------------------------------------------------X

      PLEASE TAKE NOTICE that Gerald Garson hereby appeals to the Appellate

Division of the Supreme Court of the State of New York, Second Department, from a

judgment of the Supreme Court, Kings County, dated June , 2007.

Dated:     Brooklyn, New York
          June 5, 2007

                                    Jeremy Gutman
                                    *Attorney for Defendant-Appellant*
                                    *Gerald Garson*
                                    251 East 61st Street
                                    New York, New York 10021
                                    (212) 644-5200

To:    Clerk of the Court
       Supreme Court, Kings County
       320 Jay Street
       Brooklyn, New York 11201

       Michael Vechhione, Esq.
       *Assistant District Attorney*
       Kings County District Attorney's Office
       350 Jay Street
       Brooklyn, New York 11201

### PHILIP J. WEINTRAUB, M.D., F.A.C.C.
INTERNAL MEDICINE AND CARDIOLOGY

791 PARK AVENUE
NEW YORK, NEW YORK  10021

TELEPHONE (212) 737-7115

FACSIMILE (212) 737-5489

May 16, 2007

Michael Washor, P.C.
The Woolworth Building
233 Broadway, Suite 1800
New York, NY 10279

RE:    GERALD GARSON

Dear Mr. Washor,

Gerald Garson is a patient under my care with multiple medical problems that have been specified in the attached outline.

As his cardiologist, I would like to highlight the complexities involved in managing his underlying cardiac disease and the impact of the concommittant systemic diseases and their associated surveillance requirements on his chronic anticoagulation.

Mr. Garson is in chronic atrial fibrillation, most probably as a result of alcohol toxicity. This problem requires medical supervision and he cannot and should not stop drinking on his own since his withdrawal symptoms could be potentially fatal. He is fully anticoagulated with Coumadin to prevent embolic strokes. The dose of the blood thinner is frequently adjusted based on blood testing and the blood thinner needs to be periodically stopped before procedures that involve instrumentation.

Mr. Garson, after detoxification from alcohol, will undergo a procedure to restore his heart rhythm to its normal pattern. This will be followed with lifelong monitoring for recurrent atrial fibrillation and the need for Coumadin for a minimum of one year if he is successfully cardioverted and for the remainder of his lifetime if this is unsuccessful.

In addition, he has valvular heart disease with thickening of his aortic valve which will require bi annual ultrasonic evaluations to follow possible progression. Antibiotic prophylaxis will be required before all potentially septic surgical procedures as a prevention against infective endocarditis.

Mr. Garson is medicated for labile hypertension with a drug called Benicar. He has mild peripheral vascular disease that requires monitoring and blood pressure control.

Finally, in view of his advanced age and the presence of certain risk factors known to promote the development of coronary artery disease, he will need annual stress tests to determine early coronary insufficiency and prevent a heart attack.

If there are any outstanding questions, please feel free to contact me.

Sincerely,

Philip J. Weintraub, M.D.

GERALD GARSON
Date of Birth:   August 3, 1932
SS #:  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

OUTLINE:

1.  Alcoholic Dependent Syndrome:
Mr. Garson requires a medically supervised alcohol detoxification program to
guarantee against accelerated hypertension and rapid atrial fibrillation. Once
successfully completed, he can formally attempt to correct his atrial fibrillation. He
cannot medically, could not and should not stop drinking on his own.

2.  Atrial Fibrillation:
He is currently fully anticoagulated with coumadin to protect against embolic
phenomena and stroke
This requires close monitoring of his coagulation factors since an excess of coumadin
can promote spontaneous bleeding and a subtherapeutic level of blood thinning can
expose him to stroke and clot migration. In view of his prior history of gross
hematuria, his anticoagulation levels (INR) are measured weekly.
After alcohol detoxification and therapeutic blood thinning for a minimum of four
weeks, an attempt of electrical cardioversion can be made to restore his normal sinus
rhythm
He will need to be maintained on coumadin for the remainder of his life
Periodic electrocardiographic monitoring of his cardiac rhythm and rates will be
required with the frequency to be dependent on his ability to maintain a normal sinus
rhythm

3.  Urothelial Cancer:
He will need close surveillance of his urological tree to detect the possible recurrence
of the cancer. This will include cyctoscopies, urine cytology,  MRI's of the abdomen
and pelvis, the frequency of which will be determined by his urologist and by the
future progression of his disease. Currently cyctoscopes are required every 12 weeks.
He must be taken off all blood thinners 72-96 hours before any instrumentation with
the resumption of the blood thinner to be dependent on the amount of post-procedure
bleeding.

3a. He was treated with BCG, an attenuated tuberculosis. He presented with TB
symptoms  during his treatment. Accordingly future treatment with  BCG are
contraindicated because he will be at increased risk for systemic tuberculosis and
recurrence.

4.  Hypertension:
Currently medicated with Benicar 20mg a day. This dose may have to be adjusted
downward after his alcohol detoxification has been completed. Additionally managed
with exercise.

Gerald Garson p.2

5.  Aortic Valve Disease:

He will require monitoring of his valve disease which although currently mild, is notorious for rapid progression in his particular age group. The monitoring will include cardiac ultrasounds every 3 months. Prophylactic antibiotics for dental and any invasive medical procedures is required..

6.  Bullous Pemphigoid:

An autoimmune disease that requires periodic screening for recurrence. Ongoing treatment with antineoplastic drug called Imuran which can produce depression of the bone marrow, was discontinued prior to his last surgery as contraindicated with treatment for his cancer. Imuran is known to decrease the efficacy of BCG treatment for a period of 1+ years. The autoimmune disease can manifest itself in diffuse and painful blisters and other skin lesions as well as internally. The disease has been demonstrably exacerbated by acute stress from time to time.

7.  Cataracts with progressive loss of vision:

Surgery and intraocular lens implantation is the only effective treatment
Again, all anticoagulants will need to be discontinued preoperatively and restarted when the risk of post surgical bleeding is low. It has been recommended his left eye cataract be surgically corrected now. In addition, he will have to discontinue Flomax for his procedure.

8.  Glaucoma – Increased intraocular pressure:

Biannual measurement of his intraocular pressure will be minimal requirements, assuming that complications do not arise from the cataract surgery

9.  Chronic Sinusitis:

Currently medicated with Nasonex inhaler. Exposure to dust, molds and pollens may require additional treatment – extensive sinus webbing

10. Prostatism – Prostatic Enlargement:

Currently controlled with Flomax and Proscar. He is at an increased risk of developing acute urinary retention due to need for such frequent cystoscopies

11. Gastroesophageal Reflux Disease:

Currently controlled with Tagamet and Prilosec. Esophageal inflammation and reflux is secondary to the autoimmune disease. The activity of the disease is exacerbated by emotional stress as well.

12  Osteoarthritis: Knees, shoulders, left hand and middle digits

He should have a regular exercise program to maximize joint mobility and continued use of finger braces for dislocation of 2 fingers on his left hand.

12. Tinea Pedis:

Meticulous foot hygiene and antifungal creams if symptoms occur

Gerald Garson p.3

## Drug Allergies and Contraindicated Drugs:

1. Levoquin
2. Codeine
3. Ciprofloxacin
4. Aspirin
5. Non-steroidal inflammatory agents
6. BCG

## Allergies/ Sensitivities:

1. Surgical adhesive
2. Crabmeat
3. Bleach and other environmental irritants

## Current Medication:

1. Coumadin (Warfarin) 5mg. – OD (AM) – Fluid dosage depending on weekly INR
2. Benicar 20mg. – OD (AM)
4. Xanax (Alprazulam) 0.25mg. – QID PRN
   - At least AM & PM
5. Tagamet ( Cimetidine) 300mg – TID
6. Prilosic 20mg – OD (AM)
7. Flomax 0.4 mg. – OD (PM)
8. Proscar 5mg – OD (AM)
9. Amoxicillin 2000 mg
   - pre-medicate for dental/ medical procedures
10. Topical: Clobestasol propionate
    Lactinol – E cream
11. Nasonex

## Regularly scheduled diagnostics include:

1. INR - weekly
2. CBC - weekly
3. Chem 20 - monthly
4. Echocardiograms – 12 weeks
5. EKG – 12 weeks
6. Sonograms – 12 weeks
7. Vital signs - weekly
8. Urinalysis - weekly
9. Cyctoscopies – 12 weeks
10. Cytology – 12 weeks

Robert W. Dillon, M.D.
58 A East 79th Street
New York, New York 10021
Tel: (212) 794-9000
Fax: (212) 794-5149


May 14th, 2007


Michael Washor, P.C.
The Woolworth Building
233 Broadway, Suite 1800
New York, New York 10279

Re: Gerald Garson

Dear Mr. Washor:

The following is a summary of the urologic care administered to Gerald Garson since 2000.

Mr. Garson was being followed for significant symptoms of an enlarged prostate. In January 2006 he was diagnosed with bladder cancer. On January 30th, 2006 he underwent a transurethral resection of a bladder cancer. As part of the ongoing treatment for bladder cancer, the patients require interval cystoscopies (every three months) as well as periodic CT scans. He was found to have a recurrent cancer and on August 18th, 2006 underwent a second transurethral resection of the bladder cancer.

As a result of the recurrent cancer he began intravesical treatment with BCG on September 26th, 2006. BCG is an attenuated tuberculosis bacillus which works on a cellular level to augment the bladder's immune system. It is given weekly for six weeks, then monthly for three months. Amongst the side effects are fever, chills and the possibility of developing tuberculosis. Mr. Garson did in fact develop high fevers and chills after the second monthly injection. Therapy had to be stopped and he can no longer have this treatment which often decreases the recurrence rate.

Mr. Garson still requires periodic (every three months) cystoscopies and cytologies for the next two years, and then every six months for the subsequent two years. Additionally, since there is an association of transitional cell cancers in the ureters and kidneys he requires annual CT scans.

Page 2

Should he have a recurrence, BCG cannot be used because of his reaction on December 27th, 2006.

Should you require further information please inform me of such.

Very truly yours,

Robert W. Dillon, M.D.
RWD:mm

# Lynn H. Ratner, M.D., PLLC
# Dialecti Voudouris, M.D.

*Hematology, Oncology & Internal Medicine*

113 East 83rd Street • New York, NY 10028
Tel. (212) 396-0400 • Fax (212) 396-9800

April 25, 2007

Michael S. Washor, P.C.
The Woolworth Building
233 Broadway, Suite 1800
New York, NY 10279

Re: Gerald P. Garson

Dear Mr. Washor:

Mr. Gerald P. Garson has been my patient for many years. His medical problems, as they relate to my specialty of Hematology / Oncology are the following:

1.   Urothelial cancer of the bladder.
2.
2.   Bullous pemphigoid.

3.   Chronic anticoagulation with Coumadin for atrial fibrillation.

4.   Immunosuppression related to his treatment with the drug Imuran for over 9 years.

Mr. Garson requires weekly visits to monitor his CBC and platelet count as well as other parameters related to his treatment for urothelial cancer. This condition has been complicated by his longstanding experience with immunosuppression related to the bullous pemphigoid diagnosis. I must see him frequently to make sure there is not an outbreak of the bullous pemphigoid, a potentially fatal disease. In addition, the visits are coordinated with consultations on a weekly basis with Dr. Philip Weintraub, Cardiology / Internal Medicine, and Dr. Robert Dillon, Urology, to make sure that there is no progression with any of these conditions as they pertain to his multiple chronic diagnoses.

The urothelial cancer has a marked potential for recurrence and consequently he has to undergo periodic cystoscopies by Dr. Dillon. There are other secondary issues for which he is being followed including a history of chronic gastrointestinal distress and stress related anxiety, both of which can impact the oncologic,

Re: Gerald P. Garson
Page 2

condition I have mentioned above.

I understand the details of his sophisticated urologic and cardiologic care will be
communicated to you under separate cover by the responsible physicians.

If you have any questions regarding this correspondence, please feel free to contact
me.

Sincerely,

Lynn H. Ratner, M.D.
LHR/H

NICHOLAS A. PACE, M.D.
GENERAL MOTORS BUILDING
767 5TH AVENUE, 3RD FLOOR
NEW YORK, NEW YORK 10153
—
TELEPHONE (212) 418-6450

May 17, 2007

Michael S. Washor, Esq.
Woolworth Building
233 Broadway
New York, NY 10279

Re: Gerald Garson
d/o/b: 08/03/1932

Dear Mr. Washor,

Mr. Garson was seen by me in consultation on May, 08 2007. At the time he stated   "I am in to see you because of my wife's concern regarding my alcohol intake and it's possible effect on my cardiac problems". He went on to say that "she doesn't understand that I drink because without it, it would be impossible for me to handle the incredible amount of pressure and stress I live under."

The patient admitted to drinking on the average of about 6 drinks at lunch daily and sometimes drinking heavily in the evening. Based on my experience concerning denial of the disease of alcoholism, and my examination of this patient, the true amount of his drinking can be easily doubled to 12 or more drinks daily. The patient admits that he has recently been preoccupied with thoughts of drinking and argues with his spouce regarding his drinking. He admits that over the last 4 years he has been drinking more than others of his age and to becoming nervous when he goes for any long time without a drink. He also has noticed an increase tolerance for alcohol over the last 4 years where there were  times that he drank more than he intended and  was unable to stop drinking once he had started. He also admits to having daily memory lapses for the past year, stating that many times he has been unable to remember what happened the night before because of drinking.

The patient is also taking the tranquilizer Zanex, for anxiety and nervousness. He has a history of severe heart disease with persistent atrial fibrillation and is on on anticoagulant therapy. He is also under the care of a urologist for recurrent Bladder Cancer which requires in addition to treatment, periodic cystoscopic exaiminations. Mr. Garson is also being treated for chronic gastrointestinal distress (gastroenteritis, recurrent nausea, vomiting, abdominal pain and diarrhea). He has difficulty in sleeping and admits to having periods of servere nervousness.

Pertinent Positive Physical Examination:
Pulse: 100 irregular,  Skin: erythematous with  poor turgor. Positive  tongue tremor and hand tremor.  Atrial fibrillation, Enlarged liver,( 3 finger breaths enlargement right upper

quadrant) Neurological examination: increased Deep Tendon Reflexs and severly impaired balance (Positive Skater Test)

Diagnosis:
Acute and chronic alcoholism, Impending DTs, Severe Cardiac Disease (ASHD) with cardiac arrhythmia's (Atrial Fibrillation), Possible alcoholic Myocarditis, acute gastritis and colitis, and recurrent bladder cancer.

Recommendation:
I recommended that Mr. Garson be immediately hospitalized for a much  needed carefully supervisied medical detoxification for alcoholism. I explained to him that because of his numerous medical problems, he required expert medical supervision in a specialized hospital environment for his detoxification. His detoxification will be especially complicated because of his heart disease, anti-coagulation therapy, gastrointestinal complications, neurological symptoms, and recurrent bladder cancer. I advised the patient to not try to stop drinking on his own since this should be done only under caref medical supervision in a hospital setting.  A precipitqus withdrawal, without supervision, could have him go into delirium tremors which has a 17% mortality rate. When I recommended the patient's immediate hospitalization, he refused.  Despite my reviewing the seriousness of his  present state of health, and his wife's pleading with him to go for treatment,  he refused stating that he had too many legal problems requiring his attention before he was to appear at court on June 5 th.

Discussion:
The patient obviously does  not  comprehend the seriousness of his drinking problem, nor does he recognize that alcohol is seriously  interfering with his general health and his judgement. The patient's statements that he drinks only because of all the pressures and problems in his life  indicates that he does not recognize the fact that many of his health, emotional and social problems are being complicated by his alcoholism. I am seriously concerned about the ultimate negative prognosis should this patient not recieve proper treatment for his alcoholism. I reccommend that the patient be hospitalized, and medically detoxified  before sentenced is imposed. I believe that  If the patient is incarcerated before he is medically detoxified he probably will not survive. If the court would direct Mr. Garson to receive medical detoxification treatment, before sentencing, his chances of survival will increase tremendously.

Sincerely,

Nicholas A. Pace, M.D.,
Fellow American Society Addiction Medicine
Associate Professor Medicine
New York University Medical Center
NAP:st

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

                                    **Kings County**
                                    **Indictment No.**
        - against -                   **5332/03**

GERALD GARSON,

                **Defendant**

-------------------------------------------------------------------X


## ORDER TO SHOW CAUSE and AFFIRMATION

Michael Washor
Jeremy Gutman
*Attorney fors Defendant-Appellant*
*Gerald Garson*
251 East 61st Street
New York, New York 10021
(212) 644-5200

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

                       Respondent,

          -against-

GERALD GARSON,

             Defendant-Appellant.

AFFIRMATION IN
OPPOSITION TO MOTION
FOR A STAY OF EXECUTION
OF THE JUDGMENT OF
CONVICTION PENDING
APPEAL

Kings County
Indictment Numbers
3515/2003
5332/2003

     SETH M. LIEBERMAN, an attorney admitted to practice in the State of New York and an Assistant District Attorney in the County of Kings, affirms the following to be true under the penalties of perjury:

     1.   This affirmation is submitted in opposition to the application, dated June 5, 2007, of defendant Gerald Garson for an order, pursuant to C.P.L. § 460.50, staying execution of the judgment of conviction in this case and releasing defendant on bail pending determination of his appeal.

     2.   On or about and between January 1, 2002 and March 12, 2003, defendant Gerald Garson--who was a justice of the Supreme Court, Kings County, assigned to a matrimonial part--accepted benefits from an attorney, Paul Siminovsky, including meals, beverages, and cigars, upon an agreement or understanding that,

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:   SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-

GERALD GARSON,

Defendant-Appellant.

AFFIRMATION IN
OPPOSITION TO MOTION
FOR A STAY OF EXECUTION
OF THE JUDGMENT OF
CONVICTION PENDING
APPEAL

Kings County
Indictment Numbers
3515/2003
5332/2003

SETH M. LIEBERMAN, an attorney admitted to practice in the State of New York and an Assistant District Attorney in the County of Kings, affirms the following to be true under the penalties of perjury:

1.   This affirmation is submitted in opposition to the application, dated June 5, 2007, of defendant Gerald Garson for an order, pursuant to C.P.L. § 460.50, staying execution_ of the judgment of conviction in this case and releasing defendant on bail pending determination of his appeal.

2.   On or about and between January 1, 2002 and March 12, 2003, defendant Gerald Garson--who was a justice of the Supreme Court, Kings County, assigned to a matrimonial part--accepted benefits from an attorney, Paul Siminovsky, including meals, beverages, and cigars, upon an agreement or understanding that,

in return, defendant would provide Siminovsky with favorable treatment, including assigning law guardianships to Siminovsky, providing Siminovsky with ex parte advice about cases of Siminovsky's pending before defendant, and treating Siminovsky with more courtesy than defendant would treat many other lawyers appearing before him.

3.    During February and March 2003, defendant had ex parte conversations with Siminovsky about a divorce case that was then pending before defendant and in which Siminovsky was representing one of the parties, Avraham Levi (that case is hereinafter sometimes referred to as "the Levi case").  During the course of some of those conversations--in particular, during a conversation on February 5, 2003, while the trial in the Levi case was still in progress--defendant gave Siminovsky advice about how to handle certain aspects of the case.

4.    On February 5, 2003, the Kings County District Attorney's Office, unbeknownst to Siminovsky, was conducting video and audio surveillance of defendant's robing room by means of a device placed in the robing room, and recorded defendant's ex parte conversation with Siminovsky about the Levi case. During the course of the conversation, Siminovsky told defendant that David Zaumeyer, an expert that Siminovsky had retained to

2

testify about the value of Levi's wife's business, had informed Siminovsky that Zaumeyer was not going to testify.   Defendant advised Siminovsky to subpoena Zaumeyer.   Defendant also told Siminovsky that defendant was not going to order the sale of the house, that defendant was going to award Levi exclusive use of the house, and that Siminovsky was going to win, even though Levi did not deserve it.   Additionally, defendant advised Siminovsky about what testimony to elicit from Zaumeyer.

5.   By having the above ex parte conversations with Siminovsky, defendant violated 22 N.Y.C.R.R. § 100.3(B)(6), which is one of the rules of the Chief Administrator of the Courts governing judicial conduct (the rules of the Chief Administrator governing judicial conduct are hereinafter sometimes referred to as "the Rules Governing Judicial Conduct" or "the Rules").[1]

6.   On February 25, 2003, the District Attorney's Office arrested Siminovsky, and Siminovsky agreed to assist the District Attorney's Office in its investigation.

---

[1] The Rules Governing Judicial Conduct are set out in their entirety at 22 N.Y.C.R.R. Part 100.

3

Siminovsky to charge Levi extra for the memorandum of law, and went on to give Siminovsky advice about what to put in it.

8.    In addition, according to Siminovsky's testimony at trial, on five separate occasions--on or about October 9, 2001; October 31, 2001; September 5, 2002; November 15, 2002; and March 10, 2003; respectively--defendant accepted fees from Siminovsky for having referred to him prospective clients. At the time of each referral, defendant knew or should have known that the prospective client knew that defendant was a judge. Defendant's referral of those prospective clients to Siminovsky constituted a violation of 22 N.Y.C.R.R. § 100.2(C), another of the Rules.

9.    On March 10, 2003, unbeknownst to Siminovsky, the District Attorney's Office was conducting video and audio surveillance of defendant's robing room.    That day, after receiving $1,000 in cash from a detective-investigator in the District Attorney's Office, Siminovsky, wearing a recording device, went to defendant's robing room.    At approximately 2:40 p.m., Siminovsky handed defendant the $1,000, telling defendant that it was for defendant's referrals of two clients--Dominick Aiello and Sal Caputo--and a third person to Siminovsky.    The third person had not actually retained Siminovsky.    Defendant

5

placed the money in his pants pocket. Approximately three minutes later, as Siminovsky was about to leave defendant's robing room, Siminovsky told defendant, "Make sure it doesn't fall out of your pocket," and defendant replied, "It's not going to fall out for at least an hour or two. Then it's gone."

10. At approximately 2:50 p.m., seven minutes after Siminovsky had left defendant's robing room, defendant took the money out of his pocket, put some of the money back in his pocket, counted the rest of the money and placed that money in an envelope, and put the envelope in a drawer of his desk. Defendant then left a message on Siminovsky's cell phone, asking Siminovsky to come back to defendant's robing room.

11. After conferring with the District Attorney's Office, Siminovsky returned to defendant's robing room at approximately 3:31 p.m., thirty-eight minutes after defendant had left the message. Defendant handed the envelope containing the money to Siminovsky, and suggested that Siminovsky make out a check instead to the campaign committee of defendant's wife, who had successfully run for judge. Defendant told Siminovsky that there was a shortfall of approximately $25,000 with respect to the funding of the campaign. Siminovsky tossed the envelope onto defendant's desk, and defendant said, "I appreciate it.

6

No, no, no.   No, I appreciate it."   Siminovsky replied, "It's all right."   As defendant responded, "No, no, no, no, please, please," defendant picked up the envelope and moved his hand toward Siminovsky.   Siminovsky said, "Don't worry about it." Defendant said, "All right," and placed the envelope back in his desk drawer.

12.   Apparently referring to the shortfall in the funding of Robin Garson's campaign, Siminovsky then asked defendant, "That's what you're worried about?" and defendant said yes. Siminovsky said, "But I could write a check, right?"   Defendant again said yes, told Siminovsky to send in the check, and repeated that there was "a shortage of money."

13.   The People's wiretapping and video surveillance of defendant's robing room had started in December 2002 and continued through March 10, 2003.[2]   During that period, Justice Ann Pfau, who was then Administrative Judge of the Supreme Court, Second Judicial District, approved the People's warrant

---

[2]   With this opposition, the People are submitting to Justice Carni copies of the following People's trial exhibits-- People's Exhibits 12A, 22B, 24C, and 61A--which contain videotape or audiotape surveillance material recorded on February 5, 2003, March 4, 2003, March 10, 2003, and February 27, 2003, respectively.

7

applications to conduct such surveillance.  The People obtained some of the information contained in those applications by the following means:  1) wiretapping surveillance of Siminovsky and Nissim Elmann--a wholesaler of electronics equipment--who had been referring prospective clients to Siminovsky and who had a corrupt arrangement with Siminovsky in connection with some of Siminovsky's cases before defendant; and 2) the cooperation of Frieda Hanimov, who was a litigant in a custody proceeding before defendant.  Siminovsky was the law guardian for one of Hanimov's sons, and Elmann had informed Hanimov that she could obtain a favorable outcome in the custody proceeding by giving Elmann money that, according to Elmann, he would use in part to bribe defendant.

14.  For accepting the box of cigars for having given Siminovsky _ex parte_ advice about the Levi case, defendant was charged, by Kings County Indictment Number 3515/2003, with one count of Receiving Reward for Official Misconduct in the Second Degree (hereinafter sometimes referred to as "receiving reward for official misconduct") (P.L. § 200.25) and one count of Receiving Unlawful Gratuities (P.L. § 200.35).  For accepting the referral fees, defendant was charged, by the same indictment, with five additional counts of receiving reward for

8

official misconduct.    In addition, for having had <u>ex parte</u> conversations with Siminovsky about the Levi case, defendant was charged with one count of Official Misconduct (P.L. § 195.00[1]).

15.    Furthermore, for accepting benefits from Siminovsky upon an agreement or understanding that defendant would provide Siminovsky with favorable treatment, defendant was charged, by Kings County Indictment Number 5332/2003, with one count of Bribe Receiving in the Third Degree (P.L. § 200.10).    For receiving the box of cigars as compensation for having given Siminovsky advice about the Levi case, defendant was charged, by the same indictment, with two counts of Official Misconduct (P.L. § 195.00[1], [2]).    In addition, Indictment Number 5332/2003 charged defendant with a third count of Official Misconduct (P.L. § 195.00[1]), which superseded the count of Official Misconduct in Indictment Number 3515/2003.

16.    On September 9, 2003, the Supreme Court, Kings County, consolidated Indictment Number 3515/2003 with Indictment Number 5332/2003, under Indictment Number 5332/2003, and dismissed, as superseded, the count of Official Misconduct charged in Indictment Number 3515/2003.

9

17.  In papers dated December 15, 2003, defendant made a general motion to dismiss any count for which the grand jury evidence was legally insufficient, and in particular, moved to dismiss the receiving reward counts on the ground that a judge's acceptance of benefits for having violated the Rules Governing Judicial Conduct does not constitute the crime of receiving reward for official misconduct.  In those papers, defendant also moved to suppress evidence obtained through eavesdropping and video surveillance, in part on the grounds that:  1) the People had failed to make a sufficient showing that there was probable cause to believe that defendant had committed, was committing, or was about to commit a designated offense;  2) that the People had failed to show that evidence of a designated offense would be obtained through surveillance of the robing room; and 3) that the People's surveillance of the robing room was permitted to continue longer than necessary to fulfill its investigative objectives.

18.  In a decision and order dated April 29, 2004, the Supreme Court, Kings County, denied defendant's motion to suppress evidence obtained through eavesdropping and video surveillance.  In response to defendant's claim pertaining to probable cause, the court said the following:

> The defendant argues that [Nissim] Elmann's statements about him were transparently false, and

10

seen to be so by the investigators themselves.    But
even if everything Elmann said about his supposed
relationship with the defendant was untrue,   there
remained substantial evidence that he and Simonovsky
were working together on cases, and that Simonovsky
was continually buying the defendant meals and drinks,
with   the   purpose   of   gaining   influence   over   the
defendant's   handling   of   those   cases.     Thus,   for
example, on November 18, 2002, in a recorded telephone
conversation, Simonovsky reported to his coconspirator
Elmann that he had just spent two hours getting the
defendant drunk and that "[h]e'll do what we want."

.   .   .   .

      The   two   subsequent   warrants   authorizing   video
surveillance of the defendant's robing room were also
supported by probable cause.   For the first one, aside
from the information provided in the application for
the   earlier   robing   room   warrant,   there   was   now
additional evidence that the defendant and Simonovsky
were having private discussions concerning a case [the
Levi   case]   that   was   then   on   trial   before   the
defendant.       And   Simonovsky   was   recorded   telling   .
another attorney that "it's a Garson case and I'll get
the benefit."

      The final video surveillance of the defendant's
robing room involved a plan by the District Attorney
to capture the payment of a cash "referral fee" by the
now-cooperating Simonovsky to the defendant.    The
purpose of the video surveillance was to corroborate
allegations made by the former conspirator,   and to
gain evidence to support the prosecutors' theory that
"referral fees" were among the benefits accepted by
the defendant as bribes.    Inasmuch as the payment of
cash to the defendant was planned, there was probable
cause to believe that it would occur.

People v. Garson, 4 Misc. 3d 258, 274-75 (Sup. Ct. Kings Cty.

2004) (words in brackets added).    With respect to defendant's

claim that the People had failed to show that evidence of a

11

designated offense would be obtained through video surveillance of defendant's robing room, the court said the following:

> The defendant points out that Elmann had told the woman [Hanimov] that the real deals are made, not in the courtroom, but in the defendant's chambers. He argues that, because the defendant's chambers were actually located in a different building, there was no probable cause to believe that video surveillance of the defendant's robing room would produce observations concerning any designated offense. But all the telephone contact between Elmann and the courthouse originated from the courtroom phone where the robing room was located. It was reasonable therefore for the issuing judge to conclude that Elmann's reference to the defendant's chambers was really to his robing room and not to his formal chambers in a different building. I note that great deference is due that determination, especially since, at the time, the issuing judge was the administrative judge of the court and therefore was presumably aware of the work habits and routines of the judges she supervised.

Id. at 274 {citation omitted; word in brackets added}. With respect to defendant's claim regarding the duration of the surveillance, the court said the following:

> The defendant argues that, on February 24, 2004, when Simonovsky became a cooperating witness, all the stated objectives were achieved and therefore all electronic surveillance should have terminated. He maintains that, because it did not, all evidence gathered through electronic surveillance on or after that date must be suppressed.
>
> Although Simonovsky agreed to cooperate on February 24 [sic], 2004, the extent of his willingness and the genuineness of his cooperation remained untested. Thus, the District Attorney was not required to conclude immediately that Simonovsky would provide information on the full extent of the conduct

12

> under investigation or the identities of all involved.
> Moreover, the defendant, who adamantly maintains his
> innocence, is hard-pressed to argue that, with
> Siminovsky's decision to cooperate with the District
> Attorney, prosecutors achieved their stated objective
> of gathering sufficient evidence for the successful
> prosecution of the targets.

Id. at 276-77.

19. The court also denied defendant's motion to dismiss the count of Bribe Receiving in the Third Degree, one of the counts of Official Misconduct charging a violation of P.L. § 195.00(1), and the count of Receiving Unlawful Gratuities. Id. at 260, 267-68. The court, however, dismissed the six receiving reward counts, accepting defendant's claim that the grand jury evidence was not legally sufficient to support those counts, id. at 266-67, and dismissed the remaining two counts of Official Misconduct charged in Indictment Number 5332/2003, id. at 268.

20. On appeal by the People, the Appellate Division, Second Department, in a decision and order dated April 25, 2005, affirmed the Supreme Court's order insofar as the order dismissed the receiving reward counts and the count of Official

Misconduct charging a violation of P.L. § 195.00(2).[3]  People v. Garson, 17 A.D.3d 695 (2d Dep't 2005).

21.  On further appeal by the People, the Court of Appeals, in a decision dated March 30, 2006, modified the Appellate Division's order by reinstating the six receiving reward counts, and otherwise affirmed the Appellate Division's order.  People v. Garson, 6 N.Y.3d 604 (2006).  The Court of Appeals held that the evidence submitted to the grand jury--which included the above-mentioned videotape recordings--was legally sufficient to support the receiving reward counts.  Id. at 606, 613-14, 615, 618.

22.  On April 19, 2007, defendant was convicted, following a jury trial, of the one count of Bribe Receiving in the Third Degree and two counts of Receiving Reward for Official Misconduct in the Second Degree (the receiving reward count relating to Siminovsky's giving a box of cigars to defendant on March 4, 2003; and the receiving reward count relating to Siminovsky's giving

---

[3] On their appeal to the Appellate Division, the People did not challenge the Supreme Court's order insofar as it dismissed the superseding count of Official Misconduct charging a violation of P.L. § 195.00(1).

14

$1,000 to defendant on March 10, 2003).[4]     The jury acquitted defendant of the four remaining receiving reward counts.

23.    On June 5, 2007, the trial court (Berry, J.) sentenced defendant to three consecutive terms of imprisonment of one to four years on the count of bribe receiving, and one to three years on each of the two counts of receiving reward for official misconduct.

24.    Immediately following sentencing, defendant, who had been at liberty on $15,000 bail, was remanded into the custody of the Department of Correction.

25.    Counsel for defendant then filed in the Appellate Division, Second Department, a notice of appeal--which was also filed in the Supreme Court--and an order to show cause why the sentence should not be stayed pending appeal, pursuant to C.P.L. §§ 460.50 and 510.30.

26.    On the afternoon of June 5, 2007, argument on the motion for a stay was heard by the Honorable Edward D. Carni, Associate Justice of the Appellate Division, who granted a temporary stay pending submission by the People of opposing

---

[4]    At trial, after the People had rested, the court dismissed, on the People's motion, the counts of Official Misconduct and Receiving Unlawful Gratuities.

15

papers by 9:30 a.m. on June 12, 2007, and pending the final resolution of the defense application for a stay of execution of the judgment.

27.  On the order of Justice Carni, defendant was released from custody on the evening of June 5, 2007.

For the reasons stated in the attached memorandum of law, the application for an order staying the execution of defendant's judgment of conviction under Kings County Indictment Numbers 3515/2003 and 5332/2003 should be denied and defendant should be ordered to surrender. In the alternative, defendant's bail should be increased to at least $500,000.

Dated:      Brooklyn, New York
            June 11, 2007

                                        Seth M. Lieberman
                                        Assistant District Attorney
                                        718-250-2516

16

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:    SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

                   Respondent,

           -against-

GERALD GARSON,

          Defendant-Appellant.

Kings County
Indictment Numbers
3515/2003
5332/2003

## MEMORANDUM OF LAW

### DEFENDANT'S APPLICATION FOR AN ORDER STAYING THE EXECUTION OF HIS JUDGMENT OF CONVICTION SHOULD BE DENIED.

The People oppose the defense motion for a stay of the execution of his judgment of conviction.

First, the stay should be denied because there is no justifiable reason to defer execution of defendant's sentence when defendant has not identified any claim that he intends to raise on appeal that would provide any basis to conclude that the judgment of conviction might be reversed in its entirety.

Second, there has already been a substantial delay in the proceedings leading up to defendant's conviction: defendant was arrested on March 12, 2003, over four years before his conviction. A stay of the sentence would unnecessarily add further delay to this case.

Third, notwithstanding defense counsel's representations to the contrary, defendant is a flight risk and that risk of flight has been significantly increased by defendant's sentence on June 5, 2007 to consecutive terms of imprisonment of one to four years on the count of Bribe Receiving in the Third Degree, and one to three years on each of two counts of Receiving Reward for Official Misconduct in the Second Degree.

Consequently, defendant's application for an order staying the execution of his judgment of conviction should be denied.

I.   Defendant's Application Should Be Denied Pursuant to C.P.L. § 510.30(2)(b) Because Defendant's Appeal Is Palpably Without Merit.

Criminal Procedure Law § 510.30(2)(b) provides that in considering an application of a defendant for bail pending appeal, the court "must" "consider the likelihood of ultimate reversal of the judgment" of conviction, and that "[a] determination that the appeal is palpably without merit alone justifies, but does not require, a denial of the application, regardless of any determination made with respect to the factors" set forth in C.P.L. § 510.30(2)(a) for determining an order of bail.

for believing that his claims regarding the robing room warrant applications and the duration of the eavesdropping and video surveillance would have any success on appeal.

    B.    The Verdict Was Not Against the Weight of the Evidence.

    Second, contrary to defendant's claim that the verdict was against the weight of the evidence (Defendant's Stay Application at 11-23), there was overwhelming evidence of all of the charges of which defendant was convicted.

## The Bribe Receiving Count

    With respect to the count charging defendant with Bribe Receiving in the Third Degree, not only was there overwhelming direct evidence that defendant accepted benefits from Siminovsky in the form of meals, beverages, and cigars, and that defendant provided Siminovsky with favorable treatment in the form of assigning law guardianships to Siminovsky, and giving Siminovsky ex parte advice about the Levi case, but also there was overwhelming circumstantial evidence that defendant accepted those benefits upon an "understanding" that defendant's "action, decision or exercise of discretion as a public servant [would] thereby be influenced." See P.L. § 200.10.

    Contrary to defendant's suggestion (Defendant's Stay Application at 14-16), Siminovsky's testimony that he ate and

4

drank with defendant on numerous occasions and that, on those occasions, he invariably paid for defendant's meals and drinks both was corroborated by other trial evidence and was credible. The evidence corroborating that testimony included, but is not limited to, the following:  1) the December 11, 2002 robing room videotape recording showing that defendant telephoned Siminovsky and made arrangements to meet him later that day at Nino's Restaurant in Manhattan (People's Exhibit 39A); 2) Detective-Investigator Gregory Deboer's testimony that on December 11, 2002, he observed defendant and Siminovsky dining together at Nino's, and saw Siminovsky pay the bill for that meal (Deboer: 1379-80, 1382-83); 3) the records of Siminovsky's American Express account showing a transaction on December 11, 2002 at Nino's in the amount of approximately $219 (Garabedian: 2818-19; People's Exhibits 71 and 72); 4) the testimony of Larry Rothbart--defendant's former law secretary--that he, defendant, and Siminovsky would dine out together, that Siminovsky generally paid for the meals, and that defendant never paid for the meals (Rothbart: 1501, 1624, 1642); 5) Rothbart's testimony that Siminovsky and defendant would "go out" without Rothbart "more and more often," and that "[b]y the turn of 2002 to 2003, [they would go out to eat without Rothbart] up towards two to three times a week" (Rothbart: 1501-02); 6) Detective-

5

Investigator Shaun Winter's testimony that on January 30, 2003, he observed defendant and Siminovsky together at the Archives Lounge in the Marriott Hotel, heard Siminovsky asking a waitress if Siminovsky had paid, and heard the waitress acknowledging that Siminovsky had paid, together with the January 30, 2003 Archives Lounge videotape recording showing that defendant and Siminovsky were together in the Archives Lounge on that day (People's Exhibit 35A; Winter: 1300-03; Siminovsky: 1818-21); and 7) the February 20, 2003 Queen Restaurant videotape recording showing Siminovsky dining with defendant and others, and records of Siminovsky's American Express account showing a transaction on February 20, 2003 at the Queen Restaurant in the amount of approximately $99.80 (People's Exhibit 44A; Garabedian: 2818-19; People's Exhibits 71 and 72).[2]

---

[2]  Numbers in parentheses refer to pages of the trial transcript. Names in parentheses preceding page references refer to the witnesses whose testimony is being cited. In advance of the submission of this opposition, the People have submitted to Justice Carni a copy of the transcript of the proceedings in this case from March 13, 2007 to the morning session of the trial on April 18, 2007, which includes the transcript of the trial through the lower court's final charge to the jury. (I have been informed by the court reporter who transcribed the court's final charge that the existing transcript of that charge is incomplete. I will submit a complete version of the transcript of that charge to Justice Carni after I have received it.)

Such evidence was more than sufficient to corroborate Siminovsky's testimony regarding his payment for defendant's meals and drinks.[3]   The requirement regarding corroboration of accomplice testimony is set forth in C.P.L. § 60.22(1), which provides that "[a] defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense."   The Court of Appeals has characterized the accomplice corroboration requirement as "minimal."   People v. Jones, 85 N.Y.2d 823, 825 (1995).   "Although corroborative evidence must be truly independent, and may not draw its probative value from the accomplice testimony, it need not itself prove commission of the crime," People v. Dory, 59 N.Y.2d 121, 128 (1983) (citation omitted), "or even an element of the offense," People v. Besser, 96 N.Y.2d 136, 143 (2001).   "Rather,

_____

[3]  Siminovsky's testimony that defendant gave him ex parte advice about the Levi case was corroborated by, among other evidence, the videotape and audiotape recordings showing that defendant and Siminovsky had ex parte conversations about the Levi case (People's Exhibits 12A, 37A, 60A, 62B).   Siminovsky's testimony about his receipt of law guardianship assignments from defendant was corroborated by Thomas Kilfoyle's testimony about the computer records of the Supreme Court, Kings County, with respect to such assignments and by the computer records themselves (Kilfoyle: 2762-65, 2785-86, 2788-92; People's Exhibit 68 [computer records]).

7

it is sufficient if the corroborative evidence tends to connect the defendant to the crime so as to reasonably satisfy the jury that the accomplice is telling the truth." Dory, 59 N.Y.2d at 128. "Because the purpose of the requirement is not to establish defendant's guilt independently but to provide some basis for the jury to conclude the accomplice testimony is credible, '"[s]eemingly insignificant matters may harmonize with the accomplice's narrative so as to provide the necessary corroboration."'" Besser, 96 N.Y.2d at 143 (citations omitted); see also People v. Breland, 83 N.Y.2d 286, 294 (1994); Dory, 59 N.Y.2d at 129; People v. Murphy, 198 A.D.2d 525 (2d Dep't 1993).

Defendant characterizes as "implausibl[e]" and "preposterous" Siminovsky's testimony that although he "did not have any actual recollection of the circumstances of each of his meals with" defendant, "virtually *every* time he ate at certain restaurants [the Queen Restaurant and the Archives Lounge in the Marriott Hotel]--even though they were in close proximity to the Brooklyn courthouses and to his office at Pearl and Fulton Streets--he was dining with" defendant (Defendant's Stay Application at 15-16 [italics in original]).

Contrary to defendant's contention, that testimony of Siminovsky was highly credible. It is entirely plausible that

one person--in this case, Siminovsky--would have a relationship with another person--in this case, defendant--during the course of which the first person would dine at certain restaurants only if he was going out with the second individual. This is particularly understandable if (as in defendant's case) the first person--in this case, Siminovsky--is taking out the second person--in this case, defendant--in order to influence the second person's actions, and the first person would otherwise ordinarily not want to spend money at that restaurant regardless of how close the restaurant might be to the location where the first person worked.

Moreover, it is reasonable to conclude that Simonovsky did not lie about this matter, given that he would have known that, if he had been lying about this matter, it would have been easy to disprove his testimony that on the numerous occasions that he had spent money at the Queen Restaurant and the Archives Lounge (as evinced by American Express records entered into evidence), he had--except on a handful of those occasions--always been with defendant (Siminovsky: 2212). Siminovsky would have known that, if he had been lying, his testimony could have been contradicted by employees of those restaurants, as well as by any people with whom he might have been dining or drinking without defendant. Moreover, if Siminovsky had been lying in testifying that he had

9

paid for defendant on those numerous occasions, he would have known that such testimony could have been disproved by any records showing that defendant had spent money at those restaurants on the same dates. Under these circumstances, it is highly unlikely that Siminovsky testified falsely about these matters, especially since Simonovsky knew that--according to his cooperation agreement with the District Attorney's Office (which was entered into evidence at trial as People's Exhibit 47A)--if the District Attorney's Office discovered that he had testified falsely about such important matters, then the District Attorney's Office would be able to prosecute him on felony charges based on crimes that he had committed before the trial, as well as for perjury.

Furthermore, contrary to defendant's suggestion (Defendant's Stay Application at 12-13), it is not at all surprising that the evidence regarding defendant's corrupt "understanding" was circumstantial, and that fact, in and of itself, does not provide a basis for concluding that the jury's verdict of guilty on the bribe receiving count was against the weight of the evidence. See People v. Bac Tran, 80 N.Y.2d 170, 177, 178 (1992) (bribery cases "are usually circumstantial and inferential; the underlying crimes are, after all, often perpetrated subtly with winks, nods and walks in the park"); see

also United States v. Friedman, 854 F.2d 535, 553-54 (2d Cir. 1988) ("[E]vidence of a corrupt agreement in a bribery case is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions. This is especially true in cases involving governmental officials or political leaders, whose affairs tend more than most to be subjected to public scrutiny. As a result, a jury can in such cases infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt."), cert. denied, 490 U.S. 1004 (1989).[4]

---

[4] In Friedman, the United States Court of Appeals for the Second Circuit, in reviewing the sufficiency of the evidence to support a defendant's RICO convictions, determined that there was legally sufficient evidence of the underlying crime of bribe receiving, as defined by P.L. § 200.10. 854 F.2d at 553. In holding that the evidence of bribe receiving was sufficient, the court rejected the defendant's argument that the evidence was legally insufficient both because there was no evidence of an explicit statement of the defendant that he was accepting benefits in exchange for the exercise of his official discretion and because the benefits that the defendant received were simply gratuities or gifts from a friend. Id. Indeed, the court concluded that that claim of the defendant was frivolous. Id. Thus, the decision in Friedman supports the conclusion that, regardless of whether the evidence of defendant's guilt of the bribe receiving count was overwhelming, any claim that defendant might raise on appeal that the People had failed to prove his guilt of that count beyond a reasonable doubt (Defendant's Stay Application at 15 n.2) would be utterly without merit.

Thus, in defendant's case--in addition to the evidence that, during a time period during which Siminovsky was frequently treating defendant to meals and drinks, defendant was giving Siminovsky ex parte advice about the Levi case--the evidence that, as Siminovsky increased the frequency with which he treated defendant to meals and drinks, defendant increased the number of law guardianships that he assigned to Siminovsky, demonstrates that defendant accepted those benefits "upon an understanding that his" "judgment, action, decision or exercise of discretion as a public servant" would "thereby be influenced," see P.L. § 200.10.[5]

Defendant attempts to minimize the increase in the number of law guardianships that defendant assigned to Siminovsky by referring to the increase as "marginal," and by asserting that "over the course of the three-year period charged in the indictment, [Siminovsky] received only slightly more appointments than three other attorneys whom [defendant]

---

[5] Defendant's "understanding," not Siminovsky's "understanding," was dispositive with respect to establishing defendant's guilt of bribe receiving. See People v. Souvenir, 209 A.D.2d 455, 456 (2d Dep't 1994) (with respect to the crime of bribe receiving, it is the bribe receiver's "state of mind that is controlling"); People v. Holmes, 72 A.D.2d 1, 7 (1st Dep't 1979) (same).

regularly relied on to serve as law guardians" (Defendant's Stay Application at 13).      But according to evidence at trial regarding the records of the Office of Court Administration of the State of New York, the increase in law guardianship assignments that Siminovsky received from defendant was far from "marginal":  he received thirteen in 2002, as compared with the five he received in 2001, an increase of more than one hundred fifty per cent (Siminovsky had received six assignments from defendant in 2000).  By contrast, the three other attorneys who, like Siminovsky, had received more than one law guardianship appointment from defendant during the period from 2000 through 2002, together received ten such appointments in total in 2002-- less than the thirteen assignments that Siminovsky alone had received during that year--and, among those three other attorneys, the attorney who received the most assignments from defendant in 2002, Ellen Ferber, received only five that year (Ferber had received six assignments from defendant in 2001) (Kilfoyle: 2762-65, 2785-86, 2788-92; People's Exhibit 68).

Moreover, evidence was presented to the jury that on at least two occasions, defendant implicitly expressed to Siminovsky defendant's understanding of their corrupt relationship.    First, in late 2002, while Siminovsky and defendant were dining together in the Queen Restaurant,

13

Siminovsky saw a "matrimonial clerk" and another person eating together, and told the waiter both that the waiter should bring him their bill and that Siminovsky would pay for that bill; defendant told Siminovsky, "That's a very smart thing to do, that's good business," and Siminovsky thereafter paid for defendant's meal (Siminovsky: 1830-31).   Second, in October 2002, while Siminovsky and defendant were dining together, Siminovsky told defendant that Siminovsky's father, who had been a vendor, and another person, who had been responsible for giving out contracts at a company that Siminovsky's father had done business with, had had an "unwritten arrangement" in which the person would say that his wife wanted a particular item--for example, a watch or a dog--and Siminovsky's father would give the person that item in exchange for Siminovsky's father "keeping his business" with the company.   Defendant told Siminovsky, "[T]hat's the right way to do things," and Siminovsky paid for defendant's meal that day (Siminovsky: 1832-33).

Thus, the jury's verdict of guilty on the bribe receiving count--far from being against the weight of the evidence, as defendant claims--was supported by overwhelming evidence of defendant's guilt.

14

## The Receiving Reward Counts

There was also overwhelming evidence of defendant's guilt of the receiving reward counts.[6]

First, contrary to defendant's contention (Defendant's Stay Application at 18), the evidence compelled the conclusion that on March 4, 2003, the day on which defendant received the box of cigars from Siminovsky, defendant understood that Siminovsky had given the cigars to him for his having given Siminovsky ex parte advice about the Levi case (see People's Affirmation at 4-5; People's Exhibit 22B).

Regardless of whether on March 4, 2003, Siminovsky explicitly mentioned the Levi case to defendant in connection with the cigars, the trial evidence compelled the conclusion that on that date, defendant understood that Siminovsky's reference to "pointers" referred to advice that defendant had provided to Siminovsky about the Levi case. That evidence included the evidence:    1)    that defendant had finished

---

[6] In People v. Garson, 6 N.Y.3d 604 (2006), the Court of Appeals, reviewing the grand jury evidence in this case--which was similar to the evidence presented at trial during the People's case--held that, under the standard for reviewing the legal sufficiency of grand jury evidence, the grand jury evidence "was legally sufficient to support the six counts of receiving reward for official misconduct in the second degree." Id. at 606; see also id. at 613-15.

conducting a trial in the Levi case on February 27, 2003, just five days before March 4, 2003 (Kilfoyle: 2793, 2795-96); 2) that defendant had given Simonovsky ex parte advice about the Levi case on a number of occasions during the course of the trial, including during the week before Siminovsky gave defendant the cigars (e.g., on February 5, 2003; on February 24, 2003; on February 25, 2003; and on February 27, 2003 [see Winter: 1323-28; Siminovsky: 2139-52, 2177-90, 2216-21, 2229-31; People's Exhibit 12A [DVD recording of excerpt from February 5, 2003 robing room videotape recording]; People's Exhibit 60A [DVD recording of excerpt from February 24, 2003 robing room videotape recording]; People's Exhibit 37A [DVD recording of excerpt from February 25, 2003 Siminovsky body wire recording]; People's Exhibit 62B [DVD recording of excerpt from February 27, 2003 Siminovsky body wire recording]); and 3) that when Siminovsky, after thanking defendant for the "pointers," said to defendant, "Now you're just going to tell me what to write in the memo," defendant--without any further explanation from Siminovsky about what "memo" Siminovsky had been referring to--immediately started providing Siminovsky with advice about a memorandum of law that Siminovsky had to submit in the Levi case (People's Exhibit 22B).

Furthermore, contrary to defendant's suggestion (Defendant's Stay Application at 18), the March 4, 2003 robing room videotape recording shows that defendant understood that Siminovsky had given him the cigars for defendant's having given Siminovsky that advice. When Siminovsky told defendant, "I appreciate everything," defendant then opened his desk drawer, looked at the box of cigars, and picked up the box, while Siminovsky both said to defendant, "Thanks a lot," and mentioned the "pointers" that defendant had given him (People's Exhibit 22B). In addition, the evidence compelled the conclusion that on March 4, 2003, defendant knew that the advice or "pointers" that he had given Siminovsky about the Levi case had been provided to Siminovsky ex parte: the robing room videotape recordings showed that Sigal Levi's attorney in the Levi case, Michael Joseph, had not been present when defendant had given Siminovsky that advice (see People's Exhibits 12A, 37A, 60A, 62B).[7]

Additionally, contrary to defendant's claim (Defendant's Stay Application at 19-23), there was overwhelming evidence that

---

[7] Joseph testified that he had not given defendant and Siminovsky permission to have ex parte conversations about the Levi case (Joseph: 3096).

17

on March 10, 2003, after Siminovsky had given defendant $1,000 in cash, defendant understood that Siminovsky had given him the money as a fee for defendant's having referred Aiello and Caputo to him as clients; that at the time that defendant had referred Caputo to Siminovsky, defendant had known that Caputo was aware that defendant was a judge; and that at the time that defendant had referred Siminovsky to Dominick Aiello by means of Aiello's father, Ronald Aiello, defendant had known that Ronald Aiello was aware that defendant was a judge.   That evidence included the following:   1) Rothbart's testimony that he had spoken with Ronald Aiello, a former administrative judge for the Supreme Court, Kings County, and that, after having spoken with Judge Aiello, Rothbart told defendant that Judge Aiello's son was "having family problems" and that "they wanted a reference for an attorney from" defendant (Rothbart: 1517); 2) the Aiello and Caputo retainer agreements with Siminovsky (People's Exhibits 58 and 59, respectively; see also Siminovsky: 2031-32, 2042-43); 3) Siminovsky's testimony that when defendant told him that he had referred Judge Aiello's son to Siminovsky, defendant said that defendant had known Judge Aiello for years (from which the jury could infer that, at the time of the referral, Judge Aiello knew that defendant was a judge) (Siminovsky: 2032-33); 4) Siminovsky's testimony that when defendant told him that he

had referred Caputo to Siminovsky, defendant said that, during a conversation with Caputo, defendant had told Caputo that defendant was a judge in a matrimonial part, Caputo had responded, "Oh, I'm having some [matrimonial] problems," and had asked defendant if defendant could "find [him] a lawyer," and defendant had then referred Caputo to Siminovsky (Siminovsky: 2038); and 5) the evidence that on March 10, 2003, when Siminovsky gave the money to defendant, Siminovsky mentioned the names Aiello and Caputo (People's Exhibit 24C [DVD copy of excerpts from Mar. 10, 2003 robing room videotape recording]).[8]

---

[8] Defendant contends that "the People, by failing to present any evidence from the clients in question or anyone who observed the referrals being made, failed to provide any basis upon which the jurors could conclude that [defendant] 'lent the prestige of his office' to the making of these referrals" (Defendant's Stay Application at 22 n.8). Siminovsky's testimony about defendant's statements to Siminovsky about the Aiello and Caputo referrals, along with Rothbart's testimony regarding the Aiello referral, however, show that--because of defendant's admitted relationship with Judge Aiello and defendant's admitted relationship with Caputo, and because of the circumstances under which defendant referred Siminovsky to Dominick Aiello and Caputo (see supra at 18-19)--defendant knew or believed that defendant's being a matrimonial judge would influence whether those prospective clients would hire Siminovsky upon defendant's recommendation. After all, defendant's recommendation of Siminovsky to those clients was meaningful to those clients solely because defendant, as a matrimonial judge, presumably was aware of the qualifications or reputations of matrimonial attorneys or attorneys who practiced family law. Consequently, the trial evidence showed that in referring Aiello and Caputo to

(Footnote continued on next page)

Defendant asserts that the March 10, 2003 videotape recording showed that defendant had understood the $1,000 to be a contribution to Robin Garson's campaign committee (Defendant's Stay Application at 21-22). That interpretation of the videotape recording is pure fantasy. Defendant's interpretation is based on the fact that on March 10, 2003, when Siminovsky returned to defendant's robing room pursuant to defendant's request, the first thing that defendant said to Siminovsky was "It was a lot of money for, what do you call it, the election" (People's Exhibit 24C; Defendant's Stay Application at 21). Defendant suggests that his statement--"[i]t was a lot of money for" "the election"--was a reference to the $1,000 that Siminovsky had given to defendant earlier that day (Defendant's Stay Application at 21-22). That suggestion is patently wrong, however. Reviewing that statement in context shows that the statement referred, not to the money that Siminovsky had given defendant, but rather, to the expense of Robin Garson's election campaign. Immediately after making that statement, defendant said, "So maybe you can do a check or something like that or

---

Siminovsky, defendant lent the prestige of his office to advance the private interests of Siminovsky, in violation of 22 N.Y.C.R.R. § 100.2(C), one of the Rules Governing Judicial Conduct.

whatever you know," and then shortly thereafter informed Siminovsky that there was a "shortage there" of approximately $25,000, referring to a shortfall in the funding of the campaign costs (People's Exhibit 24C).[9]

Moreover, when Siminovsky first gave the money to defendant on March 10, 2003, there is nothing to suggest that Siminovsky or defendant mentioned Robin Garson's campaign in any way. In addition, on that date--before Siminovsky's return to the robing room--as Siminovsky was leaving the robing room shortly after having given the money to defendant, Siminovsky told defendant, "Make sure it doesn't fall out of your pocket," and defendant

---

[9] In the context of his claim that the guilty verdict on the "referral fee" receiving reward count was against the weight of the evidence, defendant asserts that instead of addressing the purported problems with the People's proof that the $1,000 was a referral fee, "the prosecutor[, during his summation,] simply ignored them and implied to the jury that it was a given that the payment" was a referral fee (Defendant's Stay Application at 22). That assertion is irrelevant to defendant's claim regarding the weight of the evidence. Moreover, insofar as defendant might be suggesting that the prosecutor's characterization of the $1,000 as a referral fee was improper, that suggestion is wrong because the characterization was fairly based on the trial evidence. In addition, defendant, in his own summation, explicitly presented to the jury his argument, based on the transcript of the March 10, 2003 robing room videotape recording, that defendant had believed that the money was for the "election," not a referral fee (3373-75). The jury, therefore, was squarely presented with the two interpretations, and reasonably rejected defendant's.

replied, "It's not going to fall out for at least an hour or two. Then it's gone" (People's Exhibit 24C). It is unlikely that if defendant had viewed the money as a contribution to his wife's campaign committee, defendant would have suggested to Siminovsky, even jokingly, that defendant was going to spend the money himself within an hour or two of having received the money.

Additionally, if defendant's comment--"[i]t was a lot of money for" "the election"--was a reference to the money that Siminovsky had given defendant earlier that day, then presumably, defendant would not have simply asked Siminovsky to make out a check to the campaign committee but rather would have suggested that Siminovsky contribute less money to the campaign committee. Furthermore, toward the end of their conversation that day, after defendant had agreed to keep the money that Siminovsky had given him, Siminovsky, referring to the money, told defendant, "Go ahead, keep it. What's the matter, you can't use it?" and when defendant responded, "What?" Siminovsky replied, "You can't use it? Right?" (People's Exhibit 24C). That exchange showed that Siminovsky had made clear to defendant that the $1,000 was for defendant's personal use, and was not a contribution to Robin Garson's campaign committee.

22

In claiming that the verdict on the "referral fee" receiving reward count was against the weight of the evidence, defendant also points to the fact that there was no evidence presented at trial that before March 10, 2003, defendant and Siminovsky had ever discussed a fee either for the Aiello or Caputo referrals; the fact that, according to Siminovsky's testimony, the manner in which Siminovsky had given other referral fees to defendant differed from the manner in which Siminovsky had given the Aiello and Caputo referral fee to defendant; and the fact that defendant had attempted to return the Aiello and Caputo referral fee to Siminovsky (Defendant's Stay Application at 20). These factors do not undermine the strength of the evidence demonstrating defendant's guilt of that count. Regardless of the circumstances surrounding Siminovsky's giving referral fees to defendant before March 10, 2003, the evidence regarding defendant's referrals of Aiello and Caputo to defendant, together with the March 10, 2003 robing room videotape recording, by themselves establish defendant's guilt of the crime. The fact that defendant had attempted to return the referral fee is irrelevant: defendant's initial acceptance of the referral fee constituted a commission of the crime of receiving reward for official misconduct, and the circumstances under which defendant had attempted to return the referral fee

23

show that defendant simply had wanted to receive the benefit in a different form, namely, as a check contribution to Robin Garson's campaign committee.

Thus, the jury's verdict of guilty on each of the receiving reward counts--far from being against the weight of the evidence, as defendant claims--was supported by overwhelming evidence of defendant's guilt of each of those counts.

    C.    <u>Because the Evidence of Defendant's Guilt of the Bribe Receiving Count Was Not Purely Circumstantial, the Lower Court Properly Denied Defendant's Request for a Circumstantial Evidence Charge</u>.

Defendant asserts that the People relied solely on circumstantial evidence to prove his guilt of the bribe receiving count, and that consequently, the trial court erred in denying his request for a circumstantial evidence charge (Defendant's Stay Application at 23-24). That contention by itself does not warrant granting defendant's stay application, because, regardless of whether that contention has any merit, the contention does not apply to the two receiving reward counts of which defendant was convicted, for which he received consecutive prison terms of one to three years on each of the counts.

Moreover, defendant's contention fails. Contrary to defendant's assertion, the People's case in support of the bribe

24

receiving counts was a case of mixed direct and circumstantial evidence--in particular, the People presented direct evidence of defendant's acceptance of benefits from Siminovsky and direct evidence of defendant's providing Siminovsky with favorable treatment (see supra at 4-10 & n.3)--and therefore, the trial court was not required to give a circumstantial evidence charge with respect to that count.  See People v. Sanders, 172 A.D.2d 372 (1st Dep't 1991); see also People v. McCoy, 30 A.D.3d 441, 443 (2d Dep't 2006); People v. Johnson, 293 A.D.2d 489 (2d Dep't 2002).  The People's proof was circumstantial only with respect to defendant's mens rea--with respect to whether defendant had accepted the benefits upon an "understanding" that his conduct would thereby be influenced (see supra at 10-14), cf. Bac Tran, 80 N.Y.2d at 176-78 (with respect to crime of bribery, "agreement or understanding" is culpable mental state of briber)--but the circumstantial nature of that proof did not trigger the need for a circumstantial evidence charge.  See People v. Roldan, 211 A.D.2d 366, 370 (1st Dep't 1995) ("where, as here, a particular state of mind is an essential element of a crime, necessarily provable only by the circumstances surrounding the commission of the offense, this commonly encountered mens rea issue does not trigger the necessity for a circumstantial evidence charge"), aff'd, 88 N.Y.2d 826 (1996).

In any event, any error in the court's denial of defendant's request for a circumstantial evidence charge was harmless in light of the overwhelming evidence of defendant's guilt of the bribe receiving count (see supra at 4-14 & n.3). See People v. Fuentes, 290 A.D.2d 563, 564 (2d Dep't 2002).

D.    Defendant Has Not Preserved Some of His Claims Regarding the People's Purportedly Insinuating, by Means of Prosecution Statements and Evidence, that Bribes Had Led Defendant to Make Certain Legal Determinations in the Levi Case. In Any Event, the Statements of the Prosecution at Issue Were Fair Comment on Admissible Evidence, and Any Evidence Suggesting that Defendant Had Been Influenced by Bribes to Make Certain Legal Determinations Was an Inextricable Part of Evidence that Was Properly Admitted at Trial.

Defendant contends that although neither the indictment nor the bill of particulars placed him on notice of any allegation that he had decided the outcome of the Levi case or had made legal rulings in the Levi case in exchange for a bribe, the prosecution made remarks in its opening statement and presented evidence that "insinuate[ed] that this was the case" (Defendant's Stay Application at 24-25). Defendant's claims with respect to any remarks made during the prosecution's opening statement are unpreserved because defendant made no timely objection to those remarks and did not move for a mistrial until after the People had completed their opening

statement.     Moreover,   those   remarks   were  fair  comment  on
admissible evidence, and any evidence suggesting that defendant
had   been   influenced   by   bribes   to   make   certain   legal
determinations was  an  inextricable  part  of  properly  admitted
evidence.

During   the   prosecution's   opening   statement,   defendant
failed to make any objections (721-46).   It was not until after
the  prosecution  had  completed  its  opening  statement  that  the
defense  complained  about  any  remarks  in  the  opening  statement--
contending that the prosecution had purportedly referred to "an
uncharged crime" involving "an agreement between Mr. Siminovsky
and [defendant] to fix the Levi case"--and made a motion for a
mistrial  (748).     That  untimely  motion  failed  to  preserve  any
claims  regarding  the  opening  statement  for  appellate  review.
See People v. Malave, 7 A.D.3d 542 (2d Dep't 2004) (defendant's
motion for a mistrial, made after completion of summations, was
untimely  and  failed  to  preserve  his  contentions  regarding
summation).

Moreover,  the  remarks  about  which  defendant  now  complains
(733-34,   735,   739-40)   were   fair   comment   on   evidence   that
subsequently  was  properly  admitted:     the   evidence   that   on
February 5, 2003, defendant told Siminovsky that Siminovsky's
client, Avraham Levi, was going to win even though he did not

27

deserve to win (Siminovsky: 2176-77, 2186-87; People's Exhibit 12A); the evidence regarding defendant's ex parte discussion with Siminovsky on February 24, 2003 about the need to limit the testimony of Avraham Levi (Siminovsky: 2139, 2149-52; People's Exhibit 60A); and the evidence regarding a colloquy on February 27, 2003 among defendant, Siminovsky, Michael Joseph, and another attorney, Ellen Ferber, during which defendant loudly yelled at Joseph in response to Sigal Levi's expression of concern about defendant's limiting Avraham Levi's testimony (Siminovsky: 2165-69, 2171-76; People's Exhibit 61A).

Contrary to defendant's contention (Defendant's Stay Application at 24-25), defendant's conduct during the February 27, 2003 colloquy was covered by the People's bill of particulars with respect to the bribe receiving count. The bill of particulars specified that defendant's "treatment of Siminovsky with more courtesy than . . . defendant would treat many other lawyers appearing before him" was among the favors that defendant had provided to Siminovsky in response to benefits that Siminovsky had given to defendant (2155-56), and defendant's yelling at Joseph during the February 27, 2003 colloquy showed how defendant would treat other attorneys with less courtesy than defendant would treat Siminovsky (2162-63). Moreover, one of the meanings of the word "courtesy" is

28

"indulgence" (see The American Heritage Dictionary of the English Language 420 {4th ed. 2000}), and the fact that defendant was willing to limit Avraham Levi's testimony but not Sigal Levi's testimony--Avraham Levi testified for perhaps an afternoon at most, while Sigal testified over a period of days (Joseph: 3130)--also showed that defendant treated Siminovsky with more "courtesy" or "indulgence" than he would treat another attorney.

In addition, any error in the prosecution's opening statement or in the court's admitting the evidence regarding the February 27, 2003 colloquy, or regarding the limiting of Avraham Levi's testimony was harmless, in light of the overwhelming evidence of defendant's guilt of all of the crimes of which he was convicted (see supra at 4-24 & n.3). Defendant's contention that such remarks or evidence "tainted [defendant] in the eyes of the jury" (Defendant's Stay Application at -25) is wholly unpersuasive, given the massive amount of indisputable evidence--about which defendant does not complain--showing the tremendous advantage that defendant gave Siminovsky over Michael Joseph in connection with the Levi case (see supra at 7 n.3, 15-16). See People v. Crimmins, 36 N.Y.2d 230 (1975).

29

E.  The Trial Court Properly Precluded the Defense from
Introducing    Evidence    that    Siminovsky    Had    Been
Unwilling  to  Ask  Defendant  to  "Steer"  a  Case  to
Defendant's Court Part.

Defendant also contends that he should have been allowed to
introduce the following evidence at trial: that while
Siminovsky was cooperating with the District Attorney's
investigation, Siminovsky sought to get a fictitious case,
Monroe v. Monroe, assigned to defendant, but expressed to a
former court clerk of defendant, Paul Sarnell, his unwillingness
to ask defendant to assist in arranging to have that particular
case assigned to defendant because, according to Siminovsky,
defendant would "kill" Siminovsky if Siminovsky had sought such
assistance from defendant (Defendant's Stay Application at
25-26; see also 1113-14, 1118-27). Contrary to defendant's
contention, the trial court properly precluded defendant from
introducing such evidence because such evidence was irrelevant
to the charges against defendant.

There were no charges against defendant in this case, or
any suggestion made in this case, that defendant had either
assisted, or had been willing to assist, in arranging to have
cases assigned to him. As the prosecutor pointed out in
response to defendant's application to introduce the evidence at
issue, although Siminovsky had, with the assistance of other

30

court personnel, arranged for the assignment of certain cases to defendant, defendant had not been involved in any such efforts (1121-22).    Moreover,    any    out-of-court    statements    that Siminovsky made with respect to what defendant would have been willing or unwilling to do constituted hearsay evidence that would not have been admissible for its truth.

According to defendant, defendant had sought to introduce such evidence in order to counter the prosecution's purported efforts    to    insinuate    that    defendant    had    made    legal determinations in the Levi case in exchange for bribes from Siminovsky (Defendant's Stay Application at 24-26; see also supra at 26-28).    It is entirely unclear how Siminovsky's expressed belief that defendant would reject a request from him for assistance in "steering" cases to defendant's court part had any bearing on whether, at Siminovsky's request, defendant would have been willing to do other things that were of a very different nature.

Moreover, it is inconceivable how the preclusion of the evidence at issue prejudiced defendant in any way.    Properly admitted and indisputable evidence--the videotape and audiotape recordings--demonstrated    defendant's    willingness    to    assist Siminovsky improperly by providing him with extensive ex parte advice about the Levi case (see supra at 7 n.3, 16).    In light

of the overwhelming evidence of defendant's guilt, there is no reasonable possibility that the jury's verdict would have been different if the jury had known that despite the fact that defendant had been willing throughout the course of the Levi case to provide Siminovsky with important advantages, Siminovsky had believed that defendant would not have been willing to assist Siminovsky in getting a particular case assigned to defendant.

F.    The Trial Court Properly Permitted the People to Introduce, as Background Evidence, the Evidence Pertaining to Frieda Hanimov.

Finally, contrary to defendant's contention (Defendant's Stay Application at 26-27), the trial court properly permitted the People to introduce, as background evidence, the evidence regarding Frieda Hanimov, to explain why the District Attorney's Office began its investigation of defendant (see, e.g., Terra: 821-27, 829-30, 871-72). The information that Hanimov provided to the District Attorney's Office was the trigger for the District Attorney's investigation, and the Office's gathering of evidence with respect to meetings and conversations between Hanimov and Elmann provided the basis in part for the Office's initial surveillance of defendant. Providing the jury with evidence showing that the People had had good reason to install

eavesdropping devices in defendant's robing room was particularly important, given that jurors might have been inclined to frown upon unjustified governmental eavesdropping as an unwarranted intrusion upon an individual's privacy. (Indeed, during voir dire, some prospective jurors expressed discomfort about eavesdropping [see, e.g., 535-36, 538, 539-41, 630-31, 632-33]). See People v. Tosca, 98 N.Y.2d 660, 661 (2002) (trial court did not abuse its discretion in admitting police officers' testimony concerning an unidentified cab driver's report of recent encounter with armed defendant; testimony was admitted not for its truth, but to provide background information as to how and why police pursued and confronted defendant); People v. Flournoy, 303 A.D.2d 762 (2d Dep't 2003) (detective's testimony recounting part of her interview with eyewitness to crime was properly admitted as background information to explain events that led to defendant's arrest); People v. Carney, 18 A.D.3d 242, 243 (1st Dep't 2005) (court properly allowed testimony concerning 911 call made by nontestifying declarant, with careful limiting instructions advising jury that tape was not admitted for its truth but rather as background information explaining why police took a series of investigatory actions); People v. Casanova, 160 A.D.2d 394 (1st Dep't 1990) (testimony of police officers that two women had informed them that two men

sitting in car at specific location had a gun was properly admitted as background evidence to explain why officers approached defendant in the manner that they did and to preclude speculation as to purpose of police activity).

Furthermore, given the court's limiting instructions with respect to this evidence--which the court gave on a number of occasions, including during the final charge (885-87, 899-900, 913-14, 940-41, 3500-01)--it is inconceivable that this evidence prejudiced defendant in any way.[10]    Indeed, the introduction of

---

[10]    The limiting instructions presented during the final charge (3500-01), which were, in effect, the same as limiting instructions that the court had previously issued during the course of the trial (see, e.g., 885-87, 899-900, 913-14, 940-41), were as follows:

You'll recall, ladies and gentlemen, that I permitted the People to read a transcript of a tape-recording in Hebrew between Frieda Hanimov and [Nissim] Elmann. As I told you previously, and I will reiterate to you with emphasis at this time, that that evidence was admitted into this case for a limited purpose.

The purpose of the reading of those transcripts of the Hebrew tape-recordings was to explain to you the precipitating events which led to the People's commencement of their investigation of defendant Gerald Garson, then a sitting justice of the Supreme Court of the State of New York here in Kings County.

I charge you that the representations of [Nissim] Elmann to Frieda Hanimov, that is that he had an illegal relationship with the defendant Gerald Garson, those representations were false.    In fact, the People

(Footnote continued on next page)

34

such evidence, with the limiting instructions, in fact benefited defendant, insofar as the introduction of that evidence, along with the limiting instructions, precluded the jury from speculating why the People ultimately decided to investigate defendant. See Flournoy, 303 A.D.2d at 762 (limiting instruction effectively eliminated any risk of prejudice to defendant); Casanova, 160 A.D.2d at 395.

G.   Conclusion

In sum, every single one of the claims that, according to defendant, he will present on appeal, is palpably without merit, and, at the very least, none of them, either separately or collectively, provides any basis to conclude that defendant's judgment of conviction will be reversed in its entirety.

---

specifically and unequivocally stated that no evidence existed of any relationship or relation, whether it be social, professional, legal, or illegal between [Nissim] Elmann and the defendant Gerald Garson.

As I previously instructed you, ladies and gentlemen, this evidence was of a limited purpose and it's of minimal value, and it is only--it is only admitted into evidence for the purpose of setting the scenario of the events which caused the Kings County District Attorney's Office to commence their investigation of then sitting Supreme Court Justice Gerald Garson.

I charge you, ladies and gentlemen, that you are to consider this evidence for that limited purpose and for no other purpose.

35

**JEREMY GUTMAN**

ATTORNEY AT LAW
251 EAST 61ST STREET
NEW YORK, NEW YORK 10021

(212) 644-5200

FAX: (212) 486-7701
E-MAIL: JEREMYGUTM@AOL.COM

June 12, 2007

**By Fax Number 718-858-2446 and Next Day Hand Delivery**

Honorable Edward D. Carni
Associate Justice
Supreme Court of the State of New York
Appellate Division, Second Judicial Department
45 Monroe Place
Brooklyn, New York 11201

　　　　　Re:　　People v. Gerald Garson
　　　　　　　　2007-5188

Dear Justice Carni:

　　　　I am writing in reply to the papers submitted yesterday afternoon by the People in opposition to our application for bail pending appeal. Implicitly revealing the weakness of that opposition, the People resort to a criterion that is not recognized by the bail statute: the fact that there has been a "substantial delay in the proceedings leading up to defendant's conviction." [People's Memorandum of Law, p. 1][1]. In making this novel argument, the People fail to note that the bulk of that "delay" was caused by the People's own decision to appeal the ruling of the trial court (Fisher, J.), dismissing, *inter alia*, six counts of receiving reward for official misconduct, first to this Court and, following this Court's affirmance, to the Court of Appeals. *See* Affirmation of ADA Seth Lieberman, ¶¶ 20-21. The remainder of the "delay" was caused because, shortly before the Court of Appeals reinstated the six counts

　　　　　[1]The copy of the People's Memorandum that we received by email shifts from double spacing to single spacing. Consequently, while we are citing to the pagination as it appears on our copy, we are not certain that all of our page references correspond to the original submitted to the Court.

of receiving reward for official misconduct,[2] Mr. Garson was diagnosed with cancer and underwent surgery, after which the cancer recurred, requiring a second surgery followed by a course of chemotherapy. Clearly, therefore, even if "delay" were a relevant factor -- and the People have failed to demonstrate that it is -- the People surely should not be heard to complain about "delay" that was occasioned primarily by their own voluntary choice to exercise their right to appeal a pre-trial ruling, and that entailed no volitional act by Mr. Garson.

As we will show, with regard to the issues that are relevant to a bail application -- the risk of flight and the merits of the issues to be raised on appeal -- the People have utterly failed to support their claim that bail should not be granted.

### A.   The People Have Failed to Demonstrate that Mr. Garson Poses a Flight Risk and They Ignore the Prediction of Medical Experts that Immediate Incarceration is Likely to Have Fatal Consequences

The People do not dispute that, as discussed in our opening papers, the principle concern of a Justice deciding an application for bail pending appeal is to ensure that the appellant will remain amenable to the order of the appellate court. *People v. Kern*, 137 A.D.2d 862, 862-63 (2d Dept. 1988). With regard to that factor, however, the People offer nothing more than an unsupported, *ex cathedra* declaration that Mr. Garson is a "flight risk" [People's Memorandum, p. 2]. In making that bare-bones assertion, they do not even address -- much less contradict -- our showing as to Mr. Garson's age, his severe medical problems, his length of residency in the community, his extensive family ties, and his consistent history of attending court proceedings. Having failed to address any of the statutory criteria delineated in CPL § 510.30(a) -- all of which overwhelmingly favor Mr. Garson -- they do not even attempt to suggest how a person with Mr. Garson's overwhelming medical needs, and who depends on the income his wife receives as a Judge of the Civil Court of the City of New York, could conceivably flee this jurisdiction, even if there were the slightest indication that, at this stage of his life, he has any inclination to abandon his wife, children (including a son with Down Syndrome and a daughter who just lost a six-year-old), and grandchildren by doing so. They similarly ignore the trial court's determination, following Mr. Garson's conviction, that he had appeared so faithfully at every court proceeding that there was no need even to raise his bail.[3]

Having failed to provide a single argument in support of their hollow claim that, notwithstanding his faithful attendance at every proceeding up to and including his five-week

---

[2]Mr. Garson was ultimately acquitted of four of those counts.

[3]The trial court had made a similar observation when the People requested that he administer a *Parker* warning during trial.

Honorable Edward D. Carni
June 12, 2007
Page 3

trial, this 74-year-old first-time, non-violent offender, whose highest offense is a D felony, has *ever* been a flight risk, the People make the preposterous allegation that the risk that he will flee has now "significantly increased." The only reason offered in support of that claim is that Mr. Garson has now been sentenced to a term of imprisonment. *Id.* Since it is unlikely that anyone would be seeking bail pending appeal if he had *not* received a prison sentence, the People's argument has all the logic of Catch-22: under their approach, bail pending appeal would be available only to those who do not need it. Plainly, notwithstanding the People's baseless and perfunctory argument, this Court can readily conclude that we have amply satisfied the most critical criteria for release pending appeal.

Moreover, this Court should note that the People's letter is silent with regard to the warnings of well-respected physicians, whose letters were attached to the papers in support of our motion, that, because Mr. Garson is 74 years old and suffers from multiple illnesses and medical conditions, there is a substantial likelihood that he will die if he does not undergo alcohol detoxification under sophisticated medical supervision prior to incarceration. Surely, it is disturbing that a prosecutor's office, which would not hesitate to bring criminal charges against an individual who "consciously disregarded a substantial and unjustifiable risk that death would result from his conduct," *see*, e.g., *People v. Tallarine*, 223 A.D.2d 738, 739 (2d Dept. 1996), citing Penal Law §§ 125.15(5) (reckless manslaughter) and 15.05(3)(definition of "recklessly"), cavalierly ignores the warnings of medical experts that the immediate incarceration they seek in the present case poses just such a risk. Indeed, particularly in light of the District Attorney's determination to seek the maximum term of imprisonment for this first-time offender (notwithstanding that the offenses of conviction did not entail the amounts of money or the subversion of judicial rulings characteristic of more serious instances of bribe receiving), and his public threat that Mr. Garson would be subjected to "jail for the rest of his life" *New York Law Journal*, April 23, 2007, p. 1, quoting Kings County District Attorney Charles J. Hynes, it is difficult to view the prosecution's current posture as anything but vindictive. Under the unique circumstances of this case, granting the present application would not only fulfill the purpose of the bail statute, but, at least as importantly, would prevent the anomaly of our justice system operating in a manner that is not only inhumane and violative of the Eighth Amendment, but that could arguably make it complicit in an act that is itself criminal.

In this regard, we believe it is incumbent on counsel to advise the Court that, subsequent to Mr. Garson's sentencing, Dr. Philip Weintraub, Mr. Garson's cardiologist, and Dr. Nicholas Pace, a professor of medicine at the New York University School of Medicine and a recognized expert in the field of addiction medicine, have reiterated the opinions expressed in the letters attached to our motion, and have stated that they are prepared, if the Court deems it necessary, to provide sworn affidavits attesting to their opinions and concerns.

Honorable Edward D. Carni
June 12, 2007
Page 4

Dr. Pace has advised us that the 17% mortality rate from delirium tremens referred to in his letter applies to the overall population of alcoholics, and thus includes individuals who are otherwise in good health. For a person such as Mr. Garson, whose age, heart condition, cancer, and other illnesses significantly increase the potential for life-threatening complications, the likelihood of a fatality would be significantly greater. Dr. Pace also advised us that Mr. Garson is likely to experience delirium tremens within 12 to 24 hours of the time he ceases the intake of alcohol, and that, because of his heart condition, combined with other medical conditions, the resulting convulsions could very rapidly cause a heart attack or stroke, either of which is likely to be fatal.

During that critical 12- to 24-hour interval, Mr. Garson will either be at Rikers Island, or in transit to Rikers Island. Were delirium tremens to occur while Mr. Garson is on a prison bus, he could suffer a fatal heart attack or stroke without the ability to receive any medical intervention whatsoever. While Rikers Island has medical facilities and medical personnel that are undoubtedly capable of administering detoxification under ordinary circumstances, the age and health of this particular inmate would require a level of medical care that is beyond that required to detoxify the inmates that are regularly treated at Rikers Island. Kathleen O'Boyle, a mitigation specialist and former deputy director of the Center for Community Alternatives, a non-profit organization that is supported largely through funding by New York City and State and that works within the City and State jails and prisons, and whose mission includes monitoring and improving conditions of incarceration, advises us that, notwithstanding the institution's best efforts, because of the its necessary focus on security concerns and its staffing constraints, the medical facility at Rikers Island would have great difficulty providing the intense level of attention and intervention and the quality of care that medical experts have explained are essential to safe detoxification of an individual with the complex medical problems presented by Mr. Garson.

Thus, the extraordinary risks to Mr. Garson's health – none of which are disputed by the People – not only add further support to the conclusion that he poses no risk of flight, but make it clear that granting the present application, in addition to constituting a proper exercise of the Court's authority, would demonstrate that the criminal justice system functions in a manner that is consistent with fundamental principles of decency and compassion.[4]

_____

[4]When we appeared before the Court last week, we responded to a question about Mr. Garson's failure to undergo detoxification prior to sentencing by indicating that doing so during the approximately six-week interval between the date of conviction and the date of sentencing (which the court below declined to adjourn, notwithstanding our application based on Mr. Garson's need for medically-supervised detoxification) would have compromised his ability to participate with counsel in preparing for sentencing by, *inter alia*, soliciting and gathering letters

Honorable Edward D. Carni
June 12, 2007
Page 5

### B.    The People Have Failed to Demonstrate that the Issues to be
Raised on Mr. Garson's Appeal are Without Merit

Lacking any genuine basis for mounting a dispute with regard to the primary issue on a
bail application – whether the defendant will remain amenable to an order of the Court – the
People's opposition to our motion focuses on a single aspect of the statutory criteria
applicable to the present application: the "merit or lack of merit of the appeal." CPL §
510.30(a)(vii). With regard to that factor, however, the People misperceive the level of
scrutiny that is appropriate at this stage of the proceedings. Rather than recognizing that
"thorough review of the trial record" is the responsibility of the appellate panel that will
ultimately decide the appeal, and which will perform that task with the aid of full briefing and
arguments of counsel, *Kern*, 137 A.D.2d at 864, the People have taken the extraordinary
measure – unprecedented in my 25 years of appellate experience, which includes holding a
supervisory position in the Appeals Bureau of the Bronx County District Attorney's Office –
of submitting the entire transcript of a five-week trial in opposition to a bail application,
together with a selective portion of the many exhibits introduced at trial. Since the People
could not reasonably expect this Court to review a record of more than 3000 pages before
ruling on the present application, one is tempted to suspect that they believe our contention
that the verdict is "against the weight of the evidence" is to be taken literally and can be
measured in pounds.

---

of support and providing biographical information for inclusion in a sentencing report submitted
on his behalf. Additional factors also prevented Mr. Garson from entering an inpatient facility
during that time period. First and foremost, we must acknowledge that, throughout most of that
period, Mr. Garson was in a state of denial about the severity of his alcoholism. Equally
significantly, however, his reluctance to enter such a facility – even if there had been sufficient
time for him to do so – also reflected the emotional needs and desires of a man whose family had
recently suffered the tragic death of a six-year-old (Mr. Garson's granddaughter), followed within
months by the trauma of Mr. Garson's very public and humiliating trial and conviction. Under
these circumstances, it is surely understandable – even if not the best judgment – that, rather than
checking into a hospital for a 28-day inpatient detoxification, he sought to spend as much time as
possible with his children and grandchildren before the potential commencement of a term of
incarceration.

Mr. Garson has assured his family (as well as his attorneys) that, if the present application
is granted, he will promptly heed his doctors' advice to obtain the medically-supervised
detoxification and follow-up rehabilitation without which he is unlikely to survive, and we would
not object to the Court making it a condition of his release that he do so.

Honorable Edward D. Carni
June 12, 2007
Page 6

Notwithstanding the excessive nature of the People's submission, it should be noted that the materials they have provided do not constitute the entirety of what will ultimately be the record on appeal in this case. That record will also include transcripts and documents relating to the pretrial motions seeking suppression of the fruits of warrants that permitted eavesdropping on a judge's robing room. It may also include additional audio and video tapes obtained pursuant to those warrants. Thus, even if Your Honor were to undertake the inordinate burden of reviewing all of the documents provided by the People, those materials would provide an insufficient basis upon which to make the ultimate determinations that will be within the province of the panel of this Court that eventually hears Mr. Garson's appeal.

The full record on appeal will also include the sentencing transcript, which we have not yet been able to obtain. As reported in the *New York Law Journal*, page 1, column 4, on June 6, 2007, however, the sentencing court's remarks included the observation that, but for Mr. Garson's former status as a judge, the present case would have been "a 'slam dunk' for probation." In light of that remark, as well as a number of other factors, we anticipate that, in addition to the issues discussed in the application we filed on June 5th (which necessarily could not anticipate sentencing issues), our appeal will seek alternative relief on the ground that the sentence was excessive. Of course, the prospect that this Court may ultimately determine that Mr. Garson should receive a reduced sentence, possibly one consisting only of probation, would – in and of itself – justify the granting of bail pending appeal so that Mr. Garson will not have to serve a sentence that may ultimately be deemed excessive.

While we believe that review of the enormous – but nonetheless incomplete – record provided by the People is unnecessary at this juncture, we are confident that if the Court were to engage in such a review, it would only support the conclusion that, in addition to the issues discussed in our present application, Mr. Garson's trial entailed numerous disputed rulings that could form the basis for meritorious points to be raised on appeal.

In their discussion of the appellate issues referred to in our bail application, the People attempt to suggest that it is our burden to demonstrate a *likelihood* of reversal. As discussed in our opening papers, however, the statute that governs the present application does not impose such a burden; on the contrary, while a court is to *consider* the "merit or lack of merit of the appeal," § 510.30(a)(vii), and the "likelihood of ultimate reversal of the judgment," § 510.30(2)(b), the statute expressly permits a Court to grant bail to a defendant who does not pose a flight risk even if the issues presented in his bail application are "palpably without merit." *Id.* Far from demonstrating that the issues we have outlined are "palpably without merit," however, the People's opposition papers, even if viewed in the most favorable light imaginable, establish nothing more than the unremarkable fact that on this appeal – as on virtually every appeal from a judgment in a criminal case – the respondent will submit a brief

Honorable Edward D. Carni
June 12, 2007
Page 7

that disputes the appellant's legal reasoning and his characterization of the underlying facts. Regardless of how those issues may ultimately be decided, the People have surely failed to demonstrate that each and every issue that we contemplate arguing to this Court is meritless, and that affirmance of the judgment below is inevitable.

On the contrary, examination of the arguments presented in the People's opposition papers confirms that the issues we have identified at this juncture are substantial and meritorious:

> **1.     The Charge of Bribe Receiving Should Have
> Been Assessed Pursuant to the Standard that
> Applies When the People Rely on Circumstantial
> Evidence; When Assessed Pursuant to that
> Standard, the Verdict Was Against the Weight of
> the Evidence**

In their responding papers, the People cite *People v. Bac Tran*, 80 N.Y.2d 170, 178 (1992), in which the Court of Appeals recognized that bribery cases "are usually circumstantial and inferential." People's Memorandum, p. 7. They also cite *United States v. Friedman*, 854 F.2d 535, 553-54 (2d Cir. 1988), in which the Second Circuit similarly recognized that "evidence of a corrupt agreement in a bribery case is usually circumstantial." *Id.* Notwithstanding that acknowledgment, the People insist that the court below properly denied Garson's request for an instruction concerning the standard applicable to cases that depend on circumstantial evidence. The argument that no such instruction was required because the People's cases entailed "*mixed* direct and circumstantial evidence" [People's memorandum, p. 16] misses the point, since there is no such thing as a case in which there is *no* direct evidence; by definition, a circumstantial conclusion must be based on inferences drawn from direct evidence. Here, however, while there was direct evidence of Siminovsky paying for meals and direct evidence that he received certain benefits, the determination that there was an "understanding" that one was given in exchange for the other required that the jury draw a circumstantial conclusion. Contrary to the People's contention [People's Memorandum, p. 17], the existence of such a *quid pro quo* represents more than just the *mens rea* element of bribe receiving; the "doing of one in exchange for the other" is "the *essence* of the crime." *People v. Alvino*, 71 N.Y.2d 233, 244 (1987)(emphasis added). Since there would be no criminal act at all in the absence of such an understanding, the jury should have been instructed that it could convict Garson of this offense only if "the inference of guilt is the only one that can fairly and reasonably be drawn from the facts" and "the evidence excludes beyond a reasonable doubt every reasonable hypothesis of innocence." *People v. Sanchez*, 61 N.Y.2d 1022, 1024 (1984).

Honorable Edward D. Carni
June 12, 2007
Page 8

Notably, none of the cases cited by the People for the proposition that a circumstantial evidence charge was not required in this case involved an alleged bribe. *See* People's Memorandum, pp. 16-17, citing *People v. Sanders*, 172 A.D.2d 397[5] (1st Dept. 1991)(robbery); *People v. McCoy*, 30 A.D.3d 441, 443 (2d Dept. 2006)(criminal possession of a weapon); and *People v. Johnson*, 293 A.D.2d 489 (2d Dept. 2002)(criminal sale of a controlled substance). The absence of any controlling precedent upholding the People's position is further demonstrated by the fact that the only case they cite in which a bribe receiving conviction based on circumstantial evidence was sustained in the face of a challenge to the sufficiency of the evidence was a case decided under federal law, which, unlike the law of the State of New York, does not require a different and higher standard to cases that depend on circumstantial evidence. *See* People's Memorandum, p. 8, n.8, citing *Friedman*, 854 F.2d at 553.

Of course, if the Court agrees with our contention that the circumstantial evidence standard was applicable, that standard should apply to this Court's assessment of the weight of the evidence. Notwithstanding their bold declaration that the evidence of guilt was "overwhelming," the People do not even attempt to demonstrate that the evidence excluded every reasonable, alternative hypothesis consistent with innocence. Their failure to do so is a tacit concession that the evidence would support multiple hypotheses other than the one they urged the jury to accept. Thus, regardless of the Court's ultimate assessment of the credibility of Siminovsky's testimony – an assessment that can only be made after reviewing his testimony in its entirety and considering our arguments concerning its self-contradictory, self-serving, and perjurious nature – if the Court holds the People to the standard that applies to circumstantial evidence, it is virtually certain that it will conclude that the verdict was against the weight of the evidence.

---

[5]The citation appears incorrectly as 172 A.D.2d 372 (1991), in the People's Memorandum.

Honorable Edward D. Carni
June 12, 2007
Page 9

## 2.    The Verdicts on the Receiving Rewards Counts
## Were Against the Weight of the Evidence[6]

### March 4, 2003

The People insist that, "[r]egardless of whether on March 4, 2003, Siminovsky explicitly mentioned the Levi case to defendant in connection with the cigars, the trial evidence *compelled* the conclusion that on that date, defendant understood that Siminovsky's reference to "pointers" referred to advice that defendant had provided to Siminovsky about the Levi case." People's Memorandum, p. 11 (emphasis added). In making that assertion – which they do with all of the boldness of their claim that Mr. Garson is a flight risk – the People simply ignore the evidence that, only moments before the reference to "pointers," Garson had responded to Siminovsky's mention of "advice," by asking "What advice?"

According to the People, the fact that Garson had spoken to Siminovsky about the *Levi* case on past occasions – the most recent of which was five days earlier – constitutes proof beyond a reasonable doubt that Garson understood the "pointers" for which Siminovsky thanked him to be advice, specifically, about the *Levi* case. In making that argument, the People pay no heed to the evidence that Garson and Siminovsky, a younger lawyer who viewed Garson as a "mentor," were in each other's company on a nearly daily basis, and that their conversations were likely to entail "pointers" on any number of subjects, and thus that there is no reason to presume that Garson could *only* have understood Siminovsky to be referring to the *Levi* case. The People also refuse to consider the possibility that Garson did not view a discussion about matters such as issuing a subpoena in order to secure the appearance of a witness or preparing a witness to testify by having him review his EBT and reminding him to tell the truth – matters that, as Siminovsky acknowledged, were quite familiar to an attorney who had been practicing as long as he had – to be "advice" or "pointers" at all. The People similarly presume that a trier of fact has no choice but to infer, from the mere fact that Garson looked at the box of cigars that had earlier been placed in his desk drawer, that Garson understood not only that Siminovsky's generalized expression of thanks referred specifically to *ex parte* advice about the *Levi* case, but that he understood that the cigars were intended specifically as a reward for that advice.

---

[6]It should be noted that, notwithstanding the People's suggestion, during the conference before Your Honor on June 5, 2007, that the papers in support of our bail application contained misstatements of facts, the People's papers in opposition do not identify any such misstatement, and, notwithstanding differences of emphasis and interpretation, their discussion of the underlying facts is consistent with ours.

Honorable Edward D. Carni
June 12, 2007
Page 10

What is most striking is that, notwithstanding their burden of proof, the People did not
direct their agent, Siminovsky, to state the purpose for the gift in clear, unequivocal terms.
Instead, they offered evidence of vague remarks and actions that are subject to a variety of
interpretations, and asked the jury to ignore evidence giving rise to alternative explanations.
Given the unquestionable impropriety of the conduct captured on the videotapes – a judge
giving *ex parte* advice and accepting a gift from the attorney for a litigant – it is
understandable that a jury could be swayed to overlook the gap between the People's theory
and their proof. There is every reason to believe, however, that this Court, reviewing the
same evidence dispassionately and logically, will recognize that it failed to demonstrate
Garson's critical understanding of the purpose for the cigars beyond a reasonable doubt.[7]

### March 10, 2003

Notwithstanding the People's well-worn use of the word "overwhelming" to
characterize the proof that Garson understood the money given to him on March 10, 2003, to
be a "referral fee," the robing room video tape they have submitted to the Your Honor will
demonstrate that this is not the case. The one reference to a client that appears on the
People's own transcript of that tape [a copy of which is attached to this letter] is the
following:

> JG [Garson]: Who the fuck is Michael Pallilo . . .
>
> PS [Siminovsky]: Not a clue. . . [unintelligible]
>
> JG:    What?
>
> PS: Caputo also, maybe he'll be back. _
>
> JG: Ooh, if he's back that's a big one.
>
> PS: Yeah, let's hope.

---

[7]In an attempt to bolster their argument, the People point to the Court of Appeals'
decision regarding their pre-trial appeal, *People v. Garson*, 6 N.Y.2d 604 (2006). Contrary to the
People's implication, that decision, which involved review only of grand jury evidence and
determined only that that evidence satisfied the lower burden of establishing a *prima facie* case
in no way limits or controls this Court's independent obligation to review the trial evidence in
connection with a challenge to the weight of the evidence.

Honorable Edward D. Carni
June 12, 2007
Page 11

[People's transcript of March 10, 2003, robing room video, p. 3]. Nothing on the transcript
suggests that the money given on that date was a fee relating to the referral of Caputo (or
anyone else), which had occurred some five months earlier. Although the People insist that
the length of time since Caputo retained Siminovsky, the absence of any mention of a referral
fee during the interim, and the discrepancies between the manner in which the money was
delivered to Garson and the alleged "pattern" the staged March 10th event were meant to
corroborate are all without moment, those factors cast further doubt on a conclusion that was
dubious to begin with.

Having failed to point to evidence that supports the People's theory that Garson
understood the money to be a referral fee, the People attempt to shift the burden of proof by
arguing that, "when Siminovsky first gave the money to defendant on March 10, 2003, there
is nothing to suggest that Siminovsky or defendant mentioned Robin Garson's campaign in
any way." [People's Memorandum, p. 14]. As the defendant, Garson had no obligation to
point to evidence suggesting what was or was not mentioned when the money was initially
given to him. Far from being based on "pure fantasy" [People's Memorandum, p. 13],
however, the conclusion that Garson understood the money to be a contribution to the election
fund flows far more naturally from the videotaped evidence than the People's
"interpretation." While the People acknowledge that "when Siminovsky returned to
defendant's robing room pursuant to the defendant's request, the first thing that defendant
said to Siminovsky was "It was a lot of money for, what do you call it, the election" [People's
Memorandum, pp. 13-14], they maintain that it is "patently wrong" to suggest that Garson
was making this statement with reference to the money Siminovsky had given to him less than
an hour earlier. Inasmuch as Garson was handing that very money back to Siminovsky just as
he was saying this, however, the suggestion is, at the very least, a reasonable one, if not the
only possible one. Such an "interpretation" is further supported by the fact that Garson's
telephone call asking Siminovsky to return was made immediately after he counted the
money.

The fact that, in Garson's mind, the money was – and always had been – a contribution
to the campaign fund is further supported by the fact that, without skipping a beat, Garson
followed his comment about it being a lot of money for the "election" with a suggestion that
Siminovsky instead write a check to the campaign fund. What is "patently wrong" is the
People's theory that, although Garson's statement about "a lot of money for . . . the election"
supposedly did *not* refer to the money given to him a short time earlier (which begs the
questions: what *did* it refer to, and why was it said the moment Siminovsky responded to a
request to return that was obviously prompted by Garson's concern with regard to the money
he had just received?), Garson inexplicably reverted to talking about the money given to him
earlier – the money the People insist was understood to be a "referral fee" – when, seconds

Honorable Edward D. Carni
June 12, 2007
Page 12

later, he proposed that Siminovsky write a check instead. Refusing to view the conversation in its logical context, the People maintain that when Siminovsky told Garson "I'll do both" [Videotape transcript, p. 6], he was not referring to contributions both in cash and by check to Robin Garson's campaign fund, but to a campaign contribution by check and a "referral fee" in cash. Particularly in the absence of any actual mention of a referral fee on the tape, the People's claims about the "understanding" established by the tape are not only subject to reasonable doubt, but border on the nonsensical.

The May 10th videotape was another instance in which the jury's visceral reaction to what they were seeing -- the admittedly disturbing sight of a judge pocketing money given to him by a lawyer -- undoubtedly had a powerful impact. We trust, however, that the panel that hears our appeal will be able to put aside such reactions and that, after conscientiously reviewing the evidence and arguments in their entirety, will conclude that the verdict was based on a theory that the evidence fails to support beyond a reasonable doubt.[8]

> **3.    The Court Erroneously Permitted the People to Introduce Evidence Suggesting that Garson Based Legal Determinations on Bribes, and to Insinuate that this was the Case in its Opening Statement**

In response to our contention that evidence suggesting that Garson's legal ruling regarding the length of Avraham Levi's testimony was made in exchange for a bribe was beyond the scope of the notice provided by the indictment and bill of particulars, the People contend that Garson was on notice that he would have to defend against such allegations because the bill of particulars stated that one of the benefits Siminovsky received in exchange

---

[8]With regard to our challenge to the proof that Garson "lent the prestige of his office" in making the referrals at issue, the People argue that the jury was entitled to draw such an inference solely from the fact that the individuals to whom he made the referrals were likely to have known that Garson was a matrimonial judge. While such knowledge may have been sufficient to establish a *prima facie* case that could proceed to trial, it hardly constitutes proof beyond a reasonable doubt that the "prestige" of Garson's office played any role at all in these individuals acceptance of his recommendations. The evidence established that Sal Caputo and Ronald Aiello (the father of the matrimonial client) had known Garson long before he became a judge. Thus, there was no reason for the jury to infer that it was Garson's status as a judge – rather than their long acquaintance with him as a private individual – that caused them to rely on his recommendations. Indeed, it is hard to imagine that Ronald Aiello – a former judge himself – would have been influenced by the "prestige" of Garson's office.

Honorable Edward D. Carni
June 12, 2007
Page 13

for the alleged bribes was to be treated with more "courtesy" than other lawyers. [People's Memorandum, p. 20]. If counsel for either party in the present proceeding were to say that we appreciated the "courtesy" shown by Your Honor when we appeared in your chambers last week – as we no doubt would – we surely would not expect anyone to understand that to mean that we appreciated Your Honor making a legal determination in our favor. Notwithstanding the People's strained argument, there is a world of difference between a judge extending "courtesy" to an attorney and a judge granting the attorney's substantive applications. Read fairly, therefore, a bill of particulars advising Garson that he would have to defend against the allegation that, in exchange for bribes, he showed Siminovsky more "courtesy" than other lawyers certainly did not put him on notice that he would have to defend against the far more serious claim that a bribe influenced rulings he made during the course of a trial.[9]

Furthermore, the defense motion for a mistrial immediately following the prosecution's opening statement preserved the defense objection to a remark suggesting that the outcome of the *Levi* trial was made influenced by a bribe, since it would have been possible for the Court to take corrective action at that time, either by granting a mistrial or by giving a curative charge. *See People v. Dailey*, 188 A.D.2d 485 (2d Dept. 1992)(instruction to disregard reference to uncharged crime given promptly after improper comment in opening statement cured error); CPL § 470.05(2)(objection is preserved if made at the time of error or "at any subsequent time when the court had an opportunity of effectively changing the same").

---

[9]The People argue that any error in admitting this evidence was "harmless" in light of the "massive amount of indisputable evidence . . . showing the tremendous advantage that defendant gave Siminovsky over Michael Joseph in connection with the Levi case . . . ." [People's Memorandum, p. 20]. On the contrary, there was no evidence at all that Garson gave Siminovsky a "tremendous advantage" over his adversary in the *Levi* case. Although he engaged in *ex parte* conversations about the case that were clearly improper and in violation of the Code of Judicial Conduct, those conversations did not provide Siminovsky with any meaningful "advantage" in the litigation. Rather, as Siminovsky himself acknowledged, Garson did not tell him anything that he did not already know, and Siminovsky believed that, in view of his talent as an attorney, his chances of success would be just as good before any other matrimonial judge. Moreover, if read in the context of the conversation in which it occurred and that of other ongoing conversations, it is clear that Garson's remark that Siminovsky's client would "win" even though he did not "deserve" to did not mean that Garson intended to rule in a way that was not warranted by the facts and the law; rather, it meant that, because of the facts – for example, that title to the Levi home was in the name of Avraham and his father, and not of Sigal – Avraham would receive a greater percentage of the house, even though Garson, like Siminovsky, found Levi to be an unlikeable person.

Honorable Edward D. Carni
June 12, 2007
Page 14

Additionally, even assuming that the issue was not preserved, this Court would have the power to consider it in the interest of justice.

> 4.    **The Trial Court Erroneously Refused to Permit the Defense to Offer Evidence That Siminovsky Was Unwilling to Ask Garson to Steer a Case to his Part Because He Knew That Garson Would Be Outraged by Such a Request**

In response to our argument that the court below erroneously precluded the defense from introducing evidence regarding Siminovsky's unwillingness to ask Garson to assist him in efforts to bypass the Supreme Court's random case assignment process, the People take a cramped view of what such evidence would signify. According to their argument, because there were no charges that Garson had engaged in that precise form of misconduct, the proffered evidence would have been irrelevant. [People's Memorandum, p. 21]. The People's narrow argument misses the point. Particularly because the People had been allowed – erroneously, in our view – to introduce evidence suggesting that Garson was willing to subvert justice by making unwarranted rulings at Siminovsky's behest, evidence of Siminovsky's belief that Garson would not subvert justice by manipulating a case assignment for Siminovsky would have been highly probative with regard to the allegedly corrupt relationship that was at the heart of the charges against Garson. Contrary to the People's contention [People's memorandum, pp. 21-22], Garson's willingness to engage in *ex parte* communications with Siminovsky – while clearly wrongful – involved the appearance of impropriety and a violation of judicial ethics, and therefore was of a significantly different order than acts that would substantively affect the administration of justice. Permitting the People to inflate the form of wrongdoing with which Garson *was* charged into a more sinister form of wrongdoing with which he was *not* charged – and then prohibiting Garson from introducing evidence to counter the People's efforts in this regard – deprived him of his right to a fair trial.

> 5.    **The Court Erroneously Admitted Extensive Hearsay Evidence Concerning Nissim Elmann's Acceptance of Payments for the Purported Purpose of Bribing Garson**

The cases cited by the People in opposition to our claim that the court below erred in permitting several days of testimony, tapes, and exhibits regarding evidence that purportedly was to serve only as "background" to the present case [People's memorandum, pp. 22-23] confirm our position. Each of those cases involved limited *testimony*; none of them involved

Honorable Edward D. Carni
June 12, 2007
Page 15

evidence that approached the extraordinary degree, variety, and length of that presented in this
case. If the People truly believed that presenting evidence in this manner "in fact benefitted
defendant" [People's memorandum, p. 24], it is a wonder that they nonetheless chose to do so.
Review of the evidence on appeal will permit the Court to recognize that, notwithstanding the
court's limiting instructions, the extensive presentation of evidence concerning Nissim
Elmann's claims that he was bribing Garson went far beyond what was necessary to establish
the "background" of this investigation and inevitably prompted the jury to speculate that there
was some truth to his claims.

### 6.    The Videotapes of Garson's Robing Room
          Should Have Been Suppressed

As the Court is aware, the validity of eavesdropping warrants is a mixed question of
law and fact. *People v. Merlo*, 195 A.D.2d 576 (2d Dept. 1993). The substantial motions
submitted by predecessors to current counsel (with which we are not yet sufficiently familiar
to discuss in depth) undoubtedly raise arguable points that are subject to full review on appeal
and that, if ruled upon favorably, would warrant reversal of all counts of conviction.

### Conclusion

Notwithstanding the People's effort to suggest otherwise, the present case is one in
which the standard for granting bail pending appeal has been overwhelmingly satisfied. We
therefore urge the Court to grant the requested relief. In view of Mr. Garson's limited
financial means, the People's alternative proposal to increase his bail would effectively
amount to not granting bail at all, and would be unconstitutionally excessive. Accordingly,
we urge the Court to continue the current bail or to impose a modest increase that would
remain within Mr. Garson's means.

If it so pleases the Court, we would be happy to appear for a further conference with
regard to this application.

Respectfully,

Jeremy Gutman
*Attorney for Appellant*
*Gerald Garson*

Michael S. Washor, Esq.

Honorable Edward D. Carni
June 12, 2007
Page 16

*Of Counsel*

cc.  Seth Lieberman, Esq.
    *Assistant District Attorney*
    (by email: lieberms@brooklynda.org)