# INDICTMENT

## SUPREME COURT OF THE STATE OF NEW YORK

## COUNTY OF KINGS

$T6-L4$

THE PEOPLE OF THE STATE OF NEW YORK

AGAINST

XB.    GERALD GARSON,
2003KN024132

DEFENDANT.

INDICTMENT NO 3515/2003
NON-ALIGNED
RACKETS DIVISION

C O U N T S:

RECEIVING REWARD FOR OFFICIAL MISCONDUCT IN THE
SECOND DEGREE (6 COUNTS)
OFFICIAL MISCONDUCT
RECEIVING UNLAWFUL GRATUITIES

A TRUE BILL

FOREPERSON

CHARLES J. HYNES
DISTRICT ATTORNEY

## FIRST COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSE THE DEFENDANT OF THE CRIME OF RECEIVING REWARD FOR OFFICIAL MISCONDUCT IN THE SECOND DEGREE [PL 200.25] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT MARCH 4, 2003, IN THE COUNTY OF KINGS, BEING A PUBLIC SERVANT, DID SOLICIT, ACCEPT AND AGREE TO ACCEPT A BENEFIT, NAMELY A BOX OF CIGARS, FROM ANOTHER PERSON, NAMELY PAUL SIMINOVSKY, FOR HAVING VIOLATED HIS DUTY AS A PUBLIC SERVANT.

## SECOND COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSE THE DEFENDANT OF THE CRIME OF RECEIVING REWARD FOR OFFICIAL MISCONDUCT IN THE SECOND DEGREE [PL 200.25] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT OCTOBER 9, 2001, IN THE COUNTY OF KINGS, BEING A PUBLIC SERVANT, DID SOLICIT, ACCEPT AND AGREE TO ACCEPT A BENEFIT, NAMELY A SUM OF UNITED STATES CURRENCY, FROM ANOTHER PERSON, NAMELY PAUL SIMINOVSKY, FOR HAVING VIOLATED HIS DUTY AS A PUBLIC SERVANT.

## THIRD COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSE THE DEFENDANT OF THE CRIME OF RECEIVING REWARD FOR OFFICIAL MISCONDUCT IN THE SECOND DEGREE [PL 200.25] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT OCTOBER 31, 2001, IN THE COUNTY OF KINGS, BEING A PUBLIC SERVANT DID SOLICIT, ACCEPT AND AGREE TO ACCEPT A BENEFIT, NAMELY A SUM OF UNITED STATES CURRENCY, FROM ANOTHER PERSON, NAMELY PAUL SIMINOVSKY, FOR HAVING VIOLATED HIS DUTY AS A PUBLIC SERVANT.

## FOURTH COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSE THE DEFENDANT OF THE CRIME OF RECEIVING REWARD FOR OFFICIAL MISCONDUCT IN THE SECOND DEGREE [PL 200.25] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT SEPTEMBER 5, 2002, IN THE COUNTY OF KINGS, BEING A PUBLIC SERVANT DID SOLICIT, ACCEPT AND AGREE TO ACCEPT A BENEFIT, NAMELY A SUM OF UNITED STATES CURRENCY, FROM ANOTHER PERSON, NAMELY PAUL SIMINOVSKY, FOR HAVING VIOLATED HIS DUTY AS A PUBLIC SERVANT.

## FIFTH COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSE THE DEFENDANT OF THE CRIME OF RECEIVING REWARD FOR OFFICIAL MISCONDUCT IN THE SECOND DEGREE [PL 200.25] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT NOVEMBER 15, 2002, IN THE COUNTY OF KINGS, BEING A PUBLIC SERVANT, DID SOLICIT, ACCEPT, AND AGREE TO ACCEPT A BENEFIT, NAMELY A SUM OF UNITED STATES CURRENCY, FROM ANOTHER PERSON, NAMELY PAUL SIMINOVSKY, FOR HAVING VIOLATED HIS DUTY AS A PUBLIC SERVANT.

## SIXTH COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSE THE DEFENDANT OF THE CRIME OF RECEIVING REWARD FOR OFFICIAL MISCONDUCT IN THE SECOND DEGREE [PL 200.25] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT MARCH 10, 2003, IN THE COUNTY OF KINGS, BEING A PUBLIC SERVANT DID SOLICIT, ACCEPT, AND AGREE TO ACCEPT A BENEFIT, NAMELY A SUM OF UNITED STATES CURRENCY, FROM ANOTHER PERSON, NAMELY PAUL SIMINOVSKY, FOR HAVING VIOLATED HIS DUTY AS A PUBLIC SERVANT.

### SEVENTH COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS
INDICTMENT, ACCUSE THE DEFENDANT OF THE CRIME OF OFFICIAL
MISCONDUCT [PL 195.00-1] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT AND BETWEEN NOVEMBER 1,
2002 AND MARCH 4, 2003, IN THE COUNTY OF KINGS, PURSUANT TO A
COMMON SCHEME AND PLAN, WITH INTENT TO OBTAIN A BENEFIT,
COMMITTED AN ACT RELATING TO HIS OFFICE BUT CONSTITUTING AN
UNAUTHORIZED EXERCISE OF HIS OFFICIAL FUNCTIONS, KNOWING THAT
SUCH ACT WAS UNAUTHORIZED, NAMELY RENDERING EX PARTE ADVICE
TO PAUL SIMINOVSKY.

### EIGHTH COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT,
ACCUSE THE DEFENDANT OF THE CRIME OF RECEIVING UNLAWFUL
GRATUITIES [PL 200.35] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT MARCH 4, 2003, IN THE COUNTY OF
KINGS, BEING A PUBLIC SERVANT, SOLICITED, ACCEPTED, AND AGREED
TO ACCEPT A BENEFIT FOR HAVING ENGAGED IN OFFICIAL CONDUCT
WHICH HE WAS REQUIRED AND AUTHORIZED TO PERFORM AND FOR
WHICH HE WAS NOT ENTITLED TO ANY SPECIAL AND ADDITIONAL
COMPENSATION, PERTAINING TO THE RENDERING OF EX PARTE ADVICE
TO PAUL SIMINOVSKY.

CHARLES J. HYNES
DISTRICT ATTORNEY

# INDICTMENT
## SUPREME COURT OF THE STATE OF NEW YORK
### COUNTY OF KINGS

L 4

THE PEOPLE OF THE STATE OF NEW YORK

AGAINST

B.      GERALD GARSON,
        Dkt. No. 2003KN024132

DEFENDANT.

INDICTMENT NO. 5332/2003
(Supersedes Indictment No.
3515/2003 as to Count Seven
only)

NON-ALIGNED
RACKETS DIVISION

COUNTS:

BRIBE RECEIVING IN THE THIRD DEGREE
OFFICIAL MISCONDUCT (THREE COUNTS)

A TRUE BILL

FOREPERSON

CHARLES J. HYNES
DISTRICT ATTORNEY

## FIRST COUNT

THE GRAND JURY OF THE COUNTY OF KINGS, BY THIS INDICTMENT, ACCUSES THE DEFENDANT GERALD GARSON OF THE CRIME OF BRIBE RECEIVING IN THE THIRD DEGREE [P.L. § 200.10], COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT AND BETWEEN JANUARY 1, 2002 AND MARCH 12, 2003, IN THE COUNTY OF KINGS, BEING A PUBLIC SERVANT, PURSUANT TO A COMMON SCHEME AND PLAN, SOLICITED, ACCEPTED AND AGREED TO ACCEPT BENEFITS FROM ANOTHER PERSON, NAMELY PAUL SIMINOVSKY, UPON AN AGREEMENT AND UNDERSTANDING THAT THE DEFENDANT'S VOTE, OPINION, JUDGMENT, ACTION, DECISION AND EXERCISE OF DISCRETION AS A PUBLIC SERVANT WOULD THEREBY BE INFLUENCED.

## SECOND COUNT

THE GRAND JURY OF THE COUNTY OF KINGS, BY THIS INDICTMENT, ACCUSES THE DEFENDANT GERALD GARSON OF THE CRIME OF OFFICIAL MISCONDUCT [P.L. § 195.00-1], COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT MARCH 4, 2003, IN THE COUNTY OF KINGS, BEING A PUBLIC SERVANT, WITH INTENT TO OBTAIN A BENEFIT, COMMITTED AN ACT, PERTAINING TO HIS RECEIPT OF A BOX OF CIGARS FROM PAUL SIMINOVSKY, AND RELATING TO THE DEFENDANT'S OFFICE BUT CONSTITUTING AN UNAUTHORIZED EXERCISE OF THE DEFENDANT'S OFFICIAL FUNCTIONS, KNOWING THAT SUCH ACT WAS UNAUTHORIZED.

## THIRD COUNT

THE GRAND JURY OF THE COUNTY OF KINGS, BY THIS INDICTMENT, ACCUSES THE DEFENDANT GERALD GARSON OF THE CRIME OF OFFICIAL MISCONDUCT [P.L.§ 195.00-2], COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT MARCH 4, 2003, IN THE COUNTY OF KINGS, BEING A PUBLIC SERVANT, WITH INTENT TO OBTAIN A BENEFIT, KNOWINGLY REFRAINED FROM PERFORMING A DUTY, PERTAINING TO HIS RECEIPT OF A BOX OF CIGARS FROM PAUL SIMINOVSKY, AND WHICH WAS IMPOSED UPON THE DEFENDANT BY LAW AND WAS CLEARLY INHERENT IN THE NATURE OF THE DEFENDANT'S OFFICE.

## FOURTH COUNT

THE GRAND JURY OF THE COUNTY OF KINGS, BY THIS INDICTMENT, ACCUSES THE DEFENDANT GERALD GARSON OF THE CRIME OF OFFICIAL MISCONDUCT [P.L. § 195.00-1], COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT AND BETWEEN NOVEMBER 1, 2002 AND MARCH 4, 2003, IN THE COUNTY OF KINGS, BEING A PUBLIC SERVANT, PURSUANT TO A COMMON SCHEME AND PLAN, WITH INTENT TO OBTAIN A BENEFIT, COMMITTED AN ACT RELATING TO HIS OFFICE BUT CONSTITUTING AN UNAUTHORIZED EXERCISE OF HIS OFFICIAL FUNCTIONS, KNOWING THAT SUCH ACT WAS UNAUTHORIZED, NAMELY, RENDERING EX PARTE ADVICE TO PAUL SIMINOVSKY.

CHARLES J. HYNES
DISTRICT ATTORNEY

3



**OFFICE OF THE DISTRICT ATTORNEY, KINGS COUNTY**

RENAISSANCE PLAZA at 350 JAY STREET
BROOKLYN, N.Y. 11201-2908
TEL (718) 250-2600

**CHARLES J. HYNES**
*District Attorney*

JOHN C. L. DIXON
*Deputy Bureau Chief, Rackets Division*

September 19, 2003·

By Facsimile and Certified Mail
Diarmuid White, Esq.
White & White
148 East 78th Street
New York, NY 10021

Re: **People v. Garson,**
**Ind. No. 5332/2003**

Dear Mr. White:

I refer to your letter of September 10, 2003, requesting a bill of particulars with respect to the second indictment against your client. The People respond as follows:

**Count One**

*(1) Identify with particularity the nature of each "benefit" that the defendant is alleged to have solicited, accepted and agreed to accept between January 1, 2002, and March 12, 2003:*

Response: The nature of the benefits that the defendant solicited, accepted, or agreed to accept were meals, beverages, loans, and cigars.

*(2) Identify the date or dates on which any such benefits were accepted.*

Response: The People allege that the defendant's conduct was pursuant to a common scheme or plan and involved an ongoing course of conduct on or about and between January 1, 2002 and March 12, 2003. The actual dates that the benefits were accepted would in such a case under the... be an evidentiary issue, and therefore beyond the scope of a Bill of Particulars as it is defined in C.P.L. § 200.95(1)(a), and in addition, the dates would not be necessary to enable the defendant to adequately prepare his defense.

It is, however, anticipated that this evidence will be made available to the defendant upon his review of the grand jury exhibits, which will be provided to the defendant in due course upon approval of the minutes.

Based on those exhibits, the relevant dates would include on or about:

- January 25 and 29, 2002;
- February 1, 5, 11, and 19, 2002;
- March 22 and 28, 2002;
- April 4, 5, and 24, 2002;
- May 1, 14, 15, 17, and 23, 2002;
- June 3, 6, 7, 10, 12, 14, 25, and 27, 2002;
- July 2, 3, 19, 26, and 27, 2002;
- August 1, 2, 12, 15, 16, 26, 27, and 28, 2002;
- September 3, 6, 9, 10, 11, 19, 20, and 27, 2002;
- October 1, 2, 3, 8, 16, 23, 28, and 29, 2002;
- November 4, 5, 7, 8, 13, 14, 18, 20, 22, 25, and 27, 2002;
- December 2, 3, 6, 9, 10, 11, 12, 17, and 31, 2002;
- January 2, 6, 7, 8, 10, 14, 21, 22, 23, 27, and 29, 2003;
- February 5, 6, 7, 18, 20, 21, 25, 27, and 28, 2003; and
- March 4, 6, 7, and 12, 2003.

(3) *Identify with particularity the "vote, opinion, judgment, action, decision and exercise of discretion" that would be influenced pursuant to the alleged agreement and understanding.*

Response: The defendant's "vote, opinion, judgment, action, decision and exercise of discretion" that was influenced pursuant to his agreement and understanding with Siminovsky was: Assigning law guardianships to Siminovsky; providing Siminovsky with ex parte advice about cases pending before defendant; granting Siminovsky's requests for adjournments in cases pending before defendant; granting Siminovsky ready access to defendant's robing room; and treating Siminovsky with more courtesy than defendant would treat many other lawyers appearing before him.

Count Two

(4) *Describe the "act" which the defendant allegedly "committed."*

Response: The act that the defendant committed was his receipt and acceptance of a box of cigars from Siminovsky.

(5) *Identify the "benefit" which the defendant allegedly intended to obtain.*

Response: The benefit that the defendant intended to obtain by this act was a box of cigars.

Count Three

(6) *With respect to the allegation that the defendant refrained from performing "a duty" on March 4, 2003, identify with particularity the "duty."*

Response: The defendant refrained from performing the duty that was imposed upon him by Jud. L. § 18 to refuse the box of cigars as compensation for providing advice to Siminovsky about the Levi divorce case and to return such compensation.

(7) State whether that "duty" was "imposed upon the defendant by law" or whether the duty was "clearly inherent in the nature of the defendant's office."

Response: The duty was imposed upon the defendant by law.

(8) If the duty was "imposed upon the defendant by law," identify the law.

Response: The duty that was imposed upon the defendant by law was imposed by Jud. L. § 18.

**Count Four**

(9) Identify with particularity each "benefit" which the defendant allegedly intended to obtain between November 1, 2002, and March 4, 2003.

Response: A request for specificity relating to each benefit is a request for identification of evidence, and therefore beyond the scope of a Bill of Particulars as it is defined in C.P.L. § 200.95(1)(a), and in addition, it would not be necessary to enable the defendant to adequately prepare his defense.

The People are, however, prepared to state the nature of the benefits that the defendant intended to obtain: First, he intended to obtain a benefit for Siminovsky, namely an advantage for Siminovsky in the Levi divorce case. Second, the defendant intended to obtain a benefit for himself, namely the ongoing provision to him of meals, beverages, and cigars.

Sincerely,

John C. L. Dixon
Ph: 718-250-2580
Fax: 718-250-2599

cc (by facsimile only):

Ronald Fischetti, Esq.
950 Third Avenue, Suite 3200
New York, NY 10022

Joseph Tacopina, Esq.
321 Broadway
New York, NY 10007

09/19/03 FRI 18:24 FAX 7182502599    NO.685   P.9

Professor Abraham Abramovsky, Esq.
Fordham University School of Law
140 West 62nd Street
New York, NY 10023



**OFFICE OF THE DISTRICT ATTORNEY, KINGS COUNTY**

RENAISSANCE PLAZA at 350 JAY STREET
BROOKLYN, N.Y. 11201-2908
TEL (718) 250-2600

CHARLES J. HYNES
*District Attorney*

JOHN C. L. DIXON
*Deputy Bureau Chief, Rackets Division*

October 3, 2003

By Facsimile and Certified Mail
Diarmuid White, Esq.
White & White
148 East 78th Street
New York, NY 10021

Re: People v. Garson,
Ind. No. 5332/2003

Dear Mr. White:

I refer to your letter of September 22, 2003, requesting further information with respect to the bill of particulars and additional evidentiary details that we provided on September 19, 2003.

The information provided to date gives your client the "substance of [the] defendant's conduct encompassed by the charge", as required by C.P.L. § 200.95(1)(a), and, indeed, goes much further than that. The additional information that you seek is a matter of evidence, and therefore beyond the scope of a Bill of Particulars as it is defined in C.P.L. § 200.95(1)(a), and in addition, would not be necessary to enable the defendant to adequately prepare his defense.

Moreover, much of that information has already been provided to you in the form of tapes, transcripts, and affidavits; certain other information will follow in due course upon approval of the grand jury minutes.

Finally, we are hereby amending the particulars that we gave in response to your demand number 3 under Count One. Your request and our amended response are as follows:

(3) *Identify with particularity the "vote, opinion, judgment, action, decision and exercise of discretion" that would be influenced pursuant to the alleged agreement and understanding.*

Response: The defendant solicited, accepted, or agreed to accept a benefit upon an agreement or understanding that his vote, opinion, judgment, action, decision or exercise

of discretion with respect to the following matters would thereby be influenced: the assignment of law guardianships to Siminovsky; the provision of ex parte advice to Siminovsky about cases pending before the defendant; the granting of Siminovsky's requests for adjournments in cases pending before the defendant; the granting to Siminovsky of access to the defendant's robing room; and the treatment of Siminovsky with more courtesy than the defendant would treat many other lawyers appearing before him.

Sincerely,

John C. L. Dixon
Ph: 718-250-2580
Fax: 718-250-2599

cc (by facsimile only):

Ronald Fischetti, Esq.
950 Third Avenue, Suite 3200
New York, NY 10022

Joseph Tacopina, Esq.
321 Broadway
New York, NY 10007

Professor Abraham Abramovsky, Esq.
Fordham University School of Law
140 West 62nd Street
New York, NY 10023

Jury charge

3500

1    credibility of what you observed and heard and the

2    weight that you will give to such evidence.

3        You'll recall, ladies and gentlemen, that I

4    permitted the People to read a transcript of a

5    tape-recording in Hebrew between Frieda Hanimov and

6    Nissan Elman.  As I told you previously, and I will

7    reiterate to you with emphasis at this time, that that

8    evidence was admitted into this case for a limited

9    purpose.

10        The purpose of the reading of those

11   transcripts of the Hebrew tape-recordings was to

12   explain to you the precipitating events which led to

13   the People's commencement of their investigation of

14   defendant Gerald Garson, then a sitting justice of the

15   Supreme Court of the State of New York here in Kings

16   County.

17        I charge you that the representations of

18   Nissan Elmann to Freida Hanimov, that is that he had an

19   illegal relationship with the defendant Gerald Garson,

20   those representations were false.  In fact, the People

21   specifically and unequivocally stated that no evidence

22   existed of any relationship or relation, whether it be

23   social, professional, legal, or illegal between Nissan

24   Elmann and the defendant Gerald Garson.

25        As I previously instructed you, ladies and

DS

1

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF KINGS - CRIMINAL TERM - PART 6
    ----------------------------------------------X
3   THE PEOPLE OF THE STATE OF NEW YORK,

4           -against-

5   NISSIM ELMANN,                     Indt No.
                                  3516/2003
6               DEFENDANT
    ----------------------------------------------X
7    ----------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,
8

9           -against-

10  NISSIM ELMANN, PAUL SARNELL AND      Indt No.
    LOUIS SALERNO,                    3517/2003

11             DEFENDANTS
    ----------------------------------------------X
12   ----------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,
13

14          -against-

15  NISSIM ELMANN,                   Indt. No.
                                  3519/2003
16             DEFENDANT
    ----------------------------------------------X
17   ----------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,
18

19  NISSIM ELMANN AND AVRHAM LEVI,       Indt. No.
                                  3520/2003
20            DEFENDANTS
    ----------------------------------------------X
21   ----------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,
22

          -against-                Indt. No.
23                                  5332/2003
    GERALD GARSON,
24             DEFENDANT
    ----------------------------------------------X
25

1           THE COURT:   Let's look now if we might to the

2      question raised by Mr. Fischetti, regarding the possibility

3      of prejudice here.

4           Now, you have been kind enough to provide my

5      chambers with videotapes of the broadcasts done by this

6      television station and it seems that each time it refers to

7      the case, introduces the videotape, it speaks about the

8      case as one involving the bribery of a judge.

9           And the tape shows, as I saw it, broadcast, Judge

10     Garson accepting, counting, then trying to return and

11     ultimately keeping cash given to him by a lawyer who at the

12     time was cooperating with the District Attorney's office.

13          On at least one occasion that I saw, you provided

14     the tape to me, the station broadcast a scene in which a

15     litigant apparently in a matrimonial case, one of Judge

16     Garson's matrimonial cases, looking at a television set as

17     the television plays this tape, and she's, the litigant is

18     looking at it with I guess with what can kindly be

19     described as some dismay.

20          And at each broadcast, it seems to me that there

21     seems to be an implication that what the tape is capturing

22     is a cash bribe being given to Judge Garson for somehow

23     fixing a case in front of him.

24          But as I understand it, the District Attorney is

25     not making any such claim about what the tape shows.

1        MR. HYNES:  That's absolutely correct, your

2   Honor.

3        THE COURT:  There is a charge of bribe receiving

4   pending against Judge Garson, but it involves allegations

5   regarding appointments made to a lawyer, or access given to

6   the attorney but not the fixing of any case; is that right?

7        MR. HYNES:  That's correct, your Honor.

8        THE COURT:  And the passage of money that was

9   captured on the tape has nothing to do, as I understand it,

10  with the count of bribe receiving; is that right?

11       MR. HYNES:  That is also absolutely correct.  It

12  forms the basis of another charge.

13       THE COURT:  Now I think it's fair to say, and you

14  correct me if I'm wrong, because I've been on the bench and

15  away from the legal culture I guess, of attorneys for more

16  than 20 years, so let me just say that as I recall, it's

17  fair to say that there's a culture in the legal community

18  among lawyers of giving what is sometimes called referral

19  fees.

20       So that, for example, if I'm a lawyer

21  specializing in personal injury cases, and a person comes

22  to me, let's say a former client, and says that they now

23  want a divorce, I might talk to that person about the case,

24  take down some information, see what possible grounds there

25  are, and then I might tell that person that I don't really

EDN

# KINGS COUNTY DISTRICT ATTORNEY CHARLES J. HYNES ANNOUNCES ARREST OF BROOKLYN SUPREME COURT JUDGE GERALD P. GARSON AND FOUR OTHERS ON CORRUPTION CHARGES

**Brooklyn, April 24, 2003** – Kings County District Attorney Charles J. Hynes today announced the arrest of Brooklyn Supreme Court Judge Gerald P. Garson on two counts of Receiving a Reward for Official Misconduct, an E felony. Garson was arrested for accepting gifts to fix divorce cases. He surrendered last night at the District Attorney's Office. Upon conviction, he faces up to four years in prison.

Judge Garson and four others involved in this scheme include **Louis Salerno**, a court officer arrested on charges of Bribe Receiving in the Third Degree, a D felony; **Paul Siminovsky**, at attorney, charged with two counts of Bribery in the Third Degree, a D felony; **Nissin Elmann**, a businessman, charged with two counts of Bribery in the Third Degree, one count of Commercial Bribery in the Second Degree (a misdemeanor) and multiple counts of conspiracy (felony and misdemeanor); and **Avraham Levi**, a litigant, charged with one count of Conspiracy in the Fourth Degree, an E felony, were arrested last night. Arrest warrants have been issued for three others including a former court clerk.

Judge Garson and the other four defendants under arrest are scheduled to be arraigned this morning before Judge Alan J. Meyer at Kings County Criminal Court at 120 Schermerhorn Street. Immediately following the arraignment, District Attorney Hynes will be available at the District Attorney's Office, located at 350 Jay Street on the 19th Floor.

**Contact:**   Sandy Silverstein
·718-250-2300

# KINGS COUNTY DISTRICT ATTORNEY CHARLES J. HYNES ANNOUNCES INDICTMENT OF SUPREME COURT JUDGE GERALD P. GARSON AND SIX OTHERS IN CORRUPTION SCHEME

**Brooklyn, May 22, 2003** – Kings County District Attorney Charles J. Hynes today announced the indictment of Supreme Court Judge Gerald P. Garson for receiving rewards in order to fix divorce cases. Upon conviction, Judge Garson faces up to four years in prison.

In addition, the other defendants involved in this scheme including Court Officer Louis Salerno, businessman Nissim Elmann,

litigant Avraham Levi, former Court Clerk Paul Sarnell, Rabbi Ezra Zifrani and litigant Esther Weitzner, were indicted on charges ranging from Bribe Receiving in the Third Degree to Conspiracy in the Fifth Degree.

"Whether a judge takes $1 or $1,000, he disgraces his position and he violates the trust of the public," said District Attorney Hynes.

With the cooperation of the Office of Court Administration and Chief Administrative Judge Anne Pfau, the District Attorney's Office's Rackets Bureau headed by First Deputy District Attorney Michael Vecchione, Deputy Bureau Chief John Dixon, Chief Investigator Joseph Ponzi and Deputy Chief Investigator George Terra conducted audio and videotape surveillance of Garson and Siminovsky. A hidden camera in Garson's chambers recorded him receiving gifts such as cigars and $1,000 in cash from Siminovsky. The scheme involved Elmann allegedly steering some litigants that he spotted in the courthouse for divorce cases to Siminovsky. Siminovsky would then arrange with Sarnell, and later with a court officer, Louis Salerno, to have his cases heard before Judge Garson. Garson would then assist Siminovsky in his representation for the clients. Esther Weitzner is a litigant who along with her father, Rabbi Ezra Zifrani, paid off Siminovsky in order to get her child custody case fixed in her favor.

This eight month probe was initiated last Fall when a woman involved in a custody case called the District Attorney's Office's Citizens Action Bureau (718-250-2340). The investigation by Brooklyn prosecutors found that there was corruption in Garson's court. Garson was arrested on April 24th.



### KINGS COUNTY DISTRICT ATTORNEY CHARLES J. HYNES
### ANNOUNCES CONVICTION OF EX-JUDGE GERALD P. GARSON

#### *TOOK CASH BRIBES AND GIFTS FROM AN ATTORNEY*

Brooklyn, April 19, 2007 -- Kings County District Attorney Charles J. Hynes today announced the conviction of former Brooklyn Supreme Court Justice Gerald P. Garson on charges of Bribe Receiving in the Third Degree, a Class-D Felony, and two counts of Receiving a Reward for Official Misconduct in the Second Degree, both Class-E Felonies.

He was convicted after a five-week trial before Justice Jeffrey G. Berry. When he is sentenced June 5, Garson will face a maximum sentence of five to 15 years in prison.

The top count, Bribe Receiving in the Third Degree, is based on a relationship the former judge had with an attorney, Paul Siminovsky, in which Siminovsky bought Garson numerous lunches, dinners and drinks in exchange for favorable treatment and lucrative court appointments. The other two counts stem from two incidents, caught on video surveillance, in which Siminovsky first gave Garson a box of expensive cigars and later $1,000 in cash.

The case was prosecuted by Chief of the Rackets Division Michael Vecchione and Assistant District Attorneys Bryan Wallace, Joseph Aloxis, and Seth Lieberman.

Contact:   Jonah Bruno
            718-250-2300



Case 1:07-cv-03197-BMC    Document 1-4    Filed 08/02/07    Page 31 of 98 PageID #: 181



# ⊛CBS NEWS    July 31, 2007 2:55pm

> LOGIN   · Register · Help

Home | U.S. | World | Politics | SciTech | Health | Entertainment | Business | Travel | Opinion | Strange

News | Sports | Blogs | Interactives | Mobile | Video

CBS Evening News | Watch Now | | The Early Show | 48 Hours Mystery | 60 Minutes | CBS News Sunday Morning | Face The Nation | Up To The Minute

**SEARCH** Stories ▼   | SEARCH |  · Show Search Options  · Search Tips    Web Search By YAHOO!

## 48 HOURS MYSTERY

| ⊠ E-MAIL | 🖶 PRINT | DEL.ICIO.US | DIGG THIS STORY | SPHERE |    AnswerTips™ enabled (What's this?)

## Chamber Of Secrets
A Pregnant Mother Goes Undercover To Keep Custody Of Her Children

| 48 Hours Video | › |
| Program Facts | › |
| Tapes And Transcripts | › |
| Up Next | › |
| Blos | › |
| Contact Info | › |
| Inside Scoop | › |

> WIRELESS NEWS & ALERTS
> E-MAIL ALERTS
> PODCASTS
> RSS - ALL FEEDS



**FOR MORE INFORMATION:**
National Coalition
for Family Justice
Learn more about this
nonprofit organization.

**Frieda Hanimov**
Visit Frieda Hanimov's Web site.

**INTERACTIVE**


The Nation We
Live In
Who are Americans
and what do they do?
A comprehensive
look at our economic,
sociological and
racial breakdown.

July 2, 2005    (Page 1 of 3)


Frieda Hanimov, a pregnant mother, goes undercover to keep her children, and expose an allegedly corrupt Supreme Court justice. (CBS/48 Hours)

🔊   · PREVIOUS IMAGE   ·   NEXT IMAGE ·

(CBS) Frieda Hanimov's American dream was once a big house in a swanky New York neighborhood. It's a world away from the poverty where she grew up.

Her parents fled Russia, emigrated to Israel, and at the age of 18, this young nurse made her way to America. Just a few weeks later, she met the man she would marry, Yury Hanimov, whose business was diamonds. They would have three children, Yaniv, Sharon, and Karina.

Life was good. But after 13 years of marriage, Yuri announced to his wife that his business was failing. The dream house had to be sold, and they moved to a small apartment in Brooklyn.

Frieda says her husband told her they had to pretend to be divorced. She claims it was part of a scheme to hide their assets. "He gave me diamonds," she says. "He told me that it's worth over $6 million. He told me not to show it to anybody."

"They shine. They're gorgeous," adds Frieda, showing Correspondent Lesley Stahl the diamonds, in a broadcast that first aired last February.

But one day, Yury didn't come home. Frieda says he just disappeared with his clothes, and was unreachable by phone. And the diamonds? "Zircon," says Frieda.

The diamonds were fake, but the separation papers Frieda signed were real. And she says she had unknowingly signed away her rights to any of her husband's assets.

"This is a crime. What he did to me was a crime," says Frieda, who hired a lawyer to try to stop the divorce.

She pinned her hopes on the wisdom of a New York State Supreme Court justice, Judge Gerald Garson. "He would see that this is a set-up," she says. "And you know, a woman married to her husband, a mother of three, will get her rights."

But when she walked into his court, her hopes were shattered. "The judge tells me that I better settle this case and I don't have any chances," says Frieda. "He told me if I'm not gonna settle, I'm gonna end up in jail."

The judge chastised her for renting an apartment she co-owned with her husband, without his permission. Stunned by the judge's behavior, Frieda says she saw no choice but to agree to the divorce.

"I said, 'To hell with the money. I'm a nurse. I'll make it. As long as I have my kids, I'll just continue with my life, it's not the end,'" says Frieda.

Two years later, Frieda fell in love, got married and became pregnant.

Frieda says her ex-husband got jealous, and began trying to convince the children they would have a better life with him. Her 15-year-old son, Yaniv, liked the idea.

Advertisement

CLICK HERE TO SAVE BIG
2007 MERCURY

⊛CBS NEWS VIDEO



Settings | Help

▶ D.A. Targets Judge Garson
The grand attorney of a Brooklyn judge claimed the can't move on an attempt to catch Judge Garson. View excerpts from the surveillance tapes.

**RELATED VIDEO**

▶ D.A. Targets Judge Garson | MORE
▶ Judging From Hidden Camera | MORE
▶ Judge Behaving Badly? | MORE

**48 HOURS VIDEOS**    All 48 Hours Videos

▶ Preview: The Puppet Master | MORE
▶ Roberts' Reporter's Notebook | MORE
▶ The Surveillance Video | MORE
▶ Phil Jones Interview | MORE

**TOP VIDEOS**    All Videos

▶ Collapsed Bridge Traps Driver | MORE
▶ Vick Case Gets Boost From Plea | MORE
▶ First Look: Murdoch And WSJ | MORE
▶ Roberts Released From Hospital | MORE

More Video

Case 1:07-cv-03197-BMC    Document 1-4    Filed 08/02/07    Page 32 of 98 PageID #: 182

One night, when Frieda came home from work, her ex-husband called the police on her. "[They said,] 'Your son said that you hit him with a belt,'" recalls Frieda.

Yaniv was standing outside with his father, and told the police his mother had beaten him with a belt three days earlier. Frieda says her son had a fresh red mark on his face, one that looked like it was new. "My ex-husband pointed to my son and said, 'You see? You see the red line? This is mommy hit him with a belt.'"

She says she has no idea how the red mark got on her son's face: "I don't know. Kids play basketball, they jump. I don't know."

"I never hit my kids. Never ever. I'm against it," adds Frieda. "My kids are well dressed. Very clean. Honors in school. I'm proud to be their mother."

Frieda was arrested, and at that point, she says her son protested. "He said, 'No, no, it was a misunderstanding.' Then he went to my ex-husband and started telling him and saying, 'Daddy, you lied to me. You said they're not going to hurt Mommy,'" recalls Frieda.

"They put me in a cell until, I will say, 30 to 50 people. All knocked out. Me shaking. Pregnant," says Frieda. "Sitting and crying and I can't believe my son did this to me. It's for no reason. I never hit my son."

Then the news got even worse for Frieda. Her ex-husband filed for custody; he wanted all the children. And the man deciding the fate of her family was Judge Garson.

"When Judge Garson called me into his chamber room, he asked me who I wanted to live with, my mother or my father. So I told him my mother," says Sharon. "He told me that he's an adult, and he decides, whether I like it or not. So what's the point of me talking to the judge if he didn't even want to hear what I wanted to say?"

Another child, Natti, recalls, "I told him my mom, and he said, 'You never know what's gonna happen. It's up to me.'"

Frieda says she wasn't going to sit and wait: "I'm not going to lose my kids." She heard about a man, Nissim Elmann, who could help, a businessman who was boasting around town that he could influence the judge.

"I said, 'Let me call him,'" says Frieda. "And he tells me that this judge is in his pocket."

Frieda says Elmann told her he could prove it by dialing the judge himself. She listened in to the conversation, and says she heard a man say that she was going to lose her children in 30 days. She then hung up the phone, terrified.

Frieda began calling every law enforcement agency she could think of, including the FBI. "I was very hysterical," she says.

She was directed to Bryan Wallace, Kings County assistant district attorney, who was the first investigator to take Frieda seriously. "There was a businessman named Nissim Elmann who claimed that he had influence in Judge Garson's part," says Wallace. "Of course, my antennas went up."

"We're not talking about a traffic ticket here or someone jumping a turnstile. We're talking about corruption in the court system. And the pawns that are being played with here are children," says prosecutor Noel Downey, who works with Wallace in the Rackets division.

"We explained to her that we needed to, in essence, test her, to see if what she was telling us was the truth," says Michael Vecchione, the boss of Downey and Wallace, who knew that proving corruption in the courts would be difficult.

"I told them, 'Put wires on me,'" says Frieda. "I'll prove you this judge is corrupted."

Says Vecchione, "We couldn't cover her inside the warehouse. It's a rather stark and daunting place. It's kind of brick and closed up and so once Frieda went in that location, [she was on her own]. Her allegations were that a Supreme Court judge had been bribed. She was about to lose children."

Continued

1 | 2 | 3 >

©MMV, CBS Broadcasting Inc. All Rights Reserved

E-MAIL | PRINT | del.icio.us | Digg THIS STORY | SPHERE

**INSIDE 48 HOURS**



Murder Comes Knocking
A Gift Lures An Unsuspecting Dad To His Death

- Dangerous Liaisons
- Millionaire Manhunt
- Jeffrey MacDonald: A Time For Truth
- More

**TOP STORIES**



Roberts Assures President He's Fine
Chief Justice Calls Bush After Suffering Seizure; White House Says Roberts Is "In Great Spirits"

- Doc Accused Of Hastening Death For Organs
- FBI Searches Sen. Ted Stevens' Home
- Goldman Family Gets Rights To O.J.'s Book
- More

**CBS NEWS MOST POPULAR**

STORIES    |    VIDEOS    |    PHOTOS

- The Engine No One Wants — Except Congress | E-Mail
- Cheney Hails His Pet All | E-Mail
- FBI Searches Sen. Ted Stevens' Home | E-Mail
- Doc Accused Of Hastening Death For Organs | E-Mail
- Cops: Boss Kills Workers Asking For Raises | E-Mail

Most Popular Stories RSS Feed

Advertising Links | What's This?

**House Payments Fall Again**
$450,000 Loan $1290/mo. No credit check needed. Calculate new payment.
www.LowerMyBills.com

**Refinance with Bad Credit**
Compare up to 4 free quotes. Serious refinance requests only.
www.homesearchelpice.com

**Refinance and Save $1,000$**
$150,000 Mortgage for $483/month. Compare up to 4 free quotes.
www.pickamortgage.com

⌃ Back To Top

SEARCH | Stories ⌄ |                                    | SEARCH |   • Show Search Options • Search Tips                    Web Search By YAHOO!

**Wireless Alerts:** CBS News To Go  **E-Mail Sign-Up:** Breaking News  |  Today On CBS News  |  60 Minutes  |  48 Hours  |  The Early Show  |  CBS Sunday Morning  |  News Summaries
**Recommended Sites:** CBS Corporation  |  The ShowBuzz  |  Wallstrip  |  CBS.com  |  CBS SportsLine  |  CWTV.com  |  ETOnline.com  |  The INSIDER  |  CBS Store  |  CBS Careers  |  CBS Cares

Site Map  |  Video Site Map  |  RSS News Feeds  |  Help  |  Advertise With Us  |  Contact Us  |  Terms of Use  |  Privacy Policy  |  CBS Bios  |  Internships

◉ CBS NEWS    © MMVII, CBS Interactive Inc. All Rights Reserved

Case 1:07-cv-03197-BMC    Document 1-4    Filed 08/02/07    Page 34 of 98 PageID #: 184



Ford    The only car company this year with...2007 Mercury Milan
"Highest Ranked Midsize Car in Initial Quality"

# ⊛CBS NEWS   July 31, 2007 2:48pm    › 105 in  • Register • Help

Home | U.S. | World | Politics | SciTech | Health | Entertainment | Business | Travel | Opinion | Strange

News | Sports | Blogs | Interactives | Mobile | Video

CBS Evening News [Watch Now] | The Early Show | 48 Hours Mystery | 60 Minutes | CBS News Sunday Morning | Face The Nation | Up To The Minute

SEARCH Stories ⌄    ›SEARCH   •Show Search Options •Search Tips    Web Search By YAHOO!

## 48 HOURS MYSTERY

E-MAIL | PRINT | DELICIOUS | DIGG THIS STORY | SPHERE    AnswerTips enabled (What's this?)

Advertisement

Dell™ Instant PC Configurator
Customize and price your system right here.

DELL

## Chamber Of Secrets
A Pregnant Mother Goes Undercover To Keep Custody Of Her Children

48 Hours Video
Program Facts
Tapes And Transcripts
Up Next
Bios
Contact Info
Inside Scoop

WIRELESS NEWS ALERTS
E-MAIL ALERTS
PODCASTS
RSS - ALL FEEDS

GREENVILLE
PIG DIGGER
FOR MORE INFORMATION:
National Coalition
for Family Justice
Learn more about this
nonprofit organization.

Frieda Hanimov
Visit Frieda Hanimov's Web site.

INTERACTIVE

The Nation We
Live In
Who are Americans
and what do they do?
A comprehensive
look at our economic,
sociological and
racial breakdown.

July 2, 2005                                  (Page 3 of 3)



Frieda Hanimov, a pregnant mother, goes
undercover to keep her children, and expose an
allegedly corrupt Supreme Court
justice. (CBS/48 Hours)

|1|2|

‹ PREVIOUS IMAGE |   | NEXT IMAGE ›

(CBS) "Frieda Hanimov is not a
crusader, trying to clean up
corruption in Brooklyn. Nor is Joe
Hynes," says McMann. "Frieda is
a useful tool so that Joe Hynes
can get publicity for his case."

Is McMann suggesting that
Frieda is not a very truthful
person? "I'm not suggesting it,"
says McMann. "I'm stating it
categorically. She's a liar."

McMann calls Frieda a child
abuser who found a way to get
the charges dropped. Did she hit
her child? Vecchione says, "None
of us believe she did. She felt
that the husband had been
manipulating her child, which is
what happened."

But Frieda still has to convince
the court that she's the better parent to raise her oldest son. And for two years
after Judge Garson's arrest, she's still fighting for custody.

Finally, Yaniv, who still says his mother hit him, agrees to live with her because
he wants to be near his school.

"I got my son back. It's like my heart is, like, jumping up and down. This is every
mother's dream," says Frieda. "You know, to have kids back. I can't express that.
This is a big win for me. A big win. I'm so glad. We got it."

It seems that women all over the country have heard about what she's done.

"I'm just a mother, who fight the system and won," says Frieda, who's being
compared to Erin Brockovich.

Every month, women gather at Frieda's house. And if Frieda hears what she
thinks is evidence of corruption, she calls her new friends in law enforcement.

"If I can help those people," she says. "I was there once. If I can help those
women, why not?"

In the wake of Judge Garson's arrest, court administrators have formed a new
commission to reform New York's divorce court. On this day, Judith Sheindlin is
speaking. Before she was TV's Judge Judy, she was a family court judge in New
York for 25 years.

She says Judge Garson's case is a wakeup call for New York and the rest of the
country. "I don't know all the facts. I only know what I read in the paper," says
Sheindlin. "But certainly, here is a man who has brought the judiciary into
disrepute because of, at least, his stupidity. At least his stupidity."

And she says she's met plenty of judges with bad judgment. "There's no question
in my mind that decisions are made every day in cases, made because of
cronyism," says Sheindlin.

Whether or not Judge Garson is found guilty, the district attorney credits Frieda
with forcing the leadership of the court to re-examine how they pick judges,
handle custody cases, and train law guardians.

"Has Frieda done that? You bet she did," says Hynes. "Were it not for Frieda, I
doubt very much if anyone would have known about it."

⊛CBS NEWS VIDEO



‹ ›    Settings | Help

♦ D.A. Targets Judge Garson
The district attorney offers Siminovsky a deal he can't refuse,
in an attempt to catch Judge Garson. View excerpts from
the surveillance tapes.

RELATED VIDEO

♦ D.A. Targets Judge Garson | HERE
♦ Judging From Hidden Camera | HERE
♦ Judge Behaving Badly? | HERE

48 HOURS VIDEOS    All 48 Hours Videos

♦ Preview: The Puppet Master | HERE
♦ Robert's Reporter's Notebook | HERE
♦ The Surveillance Video | HERE
♦ Phil Jones Interview | HERE

TOP VIDEOS    All Videos

♦ Collapsed Bridge Traps Driver | HERE
♦ Vick Case Gets Boost From Plea | HERE
♦ Roberts Released From Hospital | HERE
♦ Avandia Sparks FDA Concerns | HERE

More Video

Now, Hollywood has come calling. A screenwriter is following Frieda around.

The script line is simple: A Russian immigrant, for whom English is a third language, exposed a potential sewer of corruption in an American court.

In February, just hours after 48 Hours first broadcast this story, Judge Garson gave an interview to a local CBS News reporter, and he cried: "It's taken a toll on me and my family. But we'll get through it. I will be vindicated."

Remember the $1,000 Garson accepted from lawyer Paul Siminovsky as a "thank you" for referring a case? A court has ruled there was nothing criminal about that. The district attorney is appealing.

Whatever the outcome, Judge Garson will be tried for the alleged bribery scheme for accepting thousands of dollars in free meals in exchange for preferential treatment for Siminovsky.

Judge Garson pleaded not guilty to receiving a bribe and is expected to stand trial next year. He has retired.

Nissim Elmann reversed himself and pleaded guilty to all the charges against him.

Paul Sarnell was found not guilty of all charges. Louis Salerno was convicted of receiving a bribe and is awaiting sentencing.

< | 1 | 2 | 3

©MMV, CBS Broadcasting Inc. All Rights Reserved

☐ E-MAIL   ☐ PRINT   ☐ DEL.ICIO.US   ☐ DIGG THIS STORY   ☐ SPHERE

**INSIDE 48 HOURS**



Murder Comes Knocking
A Gift Lures An Unsuspecting Dad To His Death

- Dangerous Liaisons
- Millionaire Marriott
- Jeffrey MacDonald: A Time For Truth
- More

**TOP STORIES**



Roberts Assures President He's Fine
Chief Justice Calls Bush After Suffering Seizure; White House Says Roberts Is "In Great Spirits"

- Doc Accused Of Hastening Death For Organs
- FBI Searches Sen. Ted Stevens' Home
- Gotbaum Family Gets Rights To D.J.'s Book
- More

⌃ Back To Top

### CBS NEWS MOST POPULAR

STORIES    VIDEOS    PHOTOS

- The Engine No One Wants — Except Congress | E-Mail
- Cheney Hails His Pal Al | E-Mail
- FBI Searches Sen. Ted Stevens' Home | E-Mail
- Doc Accused Of Hastening Death For Organs | E-Mail
- Cops: Boss Kills Workers Asking For Raises | E-Mail

📰 Most Popular Stories RSS Feed

Advertising Links | What's This?

House Payments Fall Again
$430,000 Loan $1299/mo. No credit check needed.
Calculate new payment.
www.LowerMyBills.com

Refinance and Save $1,000$
$150,000 Mortgage for $483/month. Compare up to 4 free quotes.
www.pickamortgage.com

Refinance with Bad Credit
Compare up to 4 free quotes. Serious refinance requests only.
www.homeloanhelpline.com

SEARCH  Stories    [SEARCH]   • Show Search Options  • Search Tips                    YAHOO!

Wireless Alerts: CBS News To Go  E-Mail Sign-Up:  Breaking News  |  Today On CBS News  |  60 Minutes  |  48 Hours  |  The Early Show  |  CBS Sunday Morning  |  News Summaries
Recommended Sites: CBS Corporation  |  The ShowBuzz  |  WallStrip  |  CBS.com  |  CBS SportsLine  |  CWTV.com  |  ETOnline.com  |  The INSIDER  |  CBS Store  |  CBS Careers  |  CBS Cares

Site Map  |  Video Site Map  |  RSS News Feeds  |  Help  |  Advertise With Us  |  Contact Us  |  Terms of Use  |  Privacy Policy  |  CBS Bios  |  Internships

**CBS NEWS**   ©MMVII, CBS Interactive Inc. All Rights Reserved.

The only car company this year with...
five J.D. Power and Associates Initial Quality™ Model Awards.*
LEARN MORE

# ⊚CBS NEWS

July 31, 2007 2:47pm

‡ LOG IN  • Register  • Help

Home | U.S. | World | Politics | SciTech | Health | Entertainment | Business | Travel | Opinion | Strange

News | Sports | Blogs | Interactives | Mobile | Video

CBS Evening News | Watch Now | The Early Show | 48 Hours Mystery | 60 Minutes | CBS News Sunday Morning | Face The Nation | Up To The Minute

SEARCH ; Stories ⌕          ›SEARCH;  • Show Search Options  • Search Tips          Web Search By YAHOO!

## 48 HOURS MYSTERY

Advertisement

Dell™ Instant PC Configurator
Customize and price your
system right here.

1.0

Roll over to get started now!

DELL   Prices 31/05/07.

⊠ E-MAIL | 🖨 IN PRINT | ⧉ DEL.ICIO.US | ⬛ DIGG THIS STORY | ⬥ SPHERE

AnswerTips™ enabled (What's this?)

## Chamber Of Secrets
A Pregnant Mother Goes Undercover To Keep Custody Of Her Children

| 48 Hours Video | › |
| Program Facts | › |
| Tapes And Transcripts | › |
| Up Next | › |
| Blog | › |
| Contact Info | › |
| Inside Scoop | › |

> WIRELESS NEWS & ALERTS
> E-MAIL ALERTS
> PODCASTS
🔲 RSS : ALL FEEDS

CROWN DAUGH
DIG DEEPER

FOR MORE INFORMATION:
National Coalition
for Family Justice
Learn more about this
nonprofit organization.

Frieda Hanimov
Visit Frieda Hanimov's Web site.

INTERACTIVE

The Nation We
Live In
Who are Americans
and what do they do?
A comprehensive
look at our economic,
sociological and
racial breakdown.

»

July 2, 2006                                      (Page 2 of 3)



Frieda Hanimov, a pregnant mother, goes
undercover to keep her children, and expose an
allegedly corrupt Supreme Court
justice. (CBS/48 Hours)

1/3

‹ PREVIOUS IMAGE  |  NEXT IMAGE › ›

(CBS) Frieda, three months
pregnant, was on an undercover
mission to expose corruption.
She headed to a warehouse in
downtown Brooklyn to meet with
Elmann.

"We didn't really know what
Nissim Elmann was about. We
didn't know what he was capable
of," says Vecchione, who
assigned detectives Jeanette
Spordone and George Terra to
Frieda.

The detectives wired up
Frieda. "She was a tiger. She
was protecting her cubs," says
Spordone. "It was ballsy of her to
go in there. We pulled up and
watched her go in. We really
didn't know what was going on
inside that warehouse."

Frieda found Elmann right in his office. Their conversation was mostly in Hebrew.
Elmann tells Frieda that the judge is looking at papers submitted by her ex-
husband. Frieda then pleads with Elmann, who shows her his cell phone, with
Judge Garson's phone number on the screen.

Elmann, an electronics salesman, guarantees she'll win custody of her two
younger children, but it will cost her.

Two weeks later, Frieda, wearing a wire again, visits Elmann to negotiate a price
for her children. The price to keep custody of Sharon and Noff was $9,000.

Frieda says it worked. She says Judge Garson and Paul Siminovsky, a lawyer
assigned by Garson to represent her children, soon began treating her
differently. "I was seeing results," says Frieda. "In the beginning, I was so
dangerous. Now, I'm a very good mother."

"She saw such a difference, how people treated her from top down," says
Downey. "We noticed it as well."

Now, it was up to the district attorney to figure out how an electronics salesman
from Brooklyn could possibly be influencing custody decisions. They put a tap on
Elmann's phone.

On tape, Elmann assures Siminovsky that he's working to get him money from
various divorce litigants. Siminovsky also brags about boozing it up with Judge
Garson.

Detectives begin tailing Siminovsky, who is seen in a surveillance tape hugging
Elmann. "Siminovsky and Elmann have a very tight relationship," says
Downey. "Siminovsky has a very tight relationship with the judge."

Investigators believed they had figured out the food chain, literally. Vecchione
showed 48 Hours the bar where "Siminovsky and the judge would meet for
lunch, drinks and dinners."

"They were very well known at the Archives because they were there every
afternoon," adds Spordone. "Very friendly. They were buddies."

"I'm talking about an attorney who would bring the judge out to lunch, to drinks, to
dinners," says Downey. "Not once, but we're talking several hundred times. Every
time, Siminovsky paid."

⊚CBS NEWS VIDEO





◀ ▶          Settings | Help

➤ D.A. Targets Judge Garson
The district attorney offers Siminovsky a deal he can't refuse,
in an attempt to catch Judge Garson. View excerpts from
the surveillance tapes.

RELATED VIDEO

➤ D.A. Targets Judge Garson | VIDEO
➤ Judging From Hidden Camera | VIDEO
➤ Judge Behaving Badly? | VIDEO

48 HOURS VIDEOS          All 48 Hours Videos

➤ Preview: The Puppet Master | VIDEO
➤ Robert's' Reporter's Notebook | VIDEO
➤ The Surveillance Video | VIDEO
➤ Phil Jones Interview | VIDEO

TOP VIDEOS          All Videos

➤ Collapsed Bridge Traps Driver | VIDEO
➤ Vick Case Gets Boost From Plea | VIDEO
➤ Roberts Released From Hospital | VIDEO
➤ Avandia Sparks FDA Concerns | VIDEO

More Video

"Paul Siminovsky would pick up the tab. It was a given," says Yacca. "People know that this lawyer is before this judge on a case. It's wrong. It's inappropriate. It's unethical."

If this was what going on in public, authorities wanted to know what was happening behind closed doors. Were judicial decisions being bought?

On a cold December night, detectives from the district attorney's office made their way into Judge Garson's chambers. They placed a tiny camera in his ceiling.

"We had a microwave dish that would read signals going back to our office," says Vecchione. "We had people who were monitoring it, all day long and into the evening."

Just weeks after Frieda, terrified she was going to lose her children, started working undercover to try to prove whether Judge Garson was taking payoffs, the district attorney began surveillance of the judge and his meetings with Siminovsky.

"You have this attorney Siminovsky getting inappropriately cozy with a judge who's appearing before, that he has cases with," says Downey.

One of Siminovsky's clients was Sigal Levi's estranged husband, Avraham Levi. Detectives secretly listened in as Judge Garson told Siminovsky that his client would win his family home – and that Sigal Levi would "walk away with nothing." At a later date, Garson instructs Siminovsky how to write a memo on the issue.

According to investigators, the judge and the lawyer said things about other women, too. "The way he spoke about women was really just beyond sexist," says Downey. "I think it borders on disturbing."

Investigators say they heard Siminovsky tell Elmann what Garson said about Frieda. "The judge was admiring her lips," says Vecchione.

But the worst thing that was going on in Garson's chambers, according to investigators, were the kickbacks – in the form of lucrative work. "You see Siminovsky's assignment numbers almost triple," says Vecchione.

Investigators say all the wining and dining of the judge paid off for Siminovsky in a big way. If a child needed representation in a custody case, Garson would assign Siminovsky as the law guardian – and the divorcing parents or the taxpayers would foot the bill, often tens of thousands of dollars.

Garson's behavior was especially appalling for Joe Hynes, the district attorney in charge. For him, the investigation was personal.

"I saw the way the courts treated my mother when she was being beaten up by my father. I have a very special interest in making damn sure that kinds stuff doesn't continue," says Hynes. "Frankly, I was shocked that it was going on at all. I thought that there had been significant changes in the way the courts acted towards women litigants and their kids."

The district attorney thought he had the goods on Siminovsky, but he wanted Judge Garson. He told his staff to offer Siminovsky a deal and get him to flip. They would recommend that Siminovsky serve no prison time.

It was an offer he couldn't refuse. Siminovsky took the deal; he would wear a wire and go see the judge.

The district attorney bought a $275 box of cigars. "And one afternoon, after Siminovsky went to lunch with the judge, and after he paid for the lunch again, came back to the robbing room, gave him the box of cigars," says Vecchione. "And said, 'This is thanks for your help in the Levy case.'"

Next, Siminovsky brought $1,000 in cash as a "thank you" to Garson for referring a case to him in another court.

"You see him reach into his pocket, and he takes out $1,000, and he hands it over to the judge, and the judge takes it and put it into his pants pocket," says Vecchione, describing what is happening on the tape. "Siminovsky leaves, and the judge takes it out of his pocket. Takes a couple of bills and puts it into another pocket and puts some in an envelope."

Judge Garson then calls Siminovsky back to his office. He tells Siminovsky that it's too much money and tries to give it back. But Siminovsky insists, and in the end, Garson keeps the money. "What we had all suspected he would do, he actually did," says Vecchione.

"Joe Hynes, the district attorney in this case, would like nothing better than to nag Jerry Garson with the fact that he accepted a bribe," says attorney Ronald Fischetti, who represents Judge Garson, and says the judge's behavior may look bad, but there's nothing illegal about any of it.

"He never fixed a case. He never accepted any money on any cases whatsoever. The $1,000 was a referral fee that Paul Siminovsky said, 'You referred me a case. I received a fee. And here's the $1,000.'"

Are judges supposed to take referral fees? "Absolutely not. And he tried to give it back three times," says Fischetti.

"But he didn't try to give it all back," says Stahl.

"He did. The whole $1,000," says Fischetti. "You see him counting it out. Put it in an envelope, opened a drawer, gave it back to him. That's our position."

But Garson ended up taking it. "You've heard of the law of entrapment. I'm sure," says Fischetti, who adds that Garson showed Siminovsky no special treatment in exchange for all those meals.

CBS.NEWS MOST POPULAR

STORIES    VIDEOS    PHOTOS

• The Engine No One Wants — Except Congress | E-Mail
• Cheney Hails His Pal At | E-Mail
• FBI Searches Sen. Ted Stevens' Home | E-Mail
• Doc Accused Of Hastening Death For Organs | E-Mail
• Cops: Boss Kills Workers Asking For Raises | E-Mail

Most Popular Stories RSS Feed

Advertising Links | What's This?

House Payments Fall Again!
$430,000 Loan $1299/mo. No credit check needed.
Calculate new payment.
www.LowerMyBills.com

Refinance and Save $1,000S
$150,000 Mortgage for $483/month. Compare up to 4 free quotes.
www.pickamortgage.com

Refinance with Bad Credit
Compare up to 4 free quotes. Serious refinance requests only.
www.home/centralprimo.com

Case 1:07-cv-03197-BMC    Document 1-4    Filed 08/02/07    Page 38 of 98 PageID #: 188

"The only bribe he's accused of taking is lunch and dinner with Paul Siminovsky in order to have favorable treatment for Paul Siminovsky and give him law guardianships. Now I tell you, I mean, that it is so ridiculous on its face. A person like Jerry Garson, who's a Supreme Court judge, is not going to throw on his robes for a hamburger."

"But the judge is on tape telling and coaching Siminovsky on how to win the case in front of him," says Stahl. "He's giving him lessons. He's telling him how to write memos. That's on tape."

"I understand that. He had made a decision regarding the property in that case, and what he was doing is telling Paul Siminovsky, in his own words, that he had ruled his favor, and you're gonna win. And that's wrong," says Fischetti.

"He says, 'Your client's gonna win. But he doesn't deserve it," says Stahl. "It sounds as though he's saying, 'I shouldn't be doing this. But because of our relationship, I'm going to.'"

"That's not correct," says Fischetti.

But 48 hours after Judge Garson took that money, detectives picked him up and brought him to a place they call "the Gulag." The $1,000 was still in his pocket.

When Judge Garson saw what investigators had on tape, they say he offered to cut a deal. But in the end, it fell apart.

Nine months after Frieda went undercover, the authorities arrested Garson and charged him with receiving a bribe. Accepting all those free lunches could put the judge behind bars for up to seven years.

When investigators raided Elmann's warehouse, they found a treasure trove of documents. "When these drawers are opened, you feel like you're in a satellite file room for the matrimonial court," says Downey.

Investigators arrested Elmann, retired court clerk Paul Sarnell, and Judge Garson's court officer, Louis Salerno. They were accused of taking bribes to steer cases to Garson's court.

A surveillance tape shows Salerno accepting a bribe, a bag full of electronics, right on the courthouse steps.

"It's a conspiracy, first and foremost," says Downey, who adds that the unraveling of it all started with Frieda.

But there were dozens of women who say that because of Judge Garson, they lost custody of their children.

Sigal Levi, the woman whose divorce Garson was discussing in the undercover tape, had always suspected corruption. In fact, she's the one whose tip to Frieda about Elmann started Frieda on her crusade.

Garson was arrested before he ruled on Levi's case, but her estranged husband pleaded guilty to conspiring to bribe the judge. "He told me he went to the right people to take care of me," says Sigal Levi.

Her husband paid Elmann $10,000. Ironically, he says he's the victim, and that he only did it because Elmann threatened him and said he'd lose everything if he didn't pay up.

"I knew about Sigal's divorce probably before she did. I knew her name, what was going on," says Lisa Cohen, who knew because she and her husband were friendly with Elmann.

"I knew that he had the judge in his pocket. I knew that he was very friendly with the judge as well as he had a very intimate rapport with Paul Siminovsky. ... From the horse's mouth, he told me, 'Any favor you need, the judge is in my pocket.'"

So when Cohen and her husband went through their own divorce later that year, she says she was terrified: "I received the notice in the mail to appear at Supreme Court. And sure enough, Judge Garson's name was right there. Said that's it. I'm doomed. I'm fixed. And it's all over."

The district attorney has not charged Cohen's ex-husband with any wrongdoing, but she still believes her husband's friendship with Elmann hurt her. She feels Judge Garson shorted her on child support.

Garson has not been charged with fixing any decisions, but an administrative judge has been appointed to review his divorce and custody rulings.

Elmann, the man alleged to be the gatekeeper of Garson's corrupt court, sat down with 48 Hours for his first interview. He had his lawyer, Gerald McMann, by his side.

Did he ever bribe Judge Garson? "Absolutely not," says Elmann.

And Siminovsky? "I was not under the impression that I was bribing him," says Elmann.

In fact, Elmann has been charged with conspiracy to bribe practically everyone in Judge Garson's court, from employees Salerno and Sarnell, to Siminovsky, to Judge Garson himself.

But Elmann says he never really knew the judge, and that he was just trying to hook people up with a lawyer the judge seemed to favor. "I was really showing off that I'm a big shot, and that was my biggest mistake ... was showing off."

"When you told Frieda that if she didn't pay, she was going to lose her kids in 30 days, what did you mean?" asks Stahl.

"There's no question that his responses to her on many occasions, if they were true, would be criminal. But they weren't true," says McMana. "He was telling these people that 'I have the judge in my pocket. Oh, I just got off the telephone with Judge Gerson. I just did this.' None of these things were true, not a single one."

Did Elmann mislead Frieda? "I might have done that," he says. "Just to calm her down."

Elmann says he lied to Frieda when he told her that her ex-husband was bribing the judge. And in fact, there is no evidence that her ex slipped anyone any money, and he has not been charged with any wrongdoing.

Still, Elmann convinced Frieda that her ex was up to no good, and took $9,000 from her. He says he gave it all to Siminovsky.

"Not even one cent [did I keep]," says Elmann. "Everything, I give it to, not even one cent."

"What did he do for anybody except his pocket. That's it. What did he do? He destroyed children's lives, and I don't have answers for my children. I just don't," says Cohen.

But Elmann and his attorney believe that if anyone's motives should be in question, it should be Frieda's.

Continued

☼ 1 | 2 | 3 ☼

©MMV, CBS Broadcasting Inc. All Rights Reserved.

| E-MAIL | PRINT | DEL.ICIO.US | Digg this story | Single

**INSIDE 48 HOURS**



Murder Comes Knocking
A Girl Lures An Unsuspecting Dad To His Death

• Dangerous Liaisons
• Millionaire Mayhem
• Jeffrey MacDonald: A Time For Truth
• More

**TOP STORIES**



Roberts Assures President He's Fine
Chief Justice Calls Bush After Suffering Seizure; White House Says Roberts Is "In Great Spirits"

• Doc Accused Of Hastening Death For Organs
• FBI Searches Sen. Ted Stevens' Home
• Goldman Family Gets Rights To O.J.'s Book
• More

☼ Back To Top

SEARCH  Stories                    SEARCH    • Show Search Options  • Search Tips    Web Search by YAHOO!

**Wireless Alerts:** CBS News To Go  **E-Mail Sign-Up:** Breaking News  |  Today On CBS News  |  60 Minutes  |  48 Hours  |  The Early Show  |  CBS Sunday Morning  |  News Summaries
**Recommended Sites:** CBS Corporation  |  The ShowBuzz  |  WallStrip  |  CBS.com  |  CBS SportsLine  |  CWTV.com  |  ETOnline.com  |  The INSIDER  |  CBS Store  |  CBS Careers  |  C9G Cares

Site Map  |  Video Site Map  |  RSS News Feeds  |  Help  |  Advertise With Us  |  Contact Us  |  Terms of Use  |  Privacy Policy  |  CBS Bios  |  Internships

⚫CBS NEWS   ©MMVII, CBS Interactive Inc. All Rights Reserved

The New York Times
nytimes.com

April 21, 2007

# Key Verdict Does Not End Corruption Inquiry

### By MICHAEL BRICK

Four years ago, the Brooklyn district attorney, Charles J. Hynes, turned against the single-party system he had navigated for decades, vowing to prove that seats of power at the courthouse were bought and sold for envelopes full of cash.

Since then, he has earned convictions of the former Brooklyn Democratic party leader, Clarence Norman Jr., on charges of extortion, solicitation of illegal contributions and theft of $5,000 from his re-election committee. Those verdicts cost Mr. Norman the Assembly seat he had held for 23 years and control of the biggest Democratic organization east of Chicago.

Mr. Hynes also secured an indictment on grand larceny and other charges, though they were later dismissed, against the Brooklyn Democrats' longtime executive director, Jeffrey C. Feldman; convicted or won guilty pleas from a divorce lawyer, Paul Siminovsky, and several courthouse assistants; and put judges on notice that their chambers could be wired for surveillance.

On Thursday, Mr. Hynes brought the investigation full circle by winning a bribery conviction against Gerald P. Garson, the former State Supreme Court justice who had offered Mr. Hynes his first big break in the broader inquiry.

Yesterday, Mr. Hynes vowed to see his investigation through, to show not just that a judge could be manipulated for money, but that a seat on the bench could be purchased from the Brooklyn Democratic Party.

"It's been a long road, which is not finished," Mr. Hynes said in a telephone interview. "It's now up to Norman and Garson to do something about the predicament they find themselves in."

On Wednesday, an appeals court allowed Mr. Norman to remain free while pursuing an appeal. Mr. Garson, who is being treated for cancer, has been ordered to report to a probation officer on Monday and to appear for sentencing on June 5. He faces a maximum sentence of 15 years in prison.

Mr. Hynes has maintained that the two men could show that cash payments to the Democratic Party secured seats on the bench, a system the district attorney once called "nothing less than a sham."

Mr. Hynes said Mr. Garson remains a potential source of information in the broader inquiry. "I would hope over the weekend that he's going to be thinking about this," Mr. Hynes said, "that he has a choice."

Mr. Norman, the man at the center of the investigation, has said through his lawyers that he has no information to share with prosecutors because he never received payments from judges or judicial candidates. He has received three sentences, from one and three years in prison each, on his convictions, all to run consecutively, and has been acquitted in a fourth case. He is free on $110,000 bail by order of the Appellate Division of the Second Judicial Department.

A lawyer for Mr. Garson, Michael S. Washor, could not be reached by telephone yesterday. Anthony L. Ricco, a lawyer for Mr. Norman, declined to comment.

At this point in the investigation, each conviction and sentence represents a missed opportunity, a potential cooperating witness gone silently to prison. And although some unrelated corruption cases await resolution, the bribery verdict against Mr. Garson closed the last publicly disclosed case in the judgeships-for-sale investigation.

Questions remain concerning Mr. Feldman's role in the inquiry. He has signed a cooperation agreement with prosecutors, but Mr. Feldman has little obvious incentive to be of much help, since they have dropped all charges against him.

For years, names of sitting judges have appeared in news accounts as suspects under investigation on suspicion that they bought their seats. Lawyers for Mr. Norman have accused Mr. Hynes of leaking the names to ratchet up the pressure, and the district attorney's office has denied the accusation. Most recently, in January, The Village Voice published a 4,700-word article detailing what the publication described as one judge's purchased path to power.

As the pressure mounts on Mr. Hynes to make his big case, the district attorney's original leads are nearing five years old. Ending the case against Mr. Garson is a neat bit of symmetry: It was Mr. Garson who, when confronted with bribery evidence in early 2003, first told prosecutors of a scheme to sell judgeships and then agreed to wear a wire. In about five years on the bench, Mr. Garson, 74, had handled some 1,100 divorces, deciding child custody cases and dividing families' financial assets. On surveillance recordings, he has been seen

accepting Dominican cigars and cash from Mr. Siminovsky.

The fallout from the case against Mr. Garson has been smaller than expected, a spokesman for the court system, David Bookstaver, said yesterday. The state's chief administrative judge for matrimonial cases, Jacqueline W. Silbermann, received about 50 motions to reopen cases that had been handled by Mr. Garson, Mr. Bookstaver said. Of those, three or four were granted a hearing and eventually were settled, he said.

On Monday, Mr. Norman was detained for a few hours as his third sentence was imposed. Calling him a "common thief" in court documents, prosecutors sought unsuccessfully to prevent his release.

"He thinks this is a joke," Mr. Hynes said yesterday. "I believe that he has information that is critical to this investigation."

Mr. Hynes paused to reconsider that assessment.

"They're not critical to my investigation," he said of Mr. Norman and Mr. Garson, "but they are substantial parts."

Copyright 2007 The New York Times Company  |  Home  |  Privacy Policy  |  Search  |  Corrections  |  XML  |  Help  |  Contact Us  |  Work for Us  |  Back to Top

# We'll sue jerk judge

BY NANCIE L. KATZ
DAILY NEWS STAFF WRITER

Posted Saturday, April 21st 2007, 4:00 AM

A day after Brooklyn divorce judge Gerald Garson was convicted of taking bribes, women who lost in his courtroom said they will sue him for ruining their lives.

"All the damage is irreversible. It's already done. The kids are taken. They're brainwashed against the other party," said Frieda Hanimov, a mother whose undercover work began the probe into Garson's corruption.

At least 25 other victims have contacted her, and they are seeking a lawyer for a class-action suit, she said.

"He helped the ex-husbands so well to hide their money we can't get it back," she said. "Now, we're going to get it from Garson. Somebody has to pay the price for all this pain."

Garson was convicted Thursday of fixing divorce cases and awarding lucrative appointments to his crooked lawyer pal Paul Siminovsky in exchange for drinks, meals, cash and cigars. Their profanity-laced talks were caught on video and audio through five months' of secret surveillance.

After his March 2003 arrest, a court review of about 50 of Garson's closed cases found that only three or four had been handled improperly, a court spokesman said.

But the women scoffed at that number as low. "Garson should pay me," said Sigal Levi, whose ex admitted fixing their case for a $10,000 bribe and winning custody of their two oldest sons. "He took something from me that nobody is going to repair."

Meanwhile, District Attorney Charles Hynes vowed yesterday to seek the maximum 15-year sentence against Garson, 75, if he doesn't fess up to which judges paid to get on the bench.

The case against Garson resulted from a wider probe into the alleged selling of Brooklyn judgeships.

nkatz@nydailynews.com

New York Law Journal
Volume 237
Copyright 2007 ALM Properties, Inc. All rights reserved.

Monday, April 23, 2007

DA SAYS NORMAN, GARSON HOLD KEYS TO JUDGE PROBE

Claims Defendants Are Withholding Information

Daniel Wise

WITH THE bribery conviction of former Justice Gerald P. Garson in hand, Brooklyn District Attorney Charles J. Hynes said Friday that 'the end game' of his office's four-year probe into the buying and selling of judgeships is about to begin.

Mr. Hynes said Mr. Garson and former Assemblyman and Brooklyn Democratic county chairman Clarence Norman hold the 'keys' to proving allegations that candidates have had to pay $50,000 or more to obtain judgeships, stories that 'have been around longer than you or me.'

'Clarence Norman and Gerald Garson have information about the system that they are concealing' and their failure to reveal it has cast 'a pall of scandal over the honorable and decent men and women who sit as judges in Kings County,' Mr. Hynes said.

Lawyers for both men have insisted that they have nothing to disclose about alleged corruption.

Mr. Garson, 74, who has bladder cancer, faces up to 15 years in prison when he is sentenced on June 5 by Acting Supreme Court Justice Jeffrey Berry. Mr. Hynes said he would request the maximum term.

Mr. Garson should 'reflect upon what he is facing -- jail for the rest of his life,' Mr. Hynes said. 'He should understand, we are serious.'

Mr. Garson's attorney, Michael S. Washor, blasted Mr. Hynes' comments.

'It is unreal, unbelievable that a prosecutor like Hynes, with his reputation, would say 'I am going to squeeze a defendant,'' said Mr. Washor.

'A sentence is supposed to be individualized; it's supposed to fit the crime, ' he added, 'not a sword to extract information.'

If Justice Berry imposes consecutive terms when Mr. Garson is sentenced on June

5, the ex-judge could face a maximum sentence of 5 to 15 years in prison. The most lenient sentence the judge could impose would be an unconditional discharge.

The district attorney's office can recommend a sentence, but the final decision will rest with Justice Berry, who also will receive a presentence report from the Probation Department.

Mr. Washor said that 'there is no basis for the belief -- not a scintilla of evidence -- that Jerry Garson knew anything whatsoever of any corruption.'

Mr. Garson was widely reported to have spent a month following his arrest in March 2003 wearing a wire in an unsuccessful bid to collect information about Democratic Party nominations for judgeships being sold in Brooklyn.

Mr. Garson's bid to win leniency by gathering information about selling judgeships was halted after prosecutors learned that the New York Post was about to report that he had been wearing a wire.

Opposition to Parole

Mr. Norman already has been sentenced to 3 to 9 years in prison following convictions in three separate felony prosecutions. He is free on bail pending his appeals.

Mr. Hynes said that his office would 'vigorously oppose' any parole applications if Mr. Norman's convictions are upheld on appeal. Because he will be in prison 'for at least six years,' Mr. Hynes said, Mr. Norman ought to 're-think his refusal to cooperate.'

Neither of Mr. Norman's trial lawyers, Anthony L. Ricco or Edward D. Wilford, returned a request for comment.

However, Edward M. Rapport, who represented Mr. Norman on his first two convictions, said at the January 2006 sentencing on the charges that 'Mr. Norman has no intention of either making things up or lying to satisfy the district attorney.'

Mr. Rappaport was responding to a request from the Brooklyn rackets chief, Michael Vecchione, that Mr. Norman be given a stiffer sentence because he had 'persist[ed] in withholding information' that lies 'at the very heart' of the investigation (NYLJ, Jan. 12, 2006).

Late Thursday afternoon, Mr. Garson was convicted of third-degree bribery and two counts of receiving rewards for misconduct.

On the over-arching bribery count, Mr. Garson, who presided over divorce cases in Brooklyn Supreme Court for five years, was convicted of accepting thousands of dollars in free meals and drinks, and, in one case, a box of expensive cigars from a lawyer who appeared frequently in front of him.

In exchange, the jury found, Mr. Garson had given the lawyer, Paul Siminovsky, who was a key prosecution witness, ex parte advice on how to handle a case he had before the judge; court appointments as a law guardian, and unusual privileges such as unfettered access to his robing room.

Mr. Norman received three consecutive sentences of 1 to 3 years following his conviction on felony charges at three trials. Acting Justice Martin Marcus imposed the latest sentence, bringing his cumulative sentence to 3 to 9 years last Monday.

Mr. Norman's three convictions were for soliciting campaign contributions in excess of legal limits; stealing a $5,000 check made out to the former assemblyman's campaign committee; and coercing a Civil Court candidate to spend $10,000 on Election Day operations she did not want.

Daniel Wise can be reached at dwise@alm.com.

4/23/2007 NYLJ 1, (col. 4)

END OF DOCUMENT

Copyright © 2007 The New York Law Pub. Co.

LAW OFFICES
**MICHAEL S. WASHOR, ESQ., P.C.**
WOOLWORTH BUILDING
233 BROADWAY, Suite 1800
NEW YORK, N.Y. 10279

**NICHOLAS J. PINTO, ESQ.**
E-MAIL: NJPESQ@HOTMAIL.COM

TELEPHONE 212/697-5900
FACSIMILE 212/406-2313
E-MAIL:MSWESQ2000@AOL.COM

May 2, 2007

Hon. Jeffrey G. Berry
Acting Justice of the Supreme Court
Orange County Courthouse
285 Main Street
Goshen, New York 10924

Re: People v. Gerald Garson
Kings County Ind. No. 5332/2003

Dear Justice Berry:

On Saturday, April 21, 2007, two days after the verdict in the above-referenced matter, the District Attorney of Kings County, Charles J. Hynes, was quoted in the *New York Times*, in an article captioned "Key Verdict Does Not End Corruption Inquiry,"saying that Mr. Garson [and Clarence Norman,] *"could show that cash payments to the Democratic Party secured seats on the bench."*

Mr. Hynes is further quoted saying that, *"Mr. Garson remains a potential source of information in the broader inquiry. I would hope over the weekend that he's going to be thinking about this. . . that he has a choice."*

An article published on the same date in the *New York Daily News* paraphrased Mr. Hynes' assertion that he would *"seek the maximum 15-year sentence against Garson, 75, if he doesn't fess up to which judges paid to get on the bench."*

Hon. Jeffrey G. Berry
May 2, 2007
Page 2

Again, on Monday, April 23, 2007, *The New York Law Journal* reported Mr. Hynes'
comments about Mr. Garson. He is quoted as saying *"the end game"* of his Office's four-
year probe into the buying and selling of judgeships is about to begin. *"Mr. Garson . .
. hold[s] the keys to proving allegations that candidates have had to pay $50,000 or more to
obtain judgeships, stories that have been around longer than you and me"*

*"[Clarence Norman and] Gerald Garson have information about the system that they
are concealing and their failure to reveal it has cast a pall of scandal over the honorable and
decent men and women who sit as judges in Kings County."*

Mr. Hynes is further quoted as saying that, at sentencing, he would request imposition
of the *"maximum term"* and concluded by saying that *"Mr. Garson should reflect upon what
he is facing – jail for the rest of his life,"* and then warning that *"[h]e should understand ,
we are serious."*[1]  (Copies of these articles are attached to this letter.)

Notwithstanding our confidence that this Court's exercise of its sentencing authority
will not be influenced by the District Attorney's unproven and unsupported extrajudicial
allegations[2] or by his desire to use the threat of an unduly harsh sentence to coerce a

---

[1] We were afforded an opportunity to respond to Mr. Hynes' comments after the author of
the article, Daniel Wise, advised us of Mr. Hynes' statement. As the article indicates, we said *"it
is unreal, unbelievable that a prosecutor like Hynes, with his reputation, would say I am going to
squeeze a defendant . . . [A] sentence is supposed to be individualized; it is supposed to fit the
crime,"* rather than be *"a sword to extract information."*

[2] In making these statements to the media, the District Attorney appears to have
disregarded the disciplinary rule providing that:

> A lawyer participating in or associated with a criminal or civil
> matter, or associated in a law firm or government agency with a
> lawyer participating in or associated with a criminal or civil matter,
> shall not make an extrajudicial statement that a reasonable person
> would expect to be disseminated by means of public
> communication if the lawyer knows or reasonably should know
> that it will have a substantial likelihood of materially prejudicing
> an adjudicative proceeding in that matter.

Code of Professional Responsibility, DR7-107(A).

Hon. Jeffrey G. Berry
May 2, 2007
Page 3

defendant to assist in investigations unrelated to his own case, our obligation to represent our
client compels us to respond – no less than if the District Attorney's statements were
communicated directly to the Court. We simply cannot stand silent as our adversary utilizes
the media in an effort to compromise our client's rights and influence the pending
sentencing.[3]

Accordingly, we are compelled to advise the Court that, contrary to Mr. Hynes'
assertions, Mr. Garson has no personal knowledge whatsoever regarding the purchasing of
judgeships. Following his arrest on March 12, 2003, Mr. Garson made an attempt, at the
urging of Kings County prosecutors, to assist in their corruption investigation by engaging
in a tape-recorded conversation with a target of their probe and, pursuant to their instructions,
making an inquiry regarding a fictitious office-seeker. As the tape of that conversation,
which we believe is in the custody of the District Attorney's Office, will no doubt confirm,
that attempt failed to garner evidence of the misconduct the District Attorney sought to
uncover. Thus, notwithstanding Mr. Hynes' inflammatory rhetoric and reckless threats, he
undoubtedly knows that his allegations about Mr. Garson's purported "concealment" of
information pertinent to a corruption inquiry are utterly unfounded.

Indeed, if Mr. Hynes' assertions concerning Mr. Garson's alleged "knowledge" about
the selling of judgeships actually had a basis in fact, his effort to inject those allegations into
the sentencing process would have to be seen as an unconscionable attempt to punish a
defendant for exercising his Fifth Amendment right to remain silent. *See Mitchell v. United
States*, 526 U.S. 314, 330 (1999)(the constitutional privilege against self-incrimination
prohibits drawing an inference against a defendant based on his silence at sentencing);
*United States v. Garcia*, 544 F.2d 681, 685 (3d Cir.1976)(vacating sentences where the lower
court predicated denial of leniency on the defendants' failure to assist in law enforcement
investigations, because penalizing defendants for refusing to waive their Fifth Amendment
privilege improperly placed a "price tag . . . on appellants' expectation of maximum
consideration at the bar of justice"). Moreover, if Mr. Hynes genuinely believed there was
any truth to the allegation that Mr. Garson knowledge of wrongdoing in the judicial selection
process, he would surely utilize the legitimate means at his disposal to seek such information:

---

[3]Confirming our sense of the outrageousness of Mr. Hynes' conduct, three different
Justices of the Supreme Court before whom I appeared in Kings County, New York County and
Bronx County during the week of April 23, 2007 – each of whom knew that I represented Gerald
Garson, but none of whom have any connection to Mr. Garson or his case – independently and
spontaneously expressed to me their bewilderment and shock at the threats communicated by Mr.
Hynes to the *Law Journal* and other media outlets.

Hon. Jeffrey G. Berry
May 2, 2007
Page 4

he would subpoena Garson to testify before a grand jury so that Garson could be compelled
to provide any information he had. He would also be expected to discuss the disclosure of
that information through direct communications with Garson's counsel, as representatives
of his Office did at the time of Garson's arrest on March 12, 2003.

In view of the District Attorney's failure to take such steps, but instead to make broad
allegations to the media about matters as to which Garson has never been charged, much less
convicted, his comments should be seen, at best, as grandstanding in order to portray himself
as a crusader against judicial corruption, and, at the same time, to provoke a public outcry
against Garson by making unsupported and misleading assertions about the nature and
significance of the present prosecution -- tactics that, unfortunately, have characterized the
approach Mr. Hynes' Office has pursued since the outset of its case against Mr. Garson . Mr.
Hynes' improper comments to the press also serve to intimidate lawyers, judges, and other
members of the public who, in the absence of a powerful public official's insinuation that
Mr. Garson is continuing to "conceal" information about judicial corruption, would be
prepared to submit letters in his support for the Court's consideration at sentencing.

At worst, Mr. Hynes' comments to the media may be seen as a misguided effort to
exploit the threat of lengthy incarceration as a means of inducing a defendant to provide the
"information" sought by the prosecutor whether or not that information has a basis in fact.
Particularly in light of the District Attorney's awareness of Mr. Garson's age and his health
concerns, the effort to accomplish the latter purpose by invoking the spectre of dying in jail
("jail for the rest of his life") not only offends standards of prosecutorial conduct, but goes
beyond the bounds of fundamental decency.

As counsel for a defendant facing sentencing, we should not be in the position of
having to respond to allegations that have not been presented to the Court and subjected to
its scrutiny, but that instead have been disseminated through the media. Because the District
Attorney has chosen to proceed in this backhanded manner, however, we have no choice but
to respond by declaring our client's unequivocal denial of the assertion that he is
"concealing" information, and by urging the Court to advise the prosecution that extrajudicial
efforts to influence the sentencing process, as well as to make the Court a party to coercing
assistance to a prosecutor's investigation, are inimical to the principles of justice that govern
proceedings in our courts, and will not be tolerated in this one.

Hon. Jeffrey G. Berry
May 2, 2007
Page 5

Respectfully,

Michael S. Washor
*Attorney for Defendant*
*Gerald Garson*

Jeremy Gutman
*Of Counsel*

cc.:  Hon. Charles J. Hynes
      *Kings County District Attorney*

      Michael Vecchione, Esq.
      Joseph Alexis, Esq.
      *Assistant District Attorneys*



Robert W. Dillon, M.D.
58 A East 79th Street
New York, New York 10021
Tel: (212) 794-9000
Fax: (212) 794-5149

August 7, 2006

Re: Gerald Garson

To Whom It May Concern:

Gerald Garson has been my patient for many years. He is being followed for significant
symptoms of benign prostatic hypertrophy. In January 2006 he was diagnosed with bladder
cancer. He underwent a transurethral resection of the cancer as well as a CT scan. Bladder
cancer requires interval (every 3 months) cystoscopy as well as repeat CT scans. On July 24,
2006 at cystoscopy he was found to have recurrent tumors in his bladder. This will require
another surgical procedure. In addition, I have recommended BCG instillation into the bladder.
BCG works on a cellular level in the bladder to augment the bladder's immune system. It is
given weekly for six weeks, then monthly for three months. BCG can give fever, chills and
potentially systemic tuberculosis since the drug is an attenuated tuberculosis bacillus. If the
treatments fail, Mr. Garson could require complete bladder removal. Additionally, bladder
cancer is associated with urothelial cancers of the ureter and/or kidney. This will require periodic
surveillance with CT scans, urinary cytologies, as well as cystoscopies. Complicating Mr.
Garson's treatment with BCG is his treatment for bullous pemphigoid with Imuran which
suppresses the bodies immune system making him more susceptible to infection.

It is my opinion that as a result of the ongoing treatment and potential serious complications, I do
not believe Mr. Garson will be able to stand trial for at least nine months.

Sincerely,

Robert W. Dillon, M.D.

Robert W. Dillon, M.D.
58 A East 79th Street
New York, New York 10021
Tel: (212) 794-9000
Fax: (212) 794-5149

September 21st, 2006

To Whom It May Concern:

Gerald Garson underwent a turbt on August 28th, 2006 for the removal of three transitional cell carcinomas of the bladder. Postoperativey he had bladder instillation of mitomycin c into the bladder. On September 26th, 2006 he will undergo bladder instillations of BCG, an immunotherapeutic agent, into the bladder.

Should you require further information, please feel free to contact me.

Sincerely,

Robert W. Dillon, M.D.

PHILIP J. WEINTRAUB, M.D., F.A.C.C.

INTERNAL MEDICINE AND CARDIOLOGY

781 PARK AVENUE
NEW YORK, NEW YORK 10021

TELEPHONE (212) 737-7115

FACSIMILE (212) 737-5489

August 9, 2006

To whom it may concern,

I am the coordinator of care and have been the cardiologist for Mr. Gerald Garson since 1994.

He has multiple medical problems.

Mr. Garson has recently been found to have a recurrence of malignant urothelial tumors which was first detected in January 2006. He will require immediate surgery to remove the tumors, but will also require additional therapy, in the form of either immunotherapy and/or chemotherapy.

The situation is complicated by the coincidence of atrial fibrillation which requires treatment with Coumadin to lower the risk of a stroke. Coumadin is a powerful blood thinner that must be meticulously monitored to maintain a therapeutic range. An excess of the drug can result in spontaneous bleeding and circulatory collapse.

Coumadin is metabolized by the liver and there are many other drugs which interfere with this metabolism. Therefore intense scrutiny of his level of anticoagulation will be especially necessary while he receives either chemotherapy or immunotherapy.

Further complicating the situation is a condition called bullous pemphigoid which was first discovered in 1996 and has responded favorably to an immunosuppressive agent called IMURAN. If Mr. Garson is treated with immunotherapy, he will receive sequential doses of BCG, which contains active mycobacterium tuberculi. Although this treatment is effective in preventing further local progression of the malignant tumors, it carries an increased risk of inducing disseminated tuberculosis, in an immunocompromised host, ( ie. Mr. Garson).

So, based on his immediate need for cancer surgery to be followed by either chemotherapy and or immunotherapy and the associated medical complexities that override Mr. Garson's care, it is my medical opinion that he is not medically able to stand trial at this time. It is unclear how he will respond to

treatment and therefore it is impossible to predict when he will be able to defend himself at trial.

The added stress induced from this confrontation with cancer is likely to be a major distraction for Mr. Garson. More importantly, I suspect that additional psychological stress during the manipulation of his immune status with the tuberculosis germ may negatively impact his response and therefore defeat the purpose of the therapy.

Mr. Garson will need close follow-up and is likely to require daily care from his medical team. My consultations with his oncologist and urologist lead me to believe that Mr. Garson will be unable to stand trial for approximately 9 months.

All this being considered, I remain open to any questions that the court may have and I am available for further updates.

Sincerely,

Philip J. Weintraub, M.D.

# Lynn H. Ratner, M.D., PLLC
# Dialecti Voudouris, M.D.

### Hematology, Oncology & Internal Medicine

112 East 83rd Street • New York, NY 10028
Tel. (212) 396-0400 • Fax (212) 396-9800

September 22, 2006

Re: Gerald Garson

To Whom It May Concern:

Mr. Gerald Garson is under my care for malignant bladder tumor as well as pemphigoid and atrial fibrillation.

Mr. Garson underwent surgical removal of three malignant tumors of the bladder on 8-28-06. He received treatment with Mitomycin C postoperatively and will begin a course of treatment with BCG instillation into the bladder during the week of 9-25-06.

Mr. Garson should not be exposed to stress and fatigue because of the underlying medical problems of pemphigoid, bladder cancer, atrial fibrillation and chronic anticoagulant therapy. He will require at least three different doctor's visits during each week of the coming months and additional rest and recuperation would be beneficial for his medical condition.

Sincerely,

Lynn H. Ratner, M.D.
LHR/l

# Lynn H. Ratner, M.D., PLLC
## Medical Oncology & Internal Medicine

112 East 83rd Street • New York, NY 10028
Tel. (212) 396-0400 • Fax (212) 396-9800

August 2, 2006

Re: Gerald P. Garson

To Whom It May Concern:

The following is a summary of Mr. Garson's status as of 8-2-06.  Mr. Garson has been my patient for many years.  He has been diagnosed in the past with the following conditions:  1) bullous pemphigoid; 2)  transitional cell carcinoma of the bladder, recurrent;  3) atrial fibrillation; 4) benign prostatic hypertrophy; 5) hypertension;  6) hypercholesterolemia.

In June of 2006 he was scheduled for a repeat cystoscopy of the bladder to follow his bladder cancer.  In addition, he was on the following medications:  Coumadin for the atrial fibrillation, Proscar for the benign prostatic hypertrophy, Prilosec for symptoms of chronic gastritis / ulcer disease, as well as Tagamet; and an immunosuppressive drug, Imuran , which he has been on for over six and a half years, to control the bullous pemphigoid.

The repeat cystoscopy indicated that there are new cancers within the bladder.  BCG instillations have been advised.  BCG is the form of tuberculosis vaccine that is used in the management of this condition to prevent spread of the disease and to forestall or avoid cystectomy, which is the removal of the bladder.  The BCG instillations, nonetheless, have to be undertaken with a great amount of care.  Because he is on an immunosuppressive drug, the danger of BCG systemic infection is great.  Consequently, I have advised Mr. Garson to go off the Imuran pending the consultation with Dr. Albert Lefkovits, the specialist in Dermatology for this condition.  The removal of the Imuran may produce some danger in that the bullous pemphigoid has a likelihood of returning.

In summary, then, Mr. Garson faces several important medical issues.  The first is the recurrent cancer of the bladder which has shown signs of progression within a short interval and which requires BCG instillations to be given monthly for six cycles after safety factors are established regarding the immunosuppressive drug that he has been taking, Imuran.  In addition, it is likely that the Coumadin dose for the atrial fibrillation will be more carefully monitored during this period.  The

Re: Gerald P. Garson
Page 2

pemphigoid may return and cause even more problems in the future. For all these
reasons, I believe that the complicated and sophisticated medical care necessary for
Mr. Garson should be considered in detail. I have reviewed these recommendations
extensively with his other physicians. It is therefore my considered opinion that
Mr. Garson would be unable to stand trial for at least nine months

If you have any questions regarding this, please feel free to contact me.

Sincerely,

Lynn H. Ratner, M.D.
LHR/fl

cc: Philip Weintraub, M.D.
791 Park Avenue
New York, NY 10021

cc: Robert Dillon, M.D.
58A East 79 Street
New York, NY 10021

cc: Albert M. Lefkovits, M.D.
1040 Park Avenue
New York, NY 10028

ALBERT M. LEFKOVITS, M.D., P.C.
SYLVIE KHORENIAN, M.D.
DOMINICK J. LIGRESTI, M.D.
HELEN SHIM, M.D.
1040 PARK AVENUE
NEW YORK, NEW YORK 10028

TEL: 212-861-9800     FAX: 212-875-8988

August 16, 2006

To Whom It May Concern:

Mr. Gerald Garson has been under my care for treatment of bullous pemphigoid since August 28, 1995. His problem, while recently under fairly good control, has been marked by frequent periods of remission and exacerbation. At the present time, he needs frequent follow-up care for monitoring of his condition and the course of treatment with Imuran, an immunosuppressive agent. His medical problems are greatly complicated by the fact that he is also suffering from recurrent cancer of the urothelial type, and at the present time has three visible tumors pre-operatively in his bladder.

The treatment for his recurrent bladder cancer includes BCG therapy. BCG is an attenuated form of tuberculosis, and under treatment with immunosuppressives, the patient can experience disseminated microbacterial infection. Together with his BCG therapy, he is receiving Mitomycin-C chemotherapy, which further increases his risk of complications.

Furthermore, with these medications, Mr. Garson is at considerable risk of developing a tuberculosis infection and of putting others at risk in a close environment. He is also at increased risk for other communicable illnesses. Additionally, he requires close monitoring for treatment of Imuran, Mitomycin, BCG and anticoagulants. (Treatment with immunosuppressive therapy is being held for thirty days to allow for more accurate pre-chemotherapy diagnostics. Anticoagulant therapy will be held for his bladder surgery. Biopsy of a suspicious skin lesion is scheduled for next week.)

His pemphigoid has demonstrably been exacerbated from time to time by acute stress.

If I can supply any further information, please do not hesitate to call upon me.

Sincerely,

Albert M. Lefkovits, M.D.

1

1   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF KINGS:  CRIMINAL TERM:   PART 6
2   ---------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,
3
                                        Indictment No.:
                  -against-            5332/2003
4                                       (Sentence)
    GERALD GARSON,
5
                        Defendant.
6   ---------------------------------------------X

7                                    -
                            Supreme Courthouse
8                           320 Jay Street
                            Brooklyn, New York 11201
9        -                  June 5, 2007

10
    B E F O R E:
11
                  THE HONORABLE JEFFREY G. BERRY, JUSTICE
12

13
    A P P E A R A N C E S:
14
                  HON. CHARLES J. HYNES, ESQ.
15                     District Attorney - Kings County
                       350 Jay Street
16                     Brooklyn, New York 11201
                  BY:  MICHAEL VECCHIONE, ESQ.
17                     JOSEPH ALEXIS, ESQ.
                       BRYAN WALLACE, ESQ.
18                     SETH LIEBERMAN, ESQ.
                       Assistant District Attorneys
19
                  MICHAEL WASHOR, ESQ.
20                     Attorney for the Defendant
                       233 Broadway
21                     New York, New York  10279
                  BY:  MICHAEL WASHOR, ESQ.
22                     JEREMY GUTMAN, ESQ.
                       MARIA GIORDANO, ESQ.
23                     NICHOLAS PINTO, ESQ.

24
                            MARLIN CASSIDY
25                          Senior Court Reporter

mc

Proceedings

51

1        First of all, for my former colleagues, of

2   which your Honor is one, I am profoundly sorry -- excuse

3   me -- for the public scrutiny visited upon the judiciary

4   as a whole as a result of my conduct.

5        Frankly, as I watched the surveillance tapes

6   during the trial, I was appalled, embarrassed and

7   ashamed at my demeanor and for that conduct I also wish

8   to apologize.

9        Secondly, what I have to say now is for my

10  family, my wife, my children and grandchildren and

11  friends.  Their love and support has sustained me these

12  past four years and I know that my own acts and

13  shortcomings have changed their lives forever.

14       I want you to know that, despite the tabloid

15  stories, I have never been accused of, charged or

16  convicted of fixing a case.  I have never decided a case

17  other than on the law and the facts.

18       I apologize to all of you for any pain that I

19  may have caused you.

20       Thank you.

21       THE COURT:  Thank you, sir.

22       This is a very difficult day.  It's a

23  difficult day for litigants.  It's a difficult day for

24  attorneys.  It's a very difficult day for justices of

25  our Supreme Court and judges throughout our state.

mc

Proceedings

.52

1      We live in an America that is freewheeling,

2    immersed in media coverage of everything, has

3    perceptions of people in public life, scrutinizes people

4    in public life, as they should, and many of the

5    statements that you said throughout the course of the

6    trial, when I would receive an update from my clerk,

7    Peter Montella, as to what the media was, just in case

8    something occurred that I felt that I had to admonish

9    the jurors about, even though I felt they fully and

10    completely followed my instructions, I could see that

11    there were some distortions put out there, but that

12    happens all the time.  That just happens in America.

13    That's one of constitutional freedoms, freedom of the

14    press.  It was litigated here.  All right.  And, if the

15    press makes mistakes, I always try to give everybody the

16    benefit of the doubt.  I always figure it was a mistake

17    as opposed to a purposeful misstatement.

18      But the fact is this case was brought on by

19    your client and by you, Gerald Garson.  You brought it

20    on.  You were elected to be a justice of the Supreme

21    Court, to be a justice of the Supreme Court, to be a

22    judge in any manner.

23      Your whole life changes when you become a

24    judge.  You shouldn't be going to bars, you shouldn't be

25    going to nightclubs, you shouldn't be out there doing

mc

Proceedings

1    things that maybe when we were attorneys we would at the

2    end of the day go because you gotta do something to pull

3    the plug and leave the steam, to go somewhere other than

4    home to your family who's got to put up with you.

5        So, not only does your professional and your

6    judicial conduct as a judge, must it be beyond reproach,

7    but even more importantly, your personal conduct as a

8    judge, it's gotta be -- you've got be as pure as driven

9    snow to the community.  You've gotta be -- not to be a

10   sexist -- but I guess like the Lone Ranger, all right.

11   You gotta be there for everybody, the lowest person in

12   the world, the most venal, terrible criminal in the

13   world, in your case, people in matrimonial matters.

14       I can think of no more difficult case to

15   preside over than a matrimonial case.  I presided over

16   serial killers, hatchet murders of parents and

17   disfiguring a mother, men who smothered sons, blew his

18   wife's brain out, persons who killed a woman in a chair

19   that her family just set up for her in the side utility

20   room of a house so that she could be with them in her

21   last days.  All types of really terrible murderers,

22   rapists, robbers.  I presided over medical malpractice

23   trials, terrible trials, so sometimes if a physician

24   will just make a mistake, will blow it, and we find that

25   they haven't maintained the standard of care that-is

Proceedings

54

1    expected of that physician practicing that specific type

2    of expertise in our community, and it's gotta be

3    resolved, it's gotta be decided by our juries, whether

4    or not the person who's been hurt by that should be

5    compensated by them.

6            I preside over drug treatment court where I

7    see people who come into me, alcoholics, drug addicted,

8    just terrorize their whole family, destroyed them, and

9    we give them a chance to make it.  Many of them make it,

10   sometimes they don't, I've gotta throw the book at them,

11   send them away.

12           And I do my regular job that I got elected to

13   do, that is presiding day in and day out on trials that

14   affect the People of Orange County.

15           I've always felt that to be a judge, and I

16   come from a very poor family, seven kids, I was the

17   baby, I was spoiled, I got to go to private Catholic

18   school, but my parents really couldn't afford it.  It

19   was the good Sisters of St. Dominick and Bishop Dunn

20   (phonetic) who were good enough to look the other way

21   when we had no money to pay for it.  And I looked at

22   growing up and someday becoming a teacher, which I did

23   for a while, a basketball coach, an attorney, and

24   eventually a city court judge for a number of years, and

25   then for the last almost 17 years as a county court and

mc

Proceedings

55

1    acting Supreme Court justice in our state, in your

2    state.

3         I love the people here.  I love the people in

4    Brooklyn.  I took this on thinking this is going to be

5    some torturous thing that I shouldn't have taken this

6    assignment, shouldn't have taken this.  I wound up in

7    Brooklyn, which is like the United Nations, Brooklyn,

8    this great place to live.

9         I had a Maori chief's niece call me up out of

10   the blue, Elizabeth, I won't give her last name, and she

11   said, my Uncle John told me I must look you up, another

12   judge who is a colleague of mine, whom I gave my address

13   to.  I used to stay with these people, fish with them

14   and socialize with them throughout New Zealand, had a

15   great time with these lovely people.

16        And I was coming down to pick her up in my

17   lovely Saab of 15 years and it broke down.  First time

18   ever I had a terrible thing like that happen and I had

19   to be towed to Newburgh, get my Ford Explorer and drive

20   back and it was too late to bring her to Orange County

21   to my colleague's home, beautiful home on a lake.  I

22   asked instead, what have you not seen in New York?  She

23   didn't go out and see the Battery.  She didn't go out

24   and see the Statue of Liberty, didn't see the Brooklyn

25   Bridge. - She knew that many people have attempted to

mc

Proceedings

56

1      sell and some people, regrettably, tried to buy it in
2      the past.

3              She is a high school principal, lovely woman,
4      husband was on the Maori all black team, famous rugby
5      team.

6              And after we went to the Battery, after we
7      took her for photo ops, took her to 9/11 to the World
8      Trade Center area, to the new Tower of Freedom and
9      things, we still had someday light.  I said, you know
10     one of the greatest views you're ever going to see is a
11     view from the Brooklyn promenade.  I said, you are going
12     to love this.

13             I took her to the bridge, took her to the
14     promenade, took her to Atlantic, to Pacific, up
15     Flatbush.  I got lost.

16             Finally, I got her back and she said to me, we
17     always heard stories about Brooklyn and stuff but we
18     never understood that Brooklyn is such a beautiful place
19     and through all my travels, all my evening walks
20     throughout Brooklyn, I learned it.

21             My 81-year-old tennis partner, he's from
22     Brooklyn, from down in Bay Ridge.  He used to tell me
23     how beautiful this place was, how great it is, and this
24     is a superduper place.  He was right and I was so glad
25     to have come here.

Proceedings

1      People of Brooklyn deserved from you

2   intelligence, caring, someone who could have lived up to

3   the education which you've been able to receive in life.

4   You're not some bum.  You were a well-educated attorney,

5   went to Penn undergrad, Penn Law School, practiced law,

6   did a good job practicing law.

7      You made a mistake 30 or so years ago which I

8   had to rule out of the trial so the jury wouldn't hear

9   it because I wanted to be fair and impartial to you.  I

10   didn't want to be here as the District Attorney's hook

11   up on the bench.  And, I made a whole lot of other

12   rulings like that, too, that were fair to you.

13      Now, you may not agree with all my rulings.

14   In fact, you don't have to, and you shouldn't because,

15   quite obviously, you were a litigant.  The People were a

16   litigant.  It's not my job to make rulings that favor

17   one side or the other based on anything other than the

18   facts and the law in this case.

19      The vast majority of judges whom I have seen

20   throughout our state, and I have traveled this state

21   from Buffalo to Erie County to Suffolk, Clinton County,

22   Essex County, St. Lawrence County, Monroe County, all

23   the lower districts, all the whole region here,

24   presiding, going to conferences, being president of the

25   Judge's Association on Judicial Conference.

mc

Proceedings

1        The vast majority of these people, they're

2   honest, they're fair, hardworking, underpaid,

3   trustworthy judges, for the most part.  They accept this

4   public trust, this sacred trust that we get.  It's an

5   honor to be a judge.

6        When people talk to me, especially if I go

7   to schools or talk to children and stuff, why did you

8   become a judge, all right?  It always goes to the exact

9   same answer.  It is beyond all doubt in my mind the

10  most honorable thing I could do with my life.  I took

11  a big pay cut to be a judge, as most attorneys who

12  are successful in practicing law do, but we do it

13  because there's a much more important thing than me

14  in life, there's a much more important thing than

15  self-aggrandizement in life, there is a much more

16  important thing than being set up in life.  And that

17  is, that all the people around you need you.

18        All the people who come to a court system,

19  they want to have that judge up there who's pure as the

20  driven snow.

21        Now, it's not easy to be a judge.  How many of

22  my colleagues do I see who really have great

23  difficulties with it?

24        One of my favorite judges I used to try cases

25  in front of, Dick Duranco, God rest his soul, was killed

mc

Proceedings

1     by the father of a litigant, shot to death in his home

2     in New Rochelle, has to be now more than probably 13 or

3     14 years ago, because he made a decision in the case

4     which was very, very unpopular to the plaintiff.  He had

5     been one of your supervising judges.  He was such a kind

6     man.  He was such a great family man.

7            He told me the first night he came home from

8     being a county court judge in Westchester County he

9     cried because he realized just how important, what a

10    grave responsibility he had to take on, to be a fair

11    judge, to be an impartial judge, to be an honest judge,

12    to be a judge for all the people because that is what

13    a judge is supposed to be.  This is our system in

14    America.

15           We may not have a perfect system in this

16    country, and I think we are all realistic enough to

17    understand that that's the way it is, but we sure as

18    hell have the greatest system this world ever seen.

19           When I argue with my friends from the

20    eastern -- former Eastern Block countries about how they

21    had no idea of a jury trial system there, I always tell

22    them it's a system where the people, the people from the

23    community, they get to decide what is going on.

24    However, so they don't get astray, we have a judge and

25    the judge makes sure that trial's fair and that it's

mc

Proceedings

1   impartial, proceeding so that the evidence that these

2   jurors get to hear is evidence that's proper and

3   admissible under our law.

4          In a matrimonial case we don't have a jury.

5   We depend upon a person, a man or a woman, to stand up

6   there, to stand tall, to stand tall for the poor people,

7   to stand tall for the immigrants, to stand tall for men

8   and women alike, to take themselves out of that

9   enjoyable life that they've had, and to kind of cloister

10  yourself.

11         It's not really a lot of fun when some friends

12  say, let's go down to the riverfront or let's go over

13  there.  I'm not going there.  Why?  Well, because this

14  person, that person, that person, about you know ten or

15  so people that I may have presided over the case in the

16  past or have come before me or something or they might

17  be selling cocaine or something that's going on down

18  there, I just don't think it's -- a judge should be

19  there, period.

20         Most of our judges, the vast majority of our

21  judges, perform their duties seriously, with dignity,

22  with integrity and with honesty.

23         Now, you were right when you said your conduct

24  caused and your demeanor often caused scrutiny to our

25  profession.  Goodness, it was all over the media.  It's

Proceedings

1    on TV, everyone got to see, which eventually the jury

2    got to see, and they found you guilty of bribe receiving

3    in the third degree, receiving reward for official

4    misconduct in the second degree.  It was loud and clear

5    what they got to see during the trial.

6            However, every cloud has a silver lining.  I

7    firmly believe that.

8            The scrutiny that you've brought to our

9    profession, it's had an ameliorative effect on our

10   profession, as Mr. Washor said extremely well.  It's in

11   every one of our handouts.  It's in everything that we

12   hear at our judicial seminars.  It's what our young

13   judges hear, my mentor or mentees whom I speak with.

14           And while it's sad that happened to you,

15   someone, who as Mr. Washor read that one decision, did

16   make a courageous decision against a very unfair thing

17   that was happening to women who were of a certain Jewish

18   faith where they couldn't get a get and because of that

19   they couldn't remarry, they couldn't go out, they

20   couldn't keep on living their lives.  You made a bright,

21   solid decision.

22           Why didn't you just keep on making bright,

23   solid decisions?  Why didn't you run your life with a

24   bright, solid decision?  Why didn't you tell Siminovsky

25   to go take a hike?  You're a bright man.  You had to

mc

62

## Proceedings

1    know what he was doing to you.  You couldn't have been

2    blinded by it.  You couldn't have been a successful

3    practitioner in the law for over 30 years and not have

4    known what was going down.

5            You were drinking, maybe too much, in excess.

6    That could have clouded it a little bit.

7            A number of years ago we had a real problem in

8    the Catholic church.  We still have a problem there.  Me

9    being a Catholic, I can talk about it.

10           We had a lot of priests who were not being

11   priests, they were doing terrible things to children and

12   to other people.

13           Cardinal O'Connor asked me to speak to some

14   priests and I went down thinking I was going to speak to

15   30 priests, I saw about 600 or 700, at Dunwoody

16   Seminary, and I was kind of lost for words.  How am I

17   going to speak to all these people that I believe,

18   although I've come to learn differently having presided

19   over some cases involving priests who molested children,

20   sexually abused them, that priests were like the Lone

21   Ranger.  In my eyes they were supposed to be pure as the

22   driven snow.  When we as Catholics, we go to them to

23   forgive our sins, well, I am not going to a criminal to

24   forgive my sins, but you know, that is what we believe.

25   Once again I looked back at all our priests.  Now I

mc

Proceedings

realize that that cloud had a silver lining because,
quite obviously, we managed to get the people who
shouldn't be there out of there and hopefully the people
we will have in the priesthood will be good priests for
all.

Gerald Garson, a judge, and you know this, you
are an intelligent person, a very intelligent person.

Well, it's not easy to be a judge.  A judge
must be honest, sincere, trustworthy.  A judge has to be
fair and impartial.  Our feelings about something, they
go out the window because if we let our feelings take
over, then a lot of times you're not fair and
understanding and impartial.  We're not the person that
we are supposed to be.

Many times I'm asked to administer an oath of
office to a young judge when they come in.  I do it.
They come, and the first thing I wish that judge is that
they go back to read the bible and see what the wisest
man in the bible and our God, if he was going to give
them anything, because he was such a great king,
Solomon, what did he ask for?  He asked for an
understanding heart so he could understand all his
people and be the king to those people.  And I always
tell a judge when I swear them in, may God bless you
with the blessing of Solomon to have that understanding

64

Proceedings

1    heart.

2          Now, at times you had that understanding

3    heart. At times it's obvious when you did preside in

4    the Supreme Court for Kings County you presided as a

5    real justice of the Supreme Court and I don't know what

6    went wrong, but it started to spiral down, kept on

7    spiraling down.

8          One of the worst things I heard during the

9    trial was that time when Sigal Levi, who really had a

10   bad feeling about everything, quite possibly because her

11   husband, Avraham Levi, had told her that he got to the

12   judge, or words to that effect. She testifies on the

13   witness stand I don't know how many days and he's not

14   even there testifying for one day.

15         Well, correct me if I am wrong, I guess even

16   Jewish women have chutzpa or something, right, and she

17   says to her lawyer, who conveys it to you, or to the law_

18   guardian, I forget whom conveyed it, that she's got

19   friends in the media and she is going to go to the media

20   because this is wrong, this is bad, what's happening to

21   her. She had a gut instinct, as Mr. Vecchione has said,

22   that she was in trouble from the get-go.

23         And instead of being a good judge, if this

24   wasn't the situation, bringing the people into the

25   courtroom and putting on the record that, you know, it's

Proceedings

65

1      not the length of time that people testify that

2      affects my decision in a case but it's the quality of

3      the testimony, it's the believability of the testimony,

4      it's the genuineness of that testimony and it's the

5      facts.  We all know as lawyers we win the winners and

6      we lose the losers.  I don't think the general public

7      really appreciates that, but that's truly how it goes

8      in law.

9            We know way ahead of time what's going to

10     happen in a case.  We have a pretty good idea.

11     Sometimes we have real horse races, sometimes they're

12     real close cases.  They're the ones that usually get

13     litigated and they are the ones that we're not sure

14     exactly how they are going to come out.  But for the

15     most part the winners are won and the losers are lost.

16           Besides having that understanding, a judge

17     has to have compassion for everyone, compassion for

18     all.

19           I was embarrassed for you talking about the

20     Russians, talking about the Israelis.  It wasn't the way

21     a judge is supposed to sit up there and preside.

22           I was told -- I didn't witness it 'cause I

23     come the side way when I come from the hotel, and once

24     in a while I come through the front door just to keep

25     the court officers on their toes, but I never faked them

mc

1   out, they always knew where I was anyway but -- and

2   there were people, masses of people out there, a lot of

3   people, women who felt that you've really offended them,

4   you've hurt them.  You've caused them great

5   difficulties.

6        Now, a lot of them may just be throwing this

7   on your shoulders and maybe not rightfully so, but they

8   felt that this matrimonial part that you ran, and they

9   personally feel, for the most part, all matrimonial

10  parts are slanted or maybe they're not getting their

11  fair justice.

12       Matrimonial cases are terribly charged with

13  emotion.  People can't think straight half the time in

14  them.  They're fighting for their children, they're

15  fighting for their future, they are fighting to stay in

16  a house until the kids get old enough to go to college,

17  they are fighting for money from a spouse, they are

18  fighting in a system that for many, many years until we

19  did come up with equitable distribution, things like

20  that, those very much slanted against women.  We have

21  been able to bring some equity to that system.  We have

22  been able, with financial disclosure and things like

23  that, to bring to women litigants a more positive

24  experience in one of the most impossible situations in

25  the world, a divorce case, a child custody case.  It's

1    why I told you I won't preside over them.

2         A judge has to be hardworking, open-minded.  A

3    judge has to really want to do what's right, and that

4    day when you blasted Sigal Levi, that was -- that was

5    the worst:  Don't threaten me.

6         You were a justice at that time of the Supreme

7    Court.  You controlled it all.  If you're fair, if

8    you're controlled, if you're kind, if you're

9    compassionate, if you're understanding to a litigant,

10   you don't have to say those words to that litigant.

11   Even if the litigant's wrong in what they are perceiving

12   up there, if you talk to them, if you try to convey to

13   them that there's a sense of justice that is going to

14   prevail in this case, I don't think we need to threaten

15   them.  You gotta be concerned about the welfare of

16   litigants.  You gotta be concerned about the legal

17   community, our legal community.

18        When I act as a judge, I think of all my

19   colleagues.  I don't want to embarrass them, let alone

20   embarrass myself or my family or what is left of them

21   who are still alive.  I don't think you ever thought

22   about your wife, your kids, anybody like that.

23        You're with this guy, Siminovsky, and he was

24   going to take you for all you're worth, and you let him.

25   You abdicated your judicial responsibility, you

Proceedings

68

1    abdicated your own moral fiber.

2         Where was the Jerry Garson who stood up for

3    the woman to make sure she got the get?

4         People have to understand that when you serve

5    society as a justice of the Supreme Court, it's a

6    privilege, it's a noble and it's an extremely important

7    contribution to everybody in our society.  You had that

8    privilege to do it and while you started out fine, you

9    didn't end up very well.

10         Mr. Vecchione's not the first District

11    Attorney or Assistant District Attorney to come before

12    me at the conclusion of a trial and ask me to throw

13    the book at somebody, and he's not going to be the

14    last one.  The People have an obligation to prosecute

15    cases rigorously, and they did.  They worked hard on

16    this case.  They developed a very big case, a very

17    powerful case against you.  The jury has spoken.  It

18    was a very fair jury in composition, they were very

19    fair in how they looked at the facts of this case and

20    applied the law to it.  They reached a verdict which I

21    would not set aside because I agreed with the verdict

22    of guilty on those three counts that I must sentence

23    you today on.

24         You're an ill man, I understand that.  A lot

25    of your illness you brought on yourself.  You know that.

mc

Proceedings

1    I know that.  Your loved ones know that.

2        A whole bunch of people, a whole lot of people

3    sent really great letters in your behalf, but none of

4    those people were in your courtroom, all right, seeing

5    what occurred when it came to the Levi versus Levi

6    matter.  They weren't in your chambers when they saw --

7    when Siminovsky came in with the thousand dollars and

8    the Caputo/Aiello matter as a, quote, referral fee.

9    They didn't see the American Express bills.  They didn't

10   hear the testimony of Siminovsky as to just the items,

11   all the meals he put on his American Express card in

12   suckering you to go down his highway of deception and

13   wrongdoing.  He's an attorney duly admitted to practice

14   law.  Did you hear what he said:  I've got Garson, I got

15   him drunk, he'll do whatever the hell I want him to.

16   Maybe he didn't use the word "hell," all right.  I think

17   he cleaned it up.

18        It's terrible.  What you brought upon yourself

19   is terrible.  You didn't bring the cancer on yourself.

20   You didn't bring the heart disease on yourself, unless

21   you were a big smoker and drinker, that might have

22   helped contribute.  You did bring your alcoholism on

23   yourself and you did it probably at the worse time of

24   your life that you could bring it on someone.

25        You're probably saying to yourself, or

mc

1    you'll say when you're finished with these proceedings

2    now, that snot, that wise ass Berry, he is just

3    preaching to me, all right.  Well, I hope you're not,

4    all right.

5         You are going to be 75 years old soon.  I'm

6    15 years your younger.  I got this assignment when I

7    was 57.  I just turned 60 last month.  I really didn't

8    want to do it, but my -- Judge Traficante was leaving

9    in a month and Joan said, Jeff, I leaned on you for a

10   lot of things, I really need you to go to Brooklyn to

11   do this and I came down and asked Mr. Washor his

12   intention, that all these cases go forward.  Well,

13   they did go forward, but I think if we go back to the

14   minute when Mr. Hynes stood up and said we are ready

15   to start our first trial, of Sarnell and Salerno in

16   September and Elmann at the time because they were

17   linked together, and told him I was ready to start next

18   week, this was in the beginning of June, and ready to

19   go with your case then and that caused a lot of big

20   gulps because, quite obviously, that is the way I know

21   how to be a judge.

22        This is one frustrating experience of putting

23   up with my life as a judge to wait and wait and wait for

24   your case to be tried.

25        Now, I suppose I could follow the People's

Proceedings

1    lead today, and they really want me to hammer you.

2         Mr. Washor's right in what he said, if this

3    was anybody else, this would be a case where this Court

4    would be considering a probationary sentence, all right.

5    To a certain degree he's correct.

6         I believe it was the Karen Foundation where

7    they wanted you to go, maybe it was a different one that

8    my mind strikes me as to what was written, and let you

9    go there and detox yourself before you go to state's

10   prison.  I told Mr. Washor I was not going to grant an

11   adjournment of this sentence to let you go there, nor

12   was I going to admonish you and require that a condition

13   of your ROR release is that you go there.

14        You're a grown man and you still refuse to act

15   like this intelligent person who is very well educated,

16   ran a very successful law practice, been a good father

17   to his children, still refused to accept these things,

18   and I do not understand it.

19        I don't mind too often when I don't

20   understand, even though it's a terrible thing when a

21   rapist commits a rape, when the robber commits a

22   robbery, when a murderer commits a murder because

23   sometimes we get inside that brain and figure that out.

24   But when I see someone like you, who is really

25   intelligent, really intelligent, not just some nobody

Proceedings

1    out there, but a highly educated, highly experienced

2    professional, who's had tragedy in his life, personal --

3    and the people around him, raised a child with special

4    difficulties, who was there as a loving parent for them,

5    where in the world did you cease having the love for

6    your family and your friends and stuff like that for all

7    the other people?  Why in the world did it occur?

8             They're out there picketing in the back, they

9    are in the courtroom wanting me to hang you as high as

10   they can from the rafters because you really upset a lot

11   of people, because the perception that you gave these

12   people was that justice was being bought, whether it's

13   correct or not, whether some of Mr. Vecchione's

14   statements might not be exactly the situation or what

15   was submitted by them in a press release or was not

16   taken correctly by the press, I don't know what the

17   situation is, but when Mr. Washor says something to me

18   or the other members of your attorney team, and when Mr.

19   Vecchione or anyone else in the D.A.'s office says

20   something to me, I take it for gospel because I know

21   they are not going to say something to me that's not up

22   front and truthful, at least they're not going to say it

23   more than once to me and then have the big hammer come

24   down on them, all right.  And all good lawyers, and this

25   trial was a fair proceeding.

Proceedings

1       Now, I never observed your alcoholic

2   difficulties.

3       There were many times when you walked three or

4   four feet from me during the day.  I always thought you

5   were on top of everything.  You were aiding in your

6   defense.  You were talking to your attorney.  You were

7   giving him notes.

8       There was a lot of notes given back and forth

9   on that defense table.  Maria was the number one note

10  taker as far as going back and forth and getting the

11  computer going.  I don't think that had any affect on

12  your trial.  I don't know if counsel was trying to make

13  that allegation.

14      But the fact is, Gerald Garson, you got my

15  empathy.  You got empathy as far as your personal

16  losses, your tragic losses, your illness, but so does

17  the whole rest of the judiciary of the State of New

18  York, they have my empathy.  They have my sympathy.  The

19  ones presiding down here in Brooklyn really have my

20  sympathy, especially the ones in the matrimonial part

21  have my sympathy because a perception has gone out

22  because of you, whether you've done it or not, the

23  perception has gone out, and in one case I believe it

24  was rigged against Sigal Levi.

25      You were telling him what to write in his

Proceedings

1    memorandum, you were telling Siminovsky how to have the

2    expert come in who was incapable of giving an expert

3    opinion as to the value of her business and you were

4    still going to let this guy promote in court incompetent

5    evidence, improper evidence.  Even I know, and I am not

6    a matrimonial justice presiding in a matrimonial part,

7    that that's not something that could come in.

8        That distorted view is what upsets me.

9    Instead of being the person up there saying Siminovsky,

10   give it up, you don't have it, you're not going to get

11   it, all the drinks, all the dinners, all the lunches,

12   they're not going to Jerry Garson and cause him to go

13   across the road.  I'm telling you right now, that's it,

14   now get out of here and don't overstep our friendship.

15   Well, he overstepped that friendship and you suckered

16   into it, you let him do it to you.

17       I gotta impose sentence and probably you're

18   all tired of listening to me anyway.  I know that when

19   Victor Barron pled guilty, I believe the judge gave him

20   three to nine years in state's prison.  I believe that's

21   on a plea agreement, though.  I believe a lot of money

22   was charged with being taken.  It was terrible conduct

23   that he was doing, downright dishonest conduct.  I don't

24   think alcoholism had any part of it, and he went to

25   state's prison.

75

Proceedings

1    People want me to place you in state's prison.

2    I have to look at all my colleagues, look at

3    the People of Brooklyn.  I gotta look at the people of

4    New York State.  I gotta look at all of them, and most

5    of all I gotta look at myself.

6    Every morning when I get up I say a really

7    easy prayer.  I say, God let me do what's right, not in

8    the world's eyes, not in the press' eyes, not in all the

9    people's eyes but what is right in your eyes.  As long

10    as I can fulfill that creed, as long as I can fulfill

11    that, then I will be a good judge because in the end

12    it's not what some editor writes about me, whether I'm

13    the most popular person in the world, it's not whether I

14    am a good guy, all that is transient, it's going to fade

15    away.  Some people might remember you, most won't, but

16    the fact is I have to live with myself and I have to

17    bear along with all my colleagues and your former

18    colleagues, the stigma that was caused by what you did,

19    that justice could be bought in Brooklyn.

20    And like I said, much of what was charged

21    against you, the jury decided you were not guilty beyond

22    a reasonable doubt of committing all these referral fee

23    crimes, but they felt that you were taking bribes, they

24    felt that you did render legal advice in coaching

25    Siminovsky how.  Could they not, hearing those phone

mc

Proceedings

76

1    conversations, the wires, all this stuff going on.

2          Peter, correct me if I am wrong, I think I

3    have got it, the conviction worded correctly here.

4          As to the first count of the consolidated

5    indictments, which was bribe receiving in the third

6    degree -- everybody on board?

7          MR. VECCHIONE:- Yes, sir.

8          THE COURT:  A class D felony, it will be

9    the judgment and the sentence of the Court that the

10   defendant will be committed to the custody and to the

11   care of the Department of Corrections of the State of

12   New York to serve an indeterminate sentence.  The

13   maximum period will be four years in state's prison,

14   one year in state's prison, minimum.

15         THE CLERK:  One to --

16         THE COURT:  One.

17         As to the third count of the indictment,

18   receiving reward for official misconduct in the second

19   degree, it will be the judgment and the sentence of

20   the Court that the defendant will be committed to the

21   custody and the care of the Department of Corrections

22   of the State of New York to serve the indeterminate

23   period of incarceration.  The maximum period will be

24   three years in the state's prison, the minimum period

25   will be one year in state's prison.  The sentence

77

Proceedings

1    will run consecutive to the sentence previously

2    imposed.

3                As to the eighth count of the indictment,

4    receiving reward for official misconduct, it will be the

5    judgment and the sentence of the Court that the

6    defendant will be committed to the custody and to the

7    care of the Department of Corrections of the State of

8    New York to serve an indeterminate period of

9    incarceration.  The maximum period will be three years

10   in state's prison, the minimum period will be one year

11   in state's prison.  This sentence will run consecutive

12   to the previous two sentences imposed by this Court, it

13   being the intent of the Court that the entire sentence,

14   that accumulation will be -- amount to three to ten

15   years indeterminate state's prison incarceration.

16               I am mandating that the Department of

17   Corrections or the local corrections department for the

18   City of New York, if you will be in their care first,

19   give you an immediate physical, review every medical

20   report that's been written and submitted to the Court

21   that will be appended and any other report that you wish

22   to have submitted to them by a physician.  That they

23   further receive any medications that you're taking, and

24   I am mandating that they receive them along with a

25   prescription from the physician telling them how they

mc

Proceedings

1    should be administered to you so that you'll have your

2    medication while you're there.

3          Regrettably, in life I've had to sentence

4    people who were older, who were sickly, to state's

5    prison.  I'm fully confident that our state's prison

6    people will provide you with proper medical care.

7          I note that your dad was 92, your mom was 80,

8    so you have a long life in your family.

9          The reason why I've given you a sentence of

10   up to ten years state's prison incarceration is that I

11   believe that the Department of Parole, they can have

12   you do a lot of constructive things while you are on

13   patrol -- parole.  Furthermore, while you're in

14   state's prison, you can do a lot of constructive

15   things.

16         I once participated in a program in state's

17   prison, these were with lifers and people convicted of

18   violent felonies.  Isn't it about time you took

19   responsibility for the harm you have done, Gerald

20   Garson?  Isn't it time you took responsibility for what

21   you have done to the litigants of Brooklyn county,

22   whether it was your fault in doing it or whether it's

23   the perception that these people have had to live with,

24   have had to think that, golly, we can get to these

25   judges, we can bribe them, money talks?

Proceedings

1        They're wrong perceptions, they are terrible

2    perceptions, and yet these people in this county,

3    because of your deeds and because of what has been

4    broadcasted to them, many of them have that

5    perception.

6        You must pay a crime victim's fee and

7    surcharge.   You must -- you can pay ahead of time or it

8    can be taken from your commissary funds while you're

9    incarcerated in state's prison.

10        I probably got about two hours sleep last

11    night trying to decide what in the world sentence would

12    I be imposing here today.   I probably won't get any

13    sleep tonight.   It's not with relish, it is not with

14    glee, it is not in any manner a happy day for me.   I

15    just trust that when we leave here today you understand

16    the litigants of Kings County and the citizens of Kings

17    County, the people that felt how badly they were wronged

18    understand, because I have understood this my whole

19    life, that when you get something as precious, as

20    important as a judgeship, that you stand up and be tall,

21    you be that judge, you be that proper person.

22        While you're in state's prison there will be

23    plenty of people you can actually help.   You know what,

24    I'm confident that you will help these people while

25    you're there.

mc

80

Proceedings

1          The above constitutes the judgment and

2     sentence of the Court.

3          These proceedings --

4          I'm sorry, Mr. Washor, go ahead.

5          MR. WASHOR:  No, no, when you're complete.

6          THE COURT:  These proceedings are now

7     completed.

8          MR. WASHOR:  Judge, --

9          COURT OFFICER:  Remain seated.

10          THE COURT:  Let the record reflect your right

11     to appeal, sir.

12          THE CLERK:  Mr. Garson, you have the right to

13     appeal the sentence just imposed upon you by filing a

14     notice of appeal within 30 days from today with a

15     duplicate copy to the Clerk of this Court.  A similar

16     notice must be served to the District Attorney in Kings

17     County.  If you cannot afford to retain counsel, you may

18     apply to the Appellate Division Second Department on

19     Monroe place in Brooklyn and ask for a lawyer to be

20     appointed to you for the purpose of prosecuting your

21     appeal.

22          MR. WASHOR:  Judge, two things.

23          THE COURT:  Yes, sir.

24          MR. WASHOR:  The commitment order, that

25     becomes very important because of his health.

mc

Proceedings

1          THE COURT:  I understand.

2          MR. WASHOR:  Can we have the medical reports

3     appended to the commitment record?

4          THE COURT:  Yes.

5          MR. WASHOR:  That gives --

6          THE COURT:  You have no objection to any of

7     this?

8          MR. VECCHIONE:  No, sir.

9          MR. WASHOR:  That gives a list of all the

10    medication.

11         THE COURT:  Yes.

12         MR. WASHOR:  And all the reports.

13         THE COURT:  Yes.

14         MR. WASHOR:  And the medications.  We have

15    medications but I don't know how we could get them to

16    him.  I know he can't take it in with him.

17         THE COURT:  He can put them in a baggy.

18    Captain Magliano, put them in a baggy.

19         Does he have on the medications when they're

20    to be administered and taken?

21         MR. WASHOR:  Yes.

22         THE COURT:  They can be taken to the

23    Corrections people, which I will be more than happy to

24    provide the on-duty person who is going to run whatever

25    Corrections facility he is going to today, to give them

mc

Proceedings

82

1    my home number.  If that person has an inability to

2    understand what my directive was, at that time I would

3    be more than happy to explain it to them, if they want

4    to call me at home about that, but I want him to take

5    his medication.

6         MR. WASHOR:  Judge, the prognostication of

7    time that it would have taken to complete the sentence

8    was way off by all parties, quite obviously, and we're

9    now placed in the position where I don't know that we

10   can make certain applications in the Appellate

11   Division.

12        THE COURT:  Well, you still have 35 minutes to

13   get over there.

14        MR. WASHOR:  No, we don't.  We have ten

15   minutes.

16        MR. GUTMAN:  We were told we have to 4:30.

17        THE COURT:  I think if you call them from here

18   and just tell them that I got a little delayed, there is

19   no doubt in my mind whomever is presiding at the

20   Appellate Division is enough of a person, is enough of a

21   jurist to stay there until they at least hear your

22   application for temporary stay.  I have no idea who it

23   is who is going to hear this.  All right.

24        Is there any other application?

25        MR. WASHOR:  No.

mc

Proceedings

1    THE COURT:  All right, then we'll stand

2    adjourned.

3    I can only say to the attorneys, thank you all

4    for the way you cooperated with me throughout this

5    proceeding.

6    MR. VECCHIONE:  Thank you.

7    ********************************

8    CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF
     THE ORIGINAL STENOGRAPHIC MINUTES TAKEN OF THIS
     PROCEEDING.

9

10

11

12

13    _____
      MARLIN CASSIDY
      Senior Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25